# Exhibit 1

CONTRACT OF SALE
(7.38 acres, more or less, Parcels A and B, Baltimore, Maryland)

THIS CONTRACT OF SALE (the "Contract") is made and entered into by and between CAPITAL DEVELOPMENT, LLC, a Maryland limited liability company (hereinafter referred to as "Seller"), and JLB REALTY LLC, a Texas limited liability company (hereinafter referred to as "Purchaser"). Seller and Purchaser are sometimes collectively referred to herein as the "Parties" and each of the Parties is sometimes singularly referred to herein as a "Party".

1.    Contract of Purchase and Sale. Upon the terms and conditions hereinafter stated, Seller hereby agrees to sell and convey to Purchaser good and marketable title to a tract of land containing approximately 7.38 acres situated in the City of Baltimore (the "City"), Maryland, an approximate description of which is set forth on Exhibit "A" attached hereto and incorporated herein by this reference for all purposes (the "Land"), together with (a) all benefits, privileges, tenements, hereditaments, rights and appurtenances thereon or pertaining to such real property, (b) rights or use of the trade name or names owned by Seller in connection with or relating to the Land, and (c) all easements which benefit the Land (the foregoing is collectively referred to herein as the "Property"), and Purchaser agrees to purchase the Property at the Purchase Price and upon the terms set forth herein. The metes and bounds description contained in the Survey shall be substituted for Exhibit "A" and shall become a part of this Contract as the description of the Land to be conveyed hereunder.

2.    Purchase Price. The purchase price (the "Purchase Price") for the Property shall be approximately TWENTY MILLION FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($20,400,000.00). Notwithstanding the foregoing, if, under Approvals (hereinafter defined) which are final, unappealable and in effect as of the Closing: (a) the maximum number of multifamily residential apartment units (each, a "Unit") which may be constructed on the Land is more or less than 444 Units, taking into consideration applicable height, set back, landscaping, open space and right of way requirements, the Purchase Price shall be adjusted by the sum of $45,000.00 times the amount by which 444 exceeds or is less than the number of Units which may be constructed on the Land (but the Purchase Price shall not be adjusted by more than $855,000.00 if the permitted number of Units shall be 425 or less; however, in such event, Purchaser shall be entitled to terminate this Contract, in which event, all Earnest Money shall be returned to Purchaser); and (b) the maximum retail floor area which may be constructed on the Land (the "Allowable Retail Floor Area") is less than 10,000 square feet, taking into consideration applicable height, set back, landscaping, open space and right of way requirements, the Purchase Price shall be reduced by the sum of $40.00 times the amount by which 10,000 exceeds the Allowable Retail Floor Area. The Purchase Price may be subject to reduction as provided in Section 7.f.ii. below. The Purchase Price shall be payable in cash at Closing.

EXHIBIT

1

PENGAD-Bayonne, N. J.

3.    Earnest Money.

    a.    Initial Earnest Money.

        Within three (3) business days following Purchaser's receipt of a copy of this Contract executed by Seller, Purchaser shall deposit with Commercial Settlement Services, LLC (hereinafter referred to as the "Title Company"), earnest money in the amount of $500,000.00 (the "Initial Earnest Money"). If Purchaser fails to timely deposit the Initial Earnest Money with the Title Company, this Contract shall terminate, in which event the Parties shall have no further obligations hereunder.

    b.    Additional Earnest Money.  Within three (3) business days following the date of expiration of the Inspection Period (hereinafter defined), if Purchaser has not sooner terminated this Contract, Purchaser shall deposit with the Title Company additional earnest money in the amount of $500,000.00 (the "Additional Earnest Money").  If Purchaser fails to timely deposit the Initial Earnest Money with the Title Company, this Contract shall terminate, in which event the Initial Earnest Money, less the $50.00 independent consideration, shall be refunded to Purchaser and the Parties shall have no further obligations hereunder.

    c.    Earnest Money.  The Initial Earnest Money and the Additional Earnest Money (when it is deposited by Purchaser with the Title Company) are collectively and individually referred to herein as "Earnest Money".  All Earnest Money shall be deposited by the Title Company into an interest bearing account.  All interest earned on the Earnest Money shall belong to Purchaser and shall be disbursed to Purchaser upon request.  Notwithstanding the provisions of this Contract, $50.00 out of the Earnest Money shall in all respects be non-refundable to Purchaser and shall be paid to Seller as independent consideration for Seller's execution of this Contract.  The Earnest Money shall be applied to the Purchase Price at the Closing.  If, pursuant to any provision of this Contract, Purchaser is entitled to obtain a refund of the Earnest Money, the Title Company shall, without further authorization or instruction from Seller or Purchaser, return the Earnest Money to Purchaser. If, pursuant to any provision of this Contract, Seller is entitled to the Earnest Money, the Title Company shall, without further authorization or instruction from Seller or Purchaser, deliver the Earnest Money to Seller.

    d.    Release of Earnest Money From Escrow.  The Purchaser agrees to direct and authorize the Title Company to deliver to Seller a portion of the Earnest Money subject to the conditions set forth in this paragraph (d).  Following expiration of the Inspection Period, the Seller shall have the right to request the release from escrow, from time to time, a portion of the Earnest Money not to exceed $500,000.00 in the aggregate in order to reimburse Seller for architectural, engineering and zoning expenses incurred by Seller in connection with the Property for services rendered following the Effective Date. In order to obtain a

release of funds from the Earnest Money for such purposes, Seller shall deliver to Purchaser and the Title Company a draw request, executed by Seller, accompanied by copies of invoices for which reimbursement is requested and containing Seller's certification to Purchaser that the reimbursement request applies only for architectural, engineering and zoning expenses incurred by Seller in connection with the Property for services rendered following the Effective Date. To secure Seller's obligation to refund the Earnest Money to Purchaser in certain events of termination of this Contract, Seller shall, as a condition precedent to the Title Company's release of the Earnest Money in such amount a deed of trust encumbering the Property securing the return of the Deposit and amendments thereto if additional advances are requested by Seller (the "Deposit Deed of Trust"), which Deposit Deed of Trust will be a junior lien encumbering the Property and which will be in a substantially similar form as provided in <u>Exhibit C</u>. The Deposit Deed of Trust shall be subject and subordinate only to the deed of trust or indemnity deed of trust (the "Senior Deed of Trust") executed by Seller to and in favor of PNC Bank, National Association ("Senior Lender") securing payment of an obligation payable to the Senior Lender (the "Senior Loan"). Notwithstanding the foregoing or any provision contained in this Contract to the contrary, the Title Company shall not release any portion of the Earnest Money to Seller until such time as: (a) the Title Company has reconfirmed that Seller is the owner of the Property free and clear of all liens other than the liens securing the Senior Loan; (b) Seller has executed and delivered the Deposit Deed of Trust to the Title Company and the Title Company has recorded the Deposit Deed of Trust; (c) Seller has paid all costs and expenses, including recording taxes, applicable to the recording of the Deposit Deed of Trust; and (d) the Title Company has received a copy of an estoppel letter executed by Senior Lender pursuant to the terms of which Senior Lender consents to the lien of the Deposit Deed of Trust and agrees to provide Purchaser with written notice of a default by Seller under any Senior Deed of Trust and shall provide notice of the commencement of any foreclosure proceedings under the Senior Deed of Trust and the right to purchase the Senior Loan for an amount equal to the outstanding balance thereof. Seller agrees to timely pay and perform each of its obligations under the Senior Deed of Trust and the note secured thereby, and not to permit any default to occur thereunder. If Seller defaults under the Senior Loan, Seller shall be deemed to be in default under this Contract. If Purchaser purchases the Senior Loan from Senior Lender, Purchaser shall be entitled to terminate this Contract and obtain a refund of all Earnest Money and other deposits made by Purchaser under this Contract. The Title Company is directed to record the Deposit Deed of Trust in the applicable land records. Seller agrees that Purchaser shall be entitled to cure any default under the Senior Deed of Trust and that all costs incurred by Purchaser in connection therewith shall be secured by the Deposit Deed of Trust and shall be payable on demand, together with interest thereon at the rate of 15% per annum from the date expended until repaid. Notwithstanding the release of any portion of the Earnest Money to Seller, if Purchaser becomes entitled to receive a refund of the Earnest Money pursuant

to any provision of this Contract, Seller shall refund the applicable portion of the Earnest Money to Purchaser. The obligation of Seller to refund such portion of the Earnest Money to Purchaser shall survive the termination of this Contract and shall not be subject to any limitation on remedies set forth in this Contract.

4.   Due Diligence Information, Title Commitment and Survey.

   a.   Delivery of Documents. Within five (5) days following the Effective Date, Seller shall deliver or cause to be delivered to Purchaser, or make available to Purchaser, copies of all of the items described on Exhibit "B" attached hereto, to the extent that such items are in Seller's possession or control, and to the extent that such items relate solely to the Property.

   b.   Title Commitment. Within forty five (45) days following the Effective Date, Purchaser shall obtain, at Purchaser's expense: (i) a current ALTA Commitment for Owner's Policy of Title Insurance (hereinafter referred to as the "Title Commitment") issued by the Title Company on behalf of an underwriter acceptable to Purchaser, whereby said Title Company commits to issue an Owner's Policy of Title Insurance ("Owner's Policy") in the amount of the Purchase Price written in accordance with this Contract; and (ii) copies of all instruments shown as exceptions on the Title Commitment (the "Exception Documents"). The Title Commitment shall describe the Property; shall list Purchaser as the prospective named insured; shall show as the policy amount the Purchase Price; and shall contain the commitment of the Title Company to insure Purchaser's fee simple interest in the Property upon the Closing, subject only to matters set forth therein. The Title Commitment shall show the status of the title of the Property and all exceptions which would appear in an Owner's Policy, if issued.

   c.   Survey. Following the Effective Date, Purchaser may obtain, at Purchaser's sole cost and expense, a current ALTA land title boundary and improvements survey of the Land (the "Survey"), prepared in accordance with Purchaser's requirements therefor. The Survey shall be in a form acceptable to the Title Company for the deletion of the standard survey exception relating to boundaries.

   d.   Objections. Purchaser shall have a period ending not later than sixty (60) days from the Effective Date (the "Title Review Period") in which to review the Survey, Title Commitment and Exception Documents and deliver to Seller, in writing, such objections as Purchaser may have to anything contained or set forth therein. Any items to which Purchaser does not object within such period shall be deemed to be approved by Purchaser and shall be "Permitted Exceptions" (herein so called) for purposes of this Contract. Seller shall use reasonable efforts to remedy or cure Purchaser's objections during the fifteen (15) day period following Seller's receipt thereof (the "Cure Period"). In the event Seller does not or can not cure such objections prior to the expiration of the Cure Period, as its sole remedy

pursuant to this Contract (except with respect to title exceptions that Seller is required to cure pursuant to the provisions of this Contract), Purchaser shall have the right to: (i) terminate this Contract by written notice to Seller, in which event Purchaser shall receive a refund of the Earnest Money, except the $50 independent consideration; or (ii) waive such objection and proceed to Closing hereunder. All title exceptions which are approved or deemed approved by Purchaser by virtue of its waiver of objection shall constitute Permitted Exceptions for purposes hereof. Notwithstanding the foregoing: [a] all matters reflected on Schedule B-1 of the Title Commitment, liens and items which are designated by the Title Company as matters to be satisfied prior to Closing shall not constitute Permitted Exceptions and shall be discharged and satisfied by Seller prior to Closing, so long as Purchaser shall have notified Seller of such matters prior to the expiration of the Title Review Period; [b] if any exceptions to title are created after the date hereof, Seller shall, if objected to by Purchaser, cause same to be released and discharged, and same shall not constitute a Permitted Exception for purposes hereof; and [c] the standard preprinted exceptions set forth on the Title Commitment shall not be listed as exceptions on the deed to be executed by Seller to Purchaser hereunder.  To the extent Seller has not complied with its obligations under the preceding sentence as of the Closing Date, the settlement agent shall be authorized to deduct at Closing from the Purchase Price such amounts as may be required to satisfy and discharge the matters required to be satisfied and discharged by Seller pursuant to the preceding sentence.

e.  Additional Exceptions.  In the event that at any time following delivery of the Title Commitment, Exception Documents or Survey described above, but prior to Closing, any changes (other than the deletion or elimination of any item as to which Purchaser has made an objection) shall occur in the Title Commitment, Exception Documents or Survey (a "Subsequent Objection"), in addition to other remedies permitted pursuant to this Contract, Purchaser shall have the right to review and approve or disapprove of any such matters.  If such matters contained in a Subsequent Objection are not included as an exception to title in an Owner's Title Insurance Policy issued to Seller by Chicago Title Insurance Company ("Chicago Title"), a copy of which is attached hereto as Exhibit D, and Purchaser's Title Company will not insure against or over such exception, then, at Seller's option, Seller may elect to cause Chicago Title to issue an Owner's Title Insurance Commitment, which shall delete or provide affirmative insurance against loss or claim from a Subsequent Objection and shall be issued at standard rates.  In such event, Purchaser shall accept the Owner's Policy issued in such manner by Chicago Title, in lieu of the Title Company and, at Closing, Purchaser shall pay the cost of the Owner's Policy issued by Chicago Title, which shall issue the Policy at standard rates. If, however, Seller either does not elect to obtain a Title Commitment from Chicago Title or if Chicago Title is unable or unwilling to issue its Owner's Policy without exception to the Subsequent Objection, Purchaser may elect to terminate this Contract and obtain a refund of the Earnest Money.  The parties acknowledge that the Property may be subject to

"affordable housing" requirements and Seller and Purchaser have agreed that they may enter into agreements with the City setting forth such affordable housing requirements as they may apply to the Property. No proposal regarding affordable housing may be submitted by Seller to the City and no such agreement may be entered into by Seller without the consent of the Purchaser, which consent shall be evidenced by an amendment to this Contract where the parties shall acknowledge the terms of the affordable housing requirements as they apply to the Property and the terms of any other modification to this Contract. Any such amendment to this Contract shall expressly provide, and Seller and Purchaser hereby agree, that all benefits, incentives and concessions to be received or provided in connection with any such affordable housing agreement shall inure to the benefit of and be assigned to Purchaser and the Property at Closing to the extent that such benefits, incentives and concessions relate solely to the Purchaser's development of the Property. To the extent that any benefits, incentives and concessions to be received or provided in connection with any affordable housing agreement relate to the development of the Property and also include the adjacent land owned by Seller and an affiliate of Seller and referred to as "Parcel C" (the "Adjacent Property"), the Purchaser and Seller agree that any such benefits, incentives and concessions derived from any affordable housing agreement shall be allocated between the Property and the Adjacent Property on the basis of the approved developable area for residential purposes of each.

5.   Inspection Period. During the term of this Contract, Purchaser shall be entitled to enter onto the Property in order to conduct such audits, inspections, or investigations thereon as Purchaser may deem appropriate. The cost of the inspections undertaken by Purchaser pursuant to this Contract shall be borne solely by Purchaser. Purchaser shall be entitled, for any reason in Purchaser's sole discretion, to terminate this Contract by written notice delivered to Seller on or prior to the expiration of sixty (60) days following the Effective Date (the period ending on such date being referred to herein as the "Inspection Period"). If Purchaser notifies Seller prior to the expiration of the Inspection Period that Purchaser has elected to terminate this Contract, this Contract shall terminate, the Earnest Money, less the $50.00 independent consideration, shall be returned to Purchaser and the Parties shall have no further obligations hereunder. Purchaser agrees to keep the Property free and clear of any mechanic's or materialmen's liens resulting from Purchaser's activities on the Property. Prior to any entry upon the Land by Purchaser or its representatives, Purchaser shall provide Seller with a certificate of liability insurance, evidencing liability insurance coverage in an amount not less than $2,000,000.00, including umbrellas, and naming Seller as an additional insured party, with respect to any activities conducted by Purchaser pursuant to this Contract. Purchaser shall indemnify, defend and hold Seller harmless from and against any claim, cause of action, losses, liabilities, damages, costs or expenses arising out of or in connection with Purchaser or its representatives entering upon the Land or performing tests, inspections or studies at the Property from and after the Effective Date, except to the extent caused by the negligence of Seller or any of its employees, agents or representatives. Purchaser shall not be required to remedy or repair any existing condition at the Property or indemnify Seller with respect to the discovery of

such existing condition. At Seller's request, Purchaser shall restore the Property to its original condition promptly following any test, study, inspection or other activity that disturbs the current condition of the Property.

6.   <u>Representations and Warranties</u>.  Seller represents and warrants to Purchaser as follows as of the date hereof and as of the Closing:

a.   Seller has and will convey to Purchaser at Closing, good and marketable title to the Property, free from all liens and encumbrances, and otherwise subject only to the Permitted Exceptions.

b.   There are no parties in possession of any portion of the Property as lessees, tenants at sufferance or trespassers.

c.   There is no pending or, to the knowledge of Seller, threatened condemnation or similar proceeding or special assessment (inclusive of assessments for street widening, repair or improvement) affecting the Property.

d.   There is no pending or, to Seller's knowledge, threatened litigation or administrative proceeding affecting Seller or the Property.

e.   The execution and delivery of, and Seller's performance under, this Contract are within Seller's powers and have been duly authorized by all requisite actions. The individual who executes and delivers this Contract and all documents to be delivered by Seller to Purchaser hereunder is and shall be duly authorized to do so. This Contract constitutes a binding obligation of Seller enforceable in accordance with its terms. Seller is duly organized, validly existing and in good standing under the laws of the state of its origin. Seller is not prohibited from consummating the transactions contemplated in this Contract by any law, regulation, agreement, instrument, restriction, order or judgment.

f.   There are no attachments, executions, assignments for the benefit of creditors, or voluntary or involuntary proceedings in bankruptcy or under other debtor relief laws contemplated by, pending, or threatened against Seller or the Property.

g.   Subject to any matter disclosed in any environmental report concerning the Property, to the knowledge of Seller, without any other independent investigation, there are no hazardous substances or environmental contaminants located in, on or about the Property, the Property has not been used as a land fill or dump site, or for the production or disposal of hazardous substances or environmental contaminants, and the Property is in compliance with and not in violation of any applicable environmental laws.

h.   There are not any outstanding contracts or options to purchase the Property or any portion thereof in favor of any third party.

i.      Subject to any Permitted Exceptions, no deed restrictions which would preclude, impair or limit Purchaser's ability to develop a multifamily apartment complex on the Property in accordance with Purchaser's contemplated plans therefor have been filed against or affect the Property.

j.      The Property has uninterrupted and free vehicular access, ingress and egress rights to and from a dedicated public roadway.

7.    Covenants and Agreements.

a.      Actions by Seller. Prior to Closing, Seller shall not: (i) make any changes or alterations to the Land; or (ii) other than as may be anticipated in Section 7.f. below, execute or create any contract or option to purchase, easement, covenant, condition, restriction, lien or encumbrance with respect to the Property or any portion thereof.

b.      Offsite Easements. To the extent that any offsite easements (the "Offsite Easements") are needed over adjacent property owned by Seller in order to provide the Land with storm and sanitary sewer, drainage, water, electricity, gas, cable television, high speed internet and telephone service (collectively, the "Utilities"), Seller shall grant such Offsite Easements to Purchaser at Closing, subject to Seller's reasonable consent as to location and the right to relocate such granted Offsite Easement, if applicable. To the extent that service for Utilities may be reasonably obtained at a location in a public right-of-way, Seller shall not be obligated to grant such Offsite Easement for such Utility.

c.      Plat Approval. Prior to Closing, Seller agrees, at Seller's sole cost and expense, if required in accordance with applicable law, to obtain all approvals required to plat or replat (in either case, a "Plat") the Land as a single lot (the "Plat Approval"), subject to no conditions, restrictions or stipulations which are not acceptable to Purchaser, and to cause such Plat to be recorded against the Land. The form of such Plat shall be subject to Purchaser's reasonable approval. The date on which the Plat has been recorded and Seller has provided notice and a copy of the recorded Plat to Purchaser is referred to herein as the "Plat Recordation Date".

d.      Allocation Agreement. The Land is currently subject to a planned unit development approval (the "PUD Approval") pursuant to Baltimore City Council Ordinance 04-859, approved by the City on December 2, 2004. The PUD Approval also affects an adjacent tract of land owned by Seller and referred to therein as Parcel C ("Parcel C") and provides for multifamily, office and retail uses with respect to the Land and Parcel C. Prior to Closing, Purchaser shall be entitled to seek to amend the PUD Approval for the Intended Use (hereinafter defined) as contemplated in this Contract. At Closing, Seller and Purchaser shall enter into an allocation agreement (the "Allocation Agreement") which will

provide for: (i) an allocation to the Land of the right to construct 444 Units and 10,000 square feet of retail floor area (the "Retail Area"); and (ii) an allocation to Parcel C of the right to construct any remaining Units in excess of 444, any excess retail and any office area allowed under the PUD Approval. The form of the Allocation Agreement shall be prepared by Purchaser and submitted to Seller within sixty (60) days following the Effective Date.

e.   omitted

f.   Option with respect to Retail Area.

    i.   Seller is currently attempting to negotiate a lease of a portion of the Property that will exceed the Retail Area with a grocery store user (a "Grocer"). Purchaser will initially cause the plans for Purchaser's proposed development of the Land ("Purchaser's Plans") to provide for use of the Retail Area and additional area as a grocery store and other retail uses consisting of approximately 40,000 square feet of leasable space (the "Retail Shell"). If, within six (6) months following the Effective Date (the date of expiration of such period is referred to herein as the "Lease Notice Date"), either (X) Seller and a Grocer have entered into a lease for the Retail Area, or (Y) Seller shall have elected to commit or cause its affiliate to commit to proceed with the development of the Retail Shell, then Seller shall provide written notice thereof to Purchaser prior to the expiration of such six (6) month period (the "Lease Notice") and the provisions of Section 7.f.ii. shall be applicable. If Seller does not deliver the Lease Notice to Purchaser on or prior to the Lease Notice Date: [a] the provisions of Section 7.f.ii. shall not be applicable; [b] Purchaser shall be entitled to cause Purchaser's Plans to be modified to accommodate Purchaser's intended uses of the Retail Area (rather than grocery use); and [c] Seller shall reimburse Purchaser for the incremental costs incurred by Purchaser in causing Purchaser's Plans to be redesigned to exclude the Retail Shell within fifteen (15) days following receipt of an invoice therefor. Purchaser shall, within five (5) days after Purchaser's receipt of a request therefor from Seller, notify Seller of the then anticipated cost to complete the Purchaser's Plans and the amount that may be attributable to the incremental costs of redesign to exclude the Retail Shell.

    ii.   If Seller delivers a Lease Notice to Purchaser on or prior to the Lease Notice Date, the following shall be applicable:

        [a]   The Purchase Price payable by Purchaser pursuant to this Contract will be reduced by the sum of $40.00 times the number of square feet within the Allowable Retail Floor Area, which shall include the Retail Shell.

[b]  Seller shall be entitled to review and approve the portion of Purchaser's Plans applicable to the shell of the Retail Area (the "Retail Improvements"). The Retail Improvements shall be limited to those improvements set forth on <u>Exhibit E</u> hereto and Purchaser will not be required to construct any improvements other than the Retail Improvements. The plans prepared in connection with the Retail Improvements are referred to herein as the "Retail Area Plans".

[c]  Following Seller's approval of the Purchaser's Plans, Seller and Purchaser shall cooperate in determining the estimated amount of the Retail Construction Costs (as defined below). At any time prior to Seller's approval of the estimated amount of the Retail Construction Costs, Seller may notify Purchaser that it does not elect to proceed with the use of the Retail Improvements for the Grocer ("Seller's Election Notice"). In such event, Seller shall reimburse Purchaser for the incremental costs incurred by Purchaser in causing Purchaser's Plans to be redesigned to exclude the Retail Shell within fifteen (15) days following receipt of an invoice therefor. In addition, if Seller's Election Notice is not delivered to Purchaser on or prior to the expiration of 120 days following the Effective Date, then the date of expiration of the Zoning Period, the Approval Period, and the Outside Closing Date (each, as hereinafter defined) shall each be extended one day for each elapsing following the expiration of such 120 day period and continuing thereafter up to and including the date of Purchaser's receipt of Seller's Election Notice.

[d]  If Closing occurs, then following Closing: [i] Purchaser shall cause the Retail Improvements to be developed substantially in accordance with the Retail Area Plans; provided, that Purchaser shall be entitled to make changes thereto which do not have a material adverse affect on the Retail Improvements; and [ii] Purchaser shall execute and cause to be recorded against the Land a condominium declaration and shall establish related documents (collectively the "Condominium Documents") for the purpose of establishing a condominium regime with respect to the Land containing a unit for the Retail Improvements (the "Retail Unit"), a unit for the residential improvements to be constructed by Purchaser (the "Residential Unit") and associated common elements, including a parking garage (the "Parking Garage") which will allocate not less than the number of parking spaces required in accordance with applicable law (unless the parties agree to request a variance from such requirement) to the Retail Unit and spaces for shared parking.

[e]     At a closing (the "Retail Unit Closing") to be held within fifteen (15) business days after the date on which Substantial Completion (hereinafter defined) of the Retail Improvements has occurred and Purchaser has provided written notice thereof to Seller and the Condominium Documents shall have been recorded (such tenth day is referred to herein as the "Retail Closing Date"), Seller shall purchase the Retail Unit from Purchaser for a purchase price (the "Retail Purchase Price") in an amount equal to the aggregate amount of costs and expenses incurred by Purchaser in connection with the design, permitting and construction of the Retail Unit and the Retail Improvements, including an allocation of financing costs, taxes, insurance, costs of preparing the Retail Area Plans, an allocation of infrastructure costs for the development, including contractor's profit, overhead and general conditions expenses in an amount reflecting the pro rata share of the Retail Unit to the balance of the residential project to be constructed by Purchaser, an allocation of costs incurred in constructing the Parking Garage, and all other costs and expenses incurred by Purchaser in connection therewith, in an amount reflecting the pro rata share of the parking spaces dedicated to the Retail Unit to the parking spaces for the balance of the residential project to be constructed by Purchaser (the "Retail Construction Costs"). For purposes hereof, "Substantial Completion" shall mean that a temporary certificate of occupancy has been issued for the Retail Improvements by the applicable governmental authority.

[f]     The estimated amount of the Retail Construction Costs shall be calculated by Purchaser and agreed to by Seller, as set forth above, prior to Closing. At Closing, Seller shall deliver to Purchaser a letter of credit in the amount of 110% of the estimated Retail Construction Costs (the "LOC"), as estimated by Purchaser. The LOC shall secure Seller's obligation to purchase the Retail Unit. The LOC shall be issued by a financial institution reasonably acceptable to Purchaser and shall have an initial maturity date of no sooner than twelve (12) months following the Closing Date. If the Retail Closing Date has not sooner occurred, Seller shall cause the LOC to be replaced with a new letter of credit in the same form and in the then outstanding amount of the initial LOC at least thirty (30) days prior to the expiration date of the initial LOC and if Seller fails to do so, Purchaser shall be entitled to draw down on the initial LOC and hold the proceeds to secure Seller's obligation to purchase the Retail Unit in the same manner as the LOC. The LOC shall be in a form that will permit it to be assigned by Purchaser to Purchaser's lender providing construction financing

for the improvements to be constructed by Purchaser, including the Retail Improvements.

[g] At the Retail Unit Closing, Seller shall pay the Retail Purchase Price to Purchaser in good funds and the parties shall execute and deliver all documents required to consummate the Retail Unit Closing, which will be in substantially the same form as the documents executed at Closing hereunder, modified to take into consideration any applicable differences and/or changes. Except for Purchaser's attorneys fees, Seller shall pay all costs and expenses incurred in connection with the Retail Unit Closing, including Seller's attorneys fees, all recordation and transfer taxes imposed on the transfer of the Retail Unit to Seller, all property taxes allocable to the Retail Unit (it being agreed and understood that there will be no proration of property taxes allocable to the Retail Unit and that Seller shall be solely responsible for payment of such amounts) and all title insurance costs.

[h] The Retail Improvements will be conveyed in as is where is condition; however, at the Retail Unit Closing, Purchaser and the GC shall execute and deliver to Seller a partial assignment of rights under any warranties issued to Purchaser or the GC in connection with the Retail Unit Improvements. Notwithstanding the above, Purchaser will covenant, in addition to any covenant that may be received from its subcontractors, that the Retail Improvements have been constructed substantially in accordance with the Retail Area Plans.

[i] The Retail Area Plans and the Condominium Documents shall be subject to the approval of Seller, which approval shall not be unreasonably withheld, conditioned or delayed, and shall be deemed to have been granted if Seller does not send written notice of disapproval with specific objections and curative measures noted to Purchaser within five (5) business days following receipt thereof by Seller. If Seller timely delivers written notice of objections with respect to any item submitted, Seller and Purchaser will work together to accommodate Seller's concerns and the approval process set forth above will be repeated until such time as Seller has approved or is deemed to have approved the item as submitted.

8. Conditions Precedent. The following shall each be conditions precedent to Purchaser's obligation to purchase the Property. If any one or more of such conditions precedent is not, or in the reasonable opinion of Purchaser will not be, satisfied at or prior to Closing, in addition to other remedies available to Purchaser under this Contract, Purchaser shall

be entitled to waive any one or more of such conditions precedent by written notice to Seller, or to terminate this Contract by written notice to Seller, in which event, the Earnest Money, less the $50 independent consideration, shall be returned by the Title Company to the Purchaser.

a.   The existing PUD Approval for the Land shall have been modified by Seller to permit construction of not less than 444 Units and not less than 10,000 square feet of Allowable Retail Floor Area on the Land in accordance with Purchaser's plans, including the release or modification of any requirement that the Land be developed pursuant to a townhouse configuration to permit Purchaser's proposed four story product with a wrap around parking deck and not less than one parking space for each dwelling unit (as defined in the applicable Baltimore City zoning regulations) to be constructed on the Land plus sufficient parking to accommodate the retail use requirements (the "Intended Use"), subject to no conditions, restrictions or stipulations which are not acceptable to Purchaser, and such modification of the PUD Approval to incorporate the Intended Use shall be final and all appeal periods in connection therewith shall have expired, with no appeal having been filed, or if an appeal is filed, same shall have been dismissed and the zoning change upheld (the date on which the foregoing have occurred is referred to herein as the "Zoning Date"). Seller agrees to promptly and diligently prepare and make application for the modification of the PUD Approval and to diligently and in good faith pursue such modification to completion. Seller agrees, within five (5) days after receipt of a request therefor from Purchaser, to notify Purchaser as to the status of the modification of the PUD Approval. If the Zoning Date shall not have occurred on or before December 31, 2008, Purchaser shall be entitled to take over efforts to obtain the modification of the PUD Approval, in which event, Seller shall have no further right to receive any disbursements from the Earnest Money pursuant to Section 3.d. hereof for costs thereafter incurred by Seller. However, Purchaser may not assume efforts to obtain the modification of the PUD Approval as set forth herein if Seller notifies Purchaser within five (5) days thereafter that Seller agrees to withdraw the request for the PUD Approval for the Intended Use and that Seller accepts the existing PUD Approval, in which event the provisions of Section 7.f shall not be applicable except as set forth in the following sentence. If the request for the PUD Approval is withdrawn by Seller, the Outside Closing Date shall, however, be extended in accordance with Section 7.f.ii[c]. If the Purchaser shall have assumed such obligations to obtain the PUD Approval and the Zoning Date shall not have occurred by March 30, 2009 (the period ending on such date is referred to herein as the "Zoning Period"), subject to extension as provided in Section 7.f.ii.[c] hereof, then, in such event, either Party shall have the right to terminate this Contract, in which event, the Earnest Money, less the $50 independent consideration, shall be returned by the Title Company and/or Seller to the Purchaser, or Purchaser may waive the effect of such condition precedent, whereupon, if previously exercised, Seller's termination of this Contract in accordance with this section shall be of no force and effect; provided, however, that Seller shall not be entitled to terminate this Contract

pursuant to this Section 8.a. if Seller has previously withdrawn the request for PUD Approval for the Intended Use and accepted the existing PUD Approval. If Seller terminates this Contract pursuant to the provisions of this Section 8.a., Seller shall reimburse to Purchaser all costs and expenses incurred by Purchaser in connection with this Contract and/or the Property and the amount thereof shall be secured by the Deposit Deed of Trust.

b.     Except for the Plat Approval, if required, which shall be the responsibility of Seller and any building permits required in connection with Purchaser's development of the Land, Purchaser shall have received the permits, licenses and approvals from the appropriate agencies, commissions and authorities of the City and other applicable governmental authorities, which are listed on Exhibit F of this Contract, including a final design approval from the Baltimore City Planning Commission (collectively, the "Approvals"), subject to no conditions, restrictions or stipulations which are not acceptable to Purchaser, and such approvals shall be final and all appeal periods in connection therewith shall have expired, with no appeal having been filed, or if an appeal is filed, same shall have been dismissed and the approvals upheld (the date on which the foregoing have occurred is referred to herein as the "Approval Date"). Purchaser agrees to promptly and diligently prepare and make application for all Approvals required for Purchaser's Intended Use and to diligently and in good faith pursue all such Approvals to completion. If the Approval Date shall not have occurred by March 31, 2009 (the period ending on such date is herein referred to as the "Approval Period"), subject to extension as provided in Section 7.f.ii.[c] hereof, then, in such event, either Party shall have the right to terminate this Contract, in which event, the Earnest Money, less the $50 independent consideration, shall be returned by the Title Company to the Purchaser, or Purchaser may waive the effect of such condition precedent, whereupon, if previously exercised, Seller's termination of this Contract in accordance with this section shall be of no force and effect.

c.     Within one hundred thirty (130) days of the Effective Date, the Purchaser shall have reached an agreement with the applicable authorities of Baltimore City that shall not impose upon the Purchaser the obligation for payment in satisfaction of traffic mitigation in excess of Seven Hundred Dollars ($700) per dwelling unit at the Property. Within thirty (30) days of the Effective Date, the Purchaser shall authorize the applicable authorities of Baltimore City to conduct a Traffic Impact Study in connection with the development of the Intended Use.

d.     To the extent required in addition to the PUD Approval, Seller shall have received final Plat Approval from all applicable governmental authorities, subject to no conditions, restrictions or stipulations which are not acceptable to Purchaser, such approvals shall be final and all appeal periods in connection therewith shall have expired, with no appeal having been filed, or if an appeal is filed, same shall have been dismissed and the Plat Approval upheld, and the Plat shall have been recorded in the real property or other applicable records of the City.

e.    Seller shall have successfully settled, or shall provide for an indemnification acceptable to Purchaser with respect to, any lawsuit or lien which may affect title to the Property.

f.    No adverse environmental condition shall have been created with respect to the Property subsequent to the expiration of the Inspection Period.

g.    No lawsuit, appeal or other action shall have been filed by any party, directly or indirectly, involving the Property, including without limitation, any such lawsuit, appeal or other action for the purpose of challenging, contesting or seeking to prohibit, restrain, enjoin or delay any change in zoning or restrictive covenants required to permit development of a multifamily apartment complex on the Land in accordance with Purchaser's plans, or Purchaser's development of the Land for such purposes.

h.    There shall exist no moratorium or other action or directive by any governmental authority which would prohibit, restrain, enjoin or delay Purchaser from constructing, or delay Purchaser in connection with the construction of, a multifamily apartment complex in accordance with Purchaser's plans.

i.    All of Seller's representations and warranties shall be true and correct in all material respects and Seller shall have performed all of Seller's obligations under this Contract.

j.    The Title Company shall have irrevocably committed and agreed to issue to Purchaser an Owner's Policy, insuring Purchaser's title in and to the Property free and clear of liens, claims and encumbrances other than the Permitted Exceptions, with such endorsements as may be requested by Purchaser.

k.    On or before one hundred sixty (160) days from the Effective Date, the Property shall have been accepted into Maryland's Voluntary Clean-up Program. Purchaser will (i) promptly following the Effective Date make application for the Property's acceptance into Maryland's Voluntary Clean-Up Program, and (ii) prior to termination of this Contract, diligently pursue the Property's acceptance into such program.

Purchaser shall be entitled to contact and make applications to any and all applicable local, municipal, county, state and federal agencies which Purchaser may deem appropriate in connection with the satisfaction of any conditions precedent set forth herein. Seller agrees to cooperate with Purchaser, at not additional cost to Seller, in connection with Purchaser's efforts to satisfy the conditions precedent, shall execute and deliver to Purchaser within five (5) days following receipt of a request therefor, such applications, consents and other documents which may be required in connection

therewith, and shall support and not oppose Purchaser in connection with Purchaser's applications and efforts to satisfy the conditions precedent.

In the event that Closing is not consummated due to the failure of one or more conditions precedent within the time periods set forth in this Section 8, Seller agrees to postpone Closing for up to sixty (60) days. If any such condition precedent is not satisfied or waived by Purchaser in writing prior to such extended Closing Date, the terms of the following sentence shall apply. In the event that (i) any condition precedent has not been satisfied or waived by Purchaser within the time periods set forth in this Section 8, as may be extended by the previous sentence, or (ii) if Closing has not, in any event, occurred on or before June 30, 2009 (the "Outside Closing Date"), subject to extension as provided in Section 7.f.ii.[c] hereof, in such event, this Contract shall terminate without the act of either party hereto, in which event, the Earnest Money, less the $50 independent consideration, shall be returned by the Title Company to the Purchaser, or Purchaser may waive the effect of such condition precedent and proceed to Closing within thirty (30) days thereafter.

9.  Closing.

    a.  Date. The closing of the sale of the Property from Seller to Purchaser (the "Closing") shall be coordinated through the offices of the Title Company on, or at Purchaser's option, before, the later to occur of: (i) the expiration of forty five (45) days following the last day of the Inspection Period; or (ii) the expiration of thirty (30) days after the last to occur of the following: [a] the Plat Recordation Date; [b] the Zoning Date; or [c] the Approval Date (the date of the Closing is sometimes referred to herein as the "Closing Date"), but in no event shall the Closing Date be later than the Outside Closing Date, as extended.

    b.  Seller to Deliver. At the Closing, Seller shall furnish and deliver to the Title Company for delivery to Purchaser, at Seller's expense (except as provided in Section 9(e) below), the following:

        (i)  A Special Warranty Deed duly executed and acknowledged by Seller, dated as of the Closing, conveying good and marketable title to the Property to Purchaser, free and clear of all liens and otherwise subject only to the Permitted Exceptions.

        (ii)  A Non-Foreign Certification signed by the Seller under penalties of perjury.

        (iii)  Possession of the Property.

        (iv)  Such instruments or documents as are necessary, or reasonably required by Purchaser or the Title Company to evidence the status and capacity of Seller and the authority of the person or persons who are executing the

various documents on behalf of Seller in connection with the purchase and sale transaction contemplated hereby.

c.   <u>Purchaser to Deliver</u>.   At the Closing, Purchaser shall deliver to the Title Company for delivery to Seller, at Purchaser's expense, the following:

(i)   The Purchase Price in immediately available funds.

(ii)   Such instruments or documents as are necessary, or reasonably required by Seller or the Title Company to evidence the authority of Purchaser to consummate the purchase and sale transaction contemplated hereby and to execute and deliver the closing documents to be delivered by Purchaser.

d.   <u>Adjustments</u>.

(i)   Seller shall be responsible for payment of all taxes and assessments levied or assessed prior to the Closing.  Real and personal property taxes for the calendar year in which the Closing takes place shall be prorated at the Closing between Purchaser and Seller through the Closing Date, based on the current year's tax at par.  If the Closing occurs on a day when the current year's tax rate is not fixed and the current year's assessment is available, taxes will be prorated based upon such assessments and the prior year's rate.  If the current assessment is not available at the time of Closing, then taxes will be prorated on the basis of the latest available tax and assessment.

(ii)   If the Land is assessed and taxed as a part of a larger parcel of real estate, then, for purposes of computing tax prorations hereunder: (i) Seller shall be solely responsible for payment of the portion of the taxes allocable to any other land and/or improvements located within the larger tract, and shall escrow the estimated amount of such taxes with the Title Company at Closing pursuant to an escrow agreement which will obligate the Title Company to release such funds to the applicable taxing authority upon receipt of a tax bill therefor and will obligate Seller to pay any deficiency between the amount of the escrowed funds and the actual amount of taxes within ten (10) days after receipt of notice thereof; and (ii) a proportionate part of the real estate taxes attributable to such larger parcel shall be allocated to the Land on the basis of the ratio that the area of land contained within the Land bears to the area of land contained within the larger parcel of real estate.

(iii)   Any tax proration based upon an estimate may, upon demand of either party to the transaction, be subsequently readjusted upon receipt of the actual tax bill for the Property for the year in which the Closing occurs, and any Party owing the other Party monies as a result of such

readjustment shall pay the same upon demand.  The provisions of this Section 9.d. shall survive the Closing for a period of twelve (12) months.

e.   Expenses of Closing.

(i)   Seller shall pay: [a] its proportionate share of the prorations set forth in Section 9(d); [b] its own attorneys' fees; [c] other charges required to be paid by Seller pursuant to this Contract; [d] one-half of any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser; and [e] other charges typically paid by sellers in transactions of this nature in the jurisdiction in which the Property is located.

(ii)   Purchaser shall pay: [a] all title examination fees and premiums for the Owner's Policy; [b] the cost of the Survey; [c] its proportionate share of the prorations set forth in Section 9(d); [d] its own attorneys' fees; [e] one-half of any local, county or state transfer, recording or documentary tax assessed in connection with the transfer to Purchaser,  [f] other charges required to be paid by Purchaser pursuant to this Contract and [g] other charges typically paid by purchasers in transactions of this nature in the jurisdiction in which the Property is located

10.   Casualty or Condemnation Prior to Closing.  If at any time prior to the Closing any portion of the Property is destroyed or damaged by fire or any other casualty, or in the event a taking by condemnation, eminent domain or similar proceedings or a conveyance in lieu thereof is commenced or threatened with respect to any portion of the Property, Seller shall give notice thereof to Purchaser and Purchaser shall thereupon have the option to terminate this Contract upon written notice to Seller prior to Closing, in which event the Earnest Money, except the $50.00 independent consideration, shall be promptly refunded to Purchaser, whereupon this Contract shall be rendered null and void and the Parties shall have no further obligations or liabilities hereunder.  If Purchaser does not exercise its option under this Section 10 to terminate this Contract, this Contract shall remain in full force and effect and Seller shall assign or pay to Purchaser at Closing Seller's interest in and to any and all insurance proceeds and condemnation awards.

11.   Default and Remedies.

a.   Purchaser's Default.  In the event Purchaser defaults under this Contract or fails to perform any obligation of Purchaser under this Contract, and such default and failure shall remain uncured for a period of five (5) days following written notice thereof from Seller to Purchaser, Seller may, as Seller's sole remedy, terminate this Contract by written notice to Purchaser at any time before such default by Purchaser is cured, in which event, Seller shall be entitled to retain the portion of the Earnest Money which has then been deposited by Purchaser as liquidated damages for the Purchaser's default and Purchaser shall thereby be released from

further obligations under this Contract. Such amount is agreed upon by and between the Seller and the Purchaser as liquidated damages, due to the difficulty and inconvenience of ascertaining and measuring actual damages, and the uncertainty thereof; and no other damages, rights or remedies shall in any case be collectible, enforceable or available to the Seller other than in this Section 11(a), but the Seller shall accept said cash payment as the Seller's total damages and relief.

b.     Seller's Default. In the event Seller defaults under this Contract, including, at Closing, that any representation or warranty of Seller set forth in Section 6 is not true in any material respect, or in the event Seller fails to perform any obligation of Seller under this Contract, including without limitation, the obligation to convey good and indefeasible title to the Property to the Purchaser on the Closing Date subject only to the Permitted Exceptions in accordance with the provisions of this Contract, then Purchaser may terminate this Contract, in which event the Earnest Money, except the $50.00 independent consideration, shall be returned to Purchaser, or Purchaser shall be entitled to seek to enforce specific performance of Seller's obligations hereunder; provided, that if the remedy of specific performance is for any reason not available, Purchaser shall be entitled to terminate this Contract as provided above and pursue the recovery of damages from Seller resulting from such breach. However, in no event shall Seller be liable for damages of a speculative nature, such as claims for lost profit unless the remedy of specific performance is not available due to Seller's conveyance or encumbrance of the Property to or in favor of any third party.

12.     Real Estate Brokerage. If, as and when the Closing actually occurs, but not otherwise, Seller agrees to pay a real estate brokerage commission to CB Richard Ellis (John Sheridan) ("Principal Broker") pursuant to a separate agreement between Seller and Principal Broker. Seller shall be responsible for the payment of the commissions becoming due to Principal Broker and any other real estate broker, finder or agent engaged by Seller in connection with this transaction, and hereby agrees to indemnify and hold Purchaser harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) resulting from the failure of Seller to pay any such commission in accordance with the provisions of this sentence. Except for the commissions becoming due to Principal Broker as described above, Purchaser shall be responsible for the payment of commissions becoming due to any real estate broker, finder or agent engaged by Purchaser in connection with this transaction, and hereby agrees to indemnify and hold Seller harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees) resulting from the failure of Purchaser to pay any such commission in accordance with the provisions of this sentence. The provisions of this paragraph shall survive the Closing of this Contract.

13.  Miscellaneous.

    a.  Notices.  All notices, requests and other communications under this Contract shall be in writing and shall be delivered in person by hand delivery or overnight delivery service, by facsimile or sent by certified mail, return receipt requested, addressed as follows:

    If intended for Seller:    Capital Development, LLC
    3925 Beech Avenue
    Baltimore, Maryland 21211
    Telephone:    (410) 522-0502
    Facsimile:    (410) 522-0501
    email: dave@blueprintconcepts.net

    with a copy to:    David Holmes
    817 South Broadway
    Suite 200
    Baltimore, Maryland 21231
    Telephone:    (410) 522-0502
    Facsimile:    (410) 522-0501
    email: dave@blueprintconcepts.net

    with a copy to:    Barry C. Greenberg
    Rosenberg Martin Greenberg, LLP
    25 South Charles Street, Suite 2115
    Baltimore, Maryland 21201-3305
    Telephone:    (410) 727-6687
    Facsimile:    (410) 727-1115
    email: bgreenberg@rosenbergmartin.com

    If intended for Purchaser:    JLB Realty LLC
    909 Lake Carolyn Parkway, Suite 960
    Irving, Texas 75039
    Attn: Bay Miltenberger
    Telephone: (214) 271-8480
    Facsimile: (214) 271 -8479
    email: baym@jlbpartners.com

with a copy to:               JLB Realty LLC
2121 Cooperative Way, Suite 230
Herndon, VA 20171
Attn: Gary Plichta/Ben Kerschberg
Telephone: (703) 344-9021/(703) 344-9025
Facsimile: (703)344-9050
email: gplichta@jlbpartners.com;
         bkerschberg@jlbpartners.com

with a copy to:               David M. Tatum
Geary, Porter & Donovan, P.C.
16475 Dallas Parkway, Suite 400
Addison, Texas 75001-6837
Telephone:   (972) 349-2207
Facsimile:    (972) 931-9208
email: dtatum@gpd.com

If intended for
Title Company:         Commercial Settlement Services, LLC
1829 Reisterstown Road, Suite 380
Baltimore. Maryland 21208
Attn: Howard L. Perlow, Executive Vice President
Telephone: (410) 653-2828, Ext. 223
Facsimile: (410) 653-3621
email: hperlow@residentialtitle.com

or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided. All such notices, requests and other communications shall be deemed to have been sufficiently given for all purposes hereof upon receipt at such address if delivered in person, by overnight delivery or by facsimile, or if mailed, upon deposit of both the original and any required copies in a post office or official depository of the United States Postal Service. Email addresses are included for reference purposes only, and any required notices must be delivered by one of the methods of delivery described above.

b.    Survival. Except as otherwise provided herein, the provisions of this Contract shall survive the Closing and shall not merge into the conveyance documents executed and delivered at Closing.

c.    Entire Agreement; Modifications. This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing

signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

d.     Applicable Law.   THIS CONTRACT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MARYLAND.

e.     Captions.  The captions in this Contract are inserted for convenience of reference only and in no way define, describe, or limit the scope or intent of this Contract or any of the provisions hereof.

f.     Binding Effect.  This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns.  This Contract and Purchaser's rights hereunder may be assigned by Purchaser without the consent of Seller to an entity in which an affiliate of Purchaser is a general partner or managing member.

g.     Time is of the Essence.  With respect to all provisions of this Contract, time is of the essence.  However, if the Closing or the final date of any period which is set out in any provision of this Contract falls on a Saturday, Sunday or legal holiday under the laws of the United States or the States of Texas or Maryland, then, and in such event, the Closing or such period shall be extended so that the Closing or the last day of such period falls on the next day which is not a Saturday, Sunday or legal holiday.  If Seller fails to timely deliver to Purchaser any documents or information required to be delivered by Seller to Purchaser hereunder, the date of expiration of the Inspection Period, the Closing Date and the expiration date of all other time periods hereunder shall be extended by the number of days elapsing between the date such items should have been delivered to Purchaser and the date such items are actually delivered to Purchaser.

h.     Counterpart Execution.  This Contract may be executed in multiple counterparts.  A facsimile copy of this Contract bearing the signature of a Party hereto shall be sufficient to bind such Party to the terms of this Contract.

i.     Assignment.  This Contract is not assignable by Purchaser without Seller's prior written consent, which may be approved or denied in Seller's sole and absolute discretion, and any purported assignment by Purchaser in violation of this provision shall be automatically null and void. Notwithstanding the foregoing, Purchaser shall have the right to assign this Contract to an entity controlled by Purchaser.  Seller shall have the right to assign this Contract to an affiliate of Seller provided Seller simultaneously conveys the Property to such affiliate and such affiliate assumes all of the obligations of Seller under and pursuant to this Contract and notwithstanding such assignment, Seller shall not be relieved of any

of its obligations under this Contract. In addition to the foregoing, Seller shall have the right to assign its rights and obligations under Section 7.f. of this Contract to an affiliate of Seller that will undertake the development of the Retail Shell and such affiliate assumes all of the obligations of Seller under and pursuant to Section 7.f. of this Contract, whereupon Seller shall be relieved of its obligations under Section 7.f.

14.  Offer and Acceptance. This Contract constitutes an offer by the first party to execute this Contract to sell or purchase the Property on the terms and conditions and for the Purchase Price stated herein. Unless sooner terminated or withdrawn by notice in writing to the second party, this offer shall automatically lapse and terminate at 5:00 p.m. on June 15, 2008, unless, prior to such time, the second party has returned to the first party a copy of this Contract bearing the signature of the second party. The "Effective Date" or any other reference to the date of this Contract shall mean the date on which this Contract is signed by Seller, Purchaser and the Title Company, as indicated by their signatures below.

15.  Like-Kind Exchange. Seller and/or Purchaser may structure the disposition and purchase of the Property as a like-kind exchange under Internal Revenue Code Section 1031 at Seller's or Purchaser's sole cost and expense. The parties shall reasonably cooperate with one another, provided that no costs or expenses or liabilities shall be incurred by one party as a result of the other party's exchange other than costs associated with the non-exchanging party's review of the exchange documents. Seller and Purchaser shall indemnify, defend and hold each other harmless therefrom and neither party shall be required to take title to or contract for purchase of any other property. If Seller or Purchaser uses a qualified intermediary to effectuate the exchange, any assignment of the rights or obligations of Seller or Purchaser hereunder shall not relieve, release or absolve the parties of their obligations to each other.

*Signatures appear on next page*

EXECUTED by Seller this _____ day of June, 2008.

SELLER:

CAPITAL DEVELOPMENT, LLC

By:_____
    David Holmes, Authorized Party

EXECUTED by Purchaser this _13th_ day of June, 2008.

PURCHASER:

JLB REALTY LLC,
a Texas limited liability company

By:_____
Name: _GARY PLICHTA_____
Title: _EXECUTIVE VICE-PRESIDENT_

EXECUTED by Seller this _13th_ day of June, 2008.

SELLER:

CAPITAL DEVELOPMENT, LLC

By: _____
    David Holmes, Authorized Party

EXECUTED by Purchaser this _____ day of June, 2008.

PURCHASER:

JLB REALTY LLC,
a Texas limited liability company

By:_____
Name:_____
Title:_____

The undersigned Title Company acknowledges receipt of a fully executed copy of this Contract this 17ᵗʰ day of June, 2008, and agrees to comply with the provisions of this Contract, including the provisions hereof governing disposition of the Earnest Money.

Seller and Purchaser covenant and agree that Title Company, in performing any of its duties under this Contract, shall not be liable for any loss, costs or damage which it may incur as a result of serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.  Accordingly, Seller and Purchaser further agree to indemnify and hold harmless Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Title Company in connection with its serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Title Company to justify its doing so, Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Contract, together with such legal pleading as it deems appropriate, and thereupon be discharged; provided, that notwithstanding the foregoing, if Purchaser terminates this Contract prior to the expiration of the Inspection Period, the Title Company shall, without further authorization and notwithstanding objection by any party, return the Earnest Money to Purchaser.

COMMERCIAL SETTLEMENT SERVICES, LLC

By: _____

Name: _____

Title: _____

Principal Broker has executed this Contract in its capacity as a real estate broker licensed to do business in the state in which the Property is located and acknowledges the fee or commission due it from Seller as a result of the transaction described in this Contract is that set forth in Section 12 of this Contract. Principal Broker warrants and represents to Seller and Purchaser that Principal Broker (a) is a real estate broker licensed to do business in the state in which the Property is located and (b) has not employed a real estate broker or agent in connection with the transaction contemplated hereby. Principal Broker further agrees to indemnify, defend and hold harmless Seller and Purchaser from any claim whatsoever (including, without limitation, reasonable attorneys' fees, court costs and costs of appeal) from a breach of any representation or warranty of Principal Broker contained herein and from anyone claiming by or through Principal Broker, as the case may be, any fee, commission or compensation on account of this Contract. Principal Broker agrees that any commission owed Principal Broker for the transaction contemplated herein shall be payable by Seller and that Principal Broker hereby releases Purchaser from any obligation to pay any such commission and releases Purchaser from any liability arising from Seller's failure to pay such commission. Principal Broker acknowledges and agrees that the consent of Principal Broker shall not be required to modify or amend the Contract.

CB RICHARD ELLIS

By: _____

Name: _John P. Blumer_

Title: _Managing Director_

_CB Richard Ellis, Inc._

EXHIBIT "A"

PROPERTY DESCRIPTION

Exhibit "A"

**Parcel 1:**

BEGINNING FOR THE SAME at the intersection of the South side of Orleans Street, 66 feet wide, and the West side of North Washington Street, 70 feet wide, thence leaving the said point of beginning and running and binding on the West side of North Washington Street, 70 feet wide, as now surveyed, courses referred to True Meridian as established by Baltimore City Topographical Commission South 2 degrees 45 minutes 00 seconds East, 75.00 feet to the intersection of the North side of a 10 foot alley and the west side of North Washington Street, 70 feet wide, thence leaving the West side of North Washington Street, 70 feet wide and running and binding on the North side of said 10 foot alley, South 87 degrees 04 minutes 30 seconds West, 140.00 to the intersection of the North side of said 10 foot alley and the East side of North Chapel Street, 20 feet wide; thence running and binding on the East side of North Chapel Street, 20 feet wide, North 2 degrees 45 minutes 00 seconds West 75.00 feet to the intersection of the South side of Orleans Street, 66 feet wide, and the East side of North Chapel Street, 20 feet wide; . thence running and binding on the South side of Orleans Street, 66 feet wide, North 87 degrees 04 minutes 30 seconds East, 140.00 feet to the place of beginning.

**Parcel 2:** (+/- 2.334 acres)

All that land situate in the City of Baltimore, State of Maryland, , known and designated as Lot No. 4, Chapel (MD A-1) and described as follows:

All courses and distances in this description are referred to the true meridian as adopted by the Baltimore Survey Control System.

Reserving to the City all of its right, title and interest in and to the beds of all streets abutting the property herein described; subject, however, to the use of said streets in Common as public highways. All references to streets and alleys are for the purpose of description only and are not to effect a dedication.

BEGINNING for the same at the point formed by the intersection of the ease side of Wolfe Street, as not laid out 70 feet wide, and the south side of Orleans Street, as now laid out 66 feet wide, and running;

THENCE binding on the south side of said Orleans Street, North 87 degrees 04' 30" East 159 54 feet to intersect the east side of the former bed of Chapel Street, 20 feet wide, as condemned and closed;

THENCE binding on the east side of the former bed of Chapel Street, South 02 degrees 45' 00" East 75.00 feet to intersect the north side of the former bed of a 10 foot alley, as condemned and closed;

THENCE binding on the north side of the former bed of said 10 foot alley, North 87 degrees 04' 30" East 140.00 feet to intersect the west side of Washington Street as now laid out 70 feet wide;

THENCE binding on the west side of said Washington Street, South 02 degrees 45' 00" East 299.76 feet to intersect the north side of Fayette Street as now laid out 70 feet wide;

THENCE binding on the north side of Fayette Street, South 87 degrees 03' 40" West 299.0 feet to intersect the aforesaid east side of Wolfe Street and;

THENCE binding on the east side of said Wolfe Street, North 02 degrees 50' 00" West 374.83 feet to the Place of Beginning.

**Baltimore City Tax Ward 06 Section 11 Block 1684 Lot 001.**


**Parcel 3:** (+/- 5.573 acres)

All that land situate in the City of Baltimore, State of Maryland, known and designated as Lot No. 5, Chapel (MD A-1) and described as follows:

All courses and distances in this description are referred to the true meridian as adopted by the Baltimore Survey Control System.

Reserving to the City all of its right, title and interest in and to the beds of all streets abutting the property herein described; subject, however, to the use of said streets in Common as public highways. All references to streets and alleys are for the purpose of description only and are not to effect a dedication.

BEGINNING for the same at the point formed by the intersection of the south side of Fayette Street, as now laid out 70 feet wide, and the east side of Wolfe Street, as now laid out 70 feet wide; and running;

THENCE binding on the south side of said Fayette Street, North 87 degrees 03' 40" East 298.90 feet to intersect the west side of Washington Street, as now laid out 70 feet wide;

THENCE binding on the west side of said Washington Street, South 02 degrees 45' 00" East 807.27 feet to intersect the north side of Baltimore Street, as now laid out 70 feet wide;

THENCE binding on the north side of said Baltimore Street, South 87 degrees 06' 00" West 302.85 feet to intersect the east side of Wolfe Street, as now laid out 60 feet wide;

THENCE binding on the east side of last said Wolfe Street, North 02 degrees 54' 50" West 331.81 feet;

THENCE binding on the east side of Wolfe Street, varying in width, North 01 degrees 43' 53" East 70.23 feet; and;

THENCE binding on the East side of Wolfe Street, as now laid out 70 feet wide North 02 degrees 50' 00" West 405.25 feet to the Place of Beginning.

**Baltimore City Tax Ward 06 Section 11 Block 1702 Lot 001**

EXHIBIT "B"

DUE DILIGENCE

1.  Any and all leases affecting the Property and amendments thereto, as well as any other agreement, incident or related document which affects the obligations of Seller or the Property with respect to such leases;

2.  All outstanding third-party service contracts and other agreements affecting the Property;

3.  All mortgages, loan documents, bond documents, regulatory agreements and all other documents pertaining to the current financing on the Property;

4.  A written summary of any legal matters affecting the Property, and copies of all documents pertaining thereto;

5.  Any notices, correspondence, approvals, permits, and/or licenses or any agreements (including, without limitation subdivision and similar agreements) with, to or from any governmental or quasi-governmental authority having jurisdiction over the Property;

6.  Plans, specifications, certificates, inspection reports, notices, correspondence and all other documents prepared, transmitted or received by Seller, if any, in connection with any existing subdivision of or improvements constructed or to be constructed upon the Property;

7.  Any letters in existence from utility companies stating whether appropriate facilities have been installed and are available to the boundaries of the Property;

8.  Any surveys, plans, geological and engineering or environmental studies or reports, zoning information, water and sewer studies, topographic maps, platting and other materials, and all other information and agreements, relating to the Property or any portion thereof which is in the possession of the Seller or its agents;

9.  Any and all tax statements for three calendar years prior to the date of this Contract;

10. All licenses and permits affecting the Property; and

11. Any other agreements or documents not referenced above relating to or affecting the Property.

EXHIBIT C

FORM OF DEPOSIT DEED OF TRUST

*AS OF THE DATE HEREOF, NO DEBT HAS BEEN INCURRED, ACCORDINGLY, NO RECORDATION TAX IS DUE PURSUANT TO SECTION 12-105(F) OF THE REAL PROPERTY ARTICLE OF THE ANNOTATED CODE OF MARYLAND*

### DEPOSIT
### DEED OF TRUST

**THIS DEED OF TRUST** (the "Deed of Trust"), made this ___ day of _____, 2008, by and among _____, a Maryland limited liability partnership ("Grantor"), and _____, Trustee, as trustee (whether one or more hereinafter referred to as "Trustee"), for the benefit of _____, a _____ limited liability company, its successors and assigns (collectively referred to as "Beneficiary").

### W I T N E S S E T H:

Grantor and Beneficiary have entered into a Contract of Sale dated _____, as may be amended from time to time (the "Contract") whereby Grantor has agreed to sell and Beneficiary agreed to purchase certain property described in the Contract and on Exhibit "A" attached hereto and incorporated herein. As consideration, Beneficiary has tendered a good-faith deposit to Grantor in the amount of _____ Dollars ($_____) (the "Deposit"), which Deposit Beneficiary has agreed to release to Grantor to be applied to the purchase price of the Property. The Deposit is to either be credited to Beneficiary at the time of purchase of such property, or refunded to Beneficiary in certain events of termination, all as more fully set forth in the Contract. This Deed of Trust, as evidenced by the Contract, is to secure the repayment of the Deposit, in an amount not to exceed _____ Dollars ($_____), in the event that pursuant to the Contract the Beneficiary becomes entitled to the same. All capitalized terms used herein which are not otherwise defined shall have the meanings provided in the Contract.

Grantor, in consideration of the indebtedness herein recited and the trust herein created, hereby grants and conveys to Trustee in trust, with power of sale, the real property located in Baltimore City, Maryland, more particularly described in Exhibit "A" attached hereto and made a part hereof.

TOGETHER with all improvements now or hereafter erected thereon;

TOGETHER with all tenements, hereditaments, easements, rights of way, franchises, licenses, permits and appurtenances in any way belonging or related thereto, and any reversions or remainders; and also all present and future leases of said real property or any part thereof, and all extensions, renewals and modifications thereof, or substitutions therefor and guarantee thereof, and all rents, issues and profits therefrom;

TOGETHER with all right, title and interest of Grantor, if any, in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the above described real estate to the center line thereof;

279867

TO HAVE AND TO HOLD the above granted property (the "Property") with the appurtenances, and any after-acquired title Grantor may subsequently obtain therein, unto Trustee, its survivor, or other successors in trust, forever; and Grantor warrants specially the title to the Property, free from any liens prior to this Deed of Trust except as may be allowed herein, and will execute such further assurances of title as may be requisite.

PROVIDED, ALWAYS, however, that if Grantor shall pay Beneficiary the indebtedness hereby secured when due, and shall fully comply with every covenant and condition set forth herein or in the Contract, then these presents and the estate hereby granted shall cease, and be void, provided, further, that until the happening of any occurrence or event which gives Beneficiary the option to cause the indebtedness hereby secured to become due and payable, Grantor shall have the right to possess and enjoy the Property. Upon full payment of the indebtedness hereby secured, Trustee hereunder shall be entitled to a fee not exceeding Fifteen Dollars ($15.00) each, for the release and reconveyance of the Property unto and at the cost of Grantor.

This conveyance is made in trust to secure and enforce the performance of the covenants and agreements of Grantor herein contained and the obligations of Grantor to repay the Deposit as provided under the Contract.

AND Grantor covenants and agrees as follows:

1.      Performance of Obligations Hereby Secured.  Grantor will promptly and diligently perform its obligations under the Contract.

2.      Taxes.  Grantor will pay when due all taxes, assessments, water rates, sewer rents and other charges now or hereafter payable related to the Property, and if Grantor fails to do so, Beneficiary may, without notice or demand to Grantor, pay the same or any of them. Moneys so paid shall be added to the amount of indebtedness hereby secured and shall be payable on demand.

3.      Default.  The occurrence of any of the following events shall constitute a default hereunder and shall entitle Beneficiary to accelerate the whole of the principal sum secured hereby:

        a.      Failure of Grantor to credit Beneficiary for the Deposit at time of Closing under the Contract.

        b.      Failure of Grantor to deliver the Deposit to Beneficiary if, as and when required to do so by the terms of the Contract.

        c.      Grantor shall be adjudicated bankrupt or insolvent or make an assignment for the benefit of creditors or otherwise commit an act of bankruptcy (as defined in the Bankruptcy Act) or shall suffer the institution against Grantor of

279867

proceedings, or apply for relief, under any law relating to bankruptcy, insolvency, or to the reorganization or relief of debtors.

      d.    Commencement of any action or proceeding to foreclose or issue execution on any lien upon the Property or any part thereof other than the lien of this Deed of Trust.

      4.    <u>Beneficiary Actions</u>.  After any default in the performance of any of Grantor's agreements herein, and after the expiration of any applicable cure periods pursuant to the Contract, Beneficiary may, at its option, perform the same and the cost thereof shall immediately be due from Grantor to Beneficiary on demand and shall be included within the indebtedness hereby secured.

      5.    <u>Notice</u>.  Every provision for notice and demand or request shall be deemed fulfilled and effective when in writing and when either (a) personally served on any one of the persons who shall at the time hold the record title to the Property, or on their personal representatives or successors, or (b) placed in the mail by depositing it in the U.S. Mail, enclosed in a postpaid envelope addressed to any one of such persons at his or their address last known to Beneficiary.  As of the date hereof, such addresses are as set forth in Paragraph 17 hereof.

      6.    <u>Fees and Costs</u>.  If after default hereunder by Grantor, and after the expiration of any applicable cure period pursuant to the Contract, Beneficiary or Trustee shall incur or expend any sums, including reasonable attorneys' fees, whether in connection with any action or proceeding or not, to sustain the lien of this Deed of Trust or its priority, or to protect or enforce any of its or their rights hereunder, or to recover any indebtedness hereby secured, or for any title examination or title insurance policy relating to the title to the Property, or for any survey of the Property, all such sums shall on notice and demand be paid by Grantor, and shall be deemed to be included within the indebtedness hereby secured.

      7.    <u>Waivers; Beneficiary's Discretion in Enforcement</u>.  Any failure by Beneficiary to insist upon the strict performance by Grantor of any of the provisions hereof shall not be deemed to be a waiver of any of the provisions hereof, and Beneficiary, notwithstanding any such failure, shall have the right thereafter to insist upon the strict performance by Grantor of any and all of the provisions of this Deed of Trust. Beneficiary may proceed to seek foreclosure or any other relief available at law or in equity in any order which Beneficiary may determine, in its sole discretion. Grantor hereby waives all benefit that might accrue to Grantor by virtue of any present or future homestead exemption or other law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment, all notices of Grantor's default; any right to have the Property marshalled; and any right to trial by jury in any action brought on, under or by virtue of this Deed of Trust.

279867

8.    Foreclosure.  If at the maturity of the indebtedness hereby secured, however such maturity may be brought about (including without limitation the unrevoked election of Beneficiary pursuant to the provisions of paragraph 3 hereof to accelerate the maturity of the indebtedness hereby secured), default should be made in the payment of the indebtedness hereby secured, Trustee shall thereupon or at any time thereafter, at the request of Beneficiary, declare the indebtedness hereby secured to be at once due and payable and take possession of the Property, and after providing and publishing notice of such sale as is required by applicable law, sell the Property or any portion thereof requested by Beneficiary to be sold, as an entirety or in parcels, by one sale or by several postponement of sales as may be deemed by Trustee to be appropriate and without regard to any right of Grantor or any other person to the marshalling of assets, at public auction, at such time or times, at such place or places, and upon such terms and conditions as Trustee shall deem appropriate.  The terms of sale being complied with, Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold, without any covenant or warranty expressed or implied.  The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Upon any sale of the Property under this Deed of Trust whether under the assent to a decree, the power of sale, or by equitable foreclosure, the proceeds of sale shall be applied (after paying all expenses of sale, including reasonable attorneys' fees and a commission to the Trustee making the sale of five percent (5%) of the amount of the said sale or sales, and also all taxes and assessments, rents and prior liens thereon due which Trustee or Beneficiary deem it advisable or expedient to pay, and all sums advanced as herein provided for) to the payment of all then due real estate taxes, to the payment of the then indebtedness hereby secured (including all other applicable fees and charges, if any, to the date of payment), to all other liens according to their priority, and finally paying over the surplus of such sale proceeds, if any, to Grantor or to any person entitled thereto upon the surrender and delivery to the purchaser of possession of the Property, hereunder, less the expense, if any, of obtaining possession thereof. Immediately upon the first insertion of any advertisement or notice of sale, Grantor shall owe all expenses incident to said advertisement or notice, all court costs and all expenses incident to any foreclosure proceedings under this Deed of Trust, including reasonable attorneys' fees and a commission on the total amount of the indebtedness, and principal, and no party shall be required to receive only that portion of the indebtedness hereby secured attributable to the principal unless the same be accompanied by a tender of the then entire indebtedness hereby secured.

9.    Rights Cumulative; Survival.  The rights and powers of Beneficiary and Trustee arising under this Deed of Trust shall be separate and cumulative and none of them shall be in exclusion of the others.  All covenants, representations and warranties of Grantor hereunder survive recording of this Deed of Trust and continue thereafter.

10.    Substitute Trustees.  Beneficiary is hereby granted by Grantor the irrevocable power to appoint as often as it desires a substitute Trustee or Trustees hereunder and to remove Trustees to be exercised at any time hereafter, with or without cause and without notice of filing for record in the office where this instrument is recorded a Deed of Appointment.  Upon the recordation of such Deed of Appointment, the Trustee so appointed shall thereupon, without any further act or deed of conveyance, become fully

vested with identically the same title and estate in and to the Property and with all the rights and duties of such Trustee's predecessor in the trust hereunder with like effect as if originally named as Trustee.

11.   Definitions.  Wherever used in this Deed of Trust, unless the context clearly indicates a contrary intent the words "Deed of Trust" shall mean this Deed of Trust and any supplement or supplements hereto, the word "Grantor" shall mean Grantor and/or any subsequent owner or owners of the Property, the word "Beneficiary" shall mean "Beneficiary" or any subsequent purchaser under the Contract, the word "person" shall mean "an individual, corporation, partnership, trust or unincorporated association," the word "Property" shall include the real estate hereinbefore described, together with any condemnation awards and any other rights or property interests at any time made subject to the lien of this Deed of Trust by the terms hereof, and pronouns of any general shall include the other genders, and either the singular or plural shall include the other.  All other capitalized terms not defined herein shall have the meanings set forth in the Contract.

12.   Successors; Entire Agreement; Governing Law.  This Deed of Trust, and all other documents issued in conjunction therewith, shall be binding upon the parties thereto and their respective heirs, executors, administrators, personal representatives, successors and assigns.  This Deed of Trust may not be changed orally, but only by an agreement in writing and signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.  The validity and construction of all matters pertaining to this Deed of Trust are to be determined according to the laws of the State of Maryland.

13.   Captions.  The captions herein set forth are for convenience of reference only and shall not be deemed to define, limit, or describe the scope or intent of this Deed of Trust.

14.   Release in Default.  In the event that Beneficiary defaults under the Contract, and such default continues at the expiration of any applicable cure period, this Deed of Trust shall be fully released and deemed null and void.  In such an event, Beneficiary shall instruct the Trustee to execute and deliver such confirmation of termination as Grantor shall request.

**[SIGNATURE FOLLOWS]**

279867

IN WITNESS WHEREOF, Grantor has executed this Deed of Trust as of the date first above written.

<u>GRANTOR</u>:


_____          By:_____


State of Maryland                          )
                                                         To Wit
County of _____    )

        I, _____, a notary public in and for the jurisdiction aforesaid, do hereby certify that _____, who is a _____ of _____, a Maryland limited liability company , party to a certain deed of trust bearing date on the day of _____, 2008, and hereto annexed, personally appeared before me in said jurisdiction, the said _____, being personally well-known to me as (or proved by the oath of credible witnesses to be) the person who executed the said deed of trust, and acknowledged the same to be his act and deed.

        Given under my hand and seal this __ day of _____, 2008.


                                                        _____
                                                        Notary Public

My Commission Expires:_____


        This is to certify that the within instrument was prepared under the supervision of the undersigned, an attorney duly admitted to practice before the Court of Appeals in Maryland.


                                                        _____
                                                        Barry C. Greenberg, Esquire


279867

**EXHIBIT A**

**[PROPERTY DESCRIPTION]**

279867

EXHIBIT D

COPY OF EXISTING OWNER'S TITLE INSURANCE POLISY ISSUED BY CHICAGO
TITLE



**Loan Policy of Title Insurance**

# Fidelity National Title Insurance Company
## of New York
A Stock Company

**POLICY NUMBER** 5412 – 2602406

*SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, a New York corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:*

*1. Title to the estate or interest described in Schedule A being vested other than as stated therein;*

*2. Any defect in or lien or encumbrance on the title;*

*3. Unmarketability of the title;*

*4. Lack of a right of access to and from the land;*

*5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;*

*6. The priority of any lien or encumbrance over the lien of the insured mortgage;*

*7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:*

*a. arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or*

*b. arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;*

*8. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.*

*The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.*

*IN WITNESS WHEREOF, FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK has caused this policy to be signed and sealed by its duly authorized officers as of Date of Policy shown in Schedule A.*

Watermark Settlement & Escrow LLC

FIDELITY NATIONAL TITLE INSURANCE COMPANY
OF NEW YORK

Countersigned

Authorized Signature
(PLEASE PRINT NAME)
**Deborah A. Marl**

SEAL

By: _____
President

Attest: *Charles H. Wimer*
Secretary

**ALTA TITLE INSURANCE POLICY**   LOAN FORM (10-17-92)
Office File No.: 2005038                       Policy No.: 5412-2602406

Schedule A

**Amount of Insurance:** $9,500,000.00

**Date of Policy:** September 26, 2005 at 12:24 P.M.

**The Insured:** Mercantile-Safe Deposit & Trust Company, its successors and/or assigns

1. The Estate or interest referred to herein is at Date of Policy vested in:

   Dell House, LLC as to Parcel 1 and
   Capital Development, LLC as to Parcel 2 and 3

2. The estate or interest in the land described in this Schedule and which is encumbered by the insured mortgage is: Fee Simple

3. The mortgage, herein referred to as the Insured mortgage, and the assignments thereof, if any, are described as follows:

   Indemnity and Letter of Credit Deed of Trust, Assignment of Leases and Rents, security Agreement and Fixture Filing by and between Capital Development, LLC and Dell House, LLC, grantor, Patrick G. Tehan and Barry C. Greenberg, as Trustee, for the benefit of Mercantile-Safe Deposit & Trust Company as Lender, dated August 31, 2005 and recorded in September 26, 2005 in Book 6788 at Page 297.

4. The land referred to in this policy is described as follows:

See attached Exhibit "A"

**Watermark Settlement & Escrow LLC**

By: _____
        Deborah Marl
        Authorized Signatory

**Schedule B, Part 1**

**Policy No.:** 5412-2602406

**This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:**

1. Taxes and other public charges, including assessments by any City, County, Municipality, Metropolitan District or Commission, payable on an annual basis subsequent to the fiscal year ending June 30, 2005. This policy does not insure against the balance of any public charges, including assessments by any City, County, Municipality, Metropolitan District or Commission, payable on an annual basis subsequent to the fiscal year ending June 30, 2005. Nor does this policy insure against possible future tax levies nor against possible public charges as defined above that have not been levied or assessed as of Date of Policy.

2. The exact acreage or volume of land state in Schedule A is not insured.

As to Parcel 1:

3. Terms and conditions of recorded instruments recorded in Liber SEB 1277 at Folio 501, Liber SEB 1277 at Folio 473 and Liber RHB 2515 at Folio 180.

4. Subject to and together with Notes, Easements, Setbacks, Reservations, as shown on Department of Public works for Baltimore City, Property Location Division Tax Block plat No. 1684, dated July, 1975.

5. Subject to the use in common with others so entitled in and to that portion of the captioned property lying and being in the bed of Orleans Street and North Washington Street.

6. Terms and conditions as contained in Deed dated December 18, 1986 from Exxon Corporation (NJ) to Yoon Hak Cha, recorded in Liber SEB 1277 at Folio 473.

As to Parcel 2 and 3:

7. Terms and conditions of recorded instruments recorded among the Land Records of Baltimore City in Plat Book WA 2648.

8. Terms and provisions contained in an Agreement dated August 2, 1972 and recorded among the land Records of Baltimore City in Liber No. 2947, Folio 747 between Chapel Housing Partnership and the Mayor and City Council of Baltimore, as impacted by Certificate of Completion dated August 4, 1977 and recorded August 9, 1977 in Liber 3507, Folio 694.

9.  Terms and provisions contained in Deed dated September 4, 1975 and recorded among the Land Records of Baltimore City in Liber 3267, Folio 622 from the Mayor and City Council in Baltimore unto Chapel Housing Partnership.

10. Encroachment of 3 story building into setback created by Agreement recorded at R. H.B. 2947, Folio 747, as shown on survey of subject property entitled "ALTA/ACSM Land Title Survey Property of Chapel Housing Partnership" prepared by S.J. Martinet and Co. Inc., certified August 1, 2002.

As to Parcels 1, 2 and 3:

11. Pending disbursement of the full proceeds of the loan secured by the Deed of Trust as set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increases as and in the amount of each disbursement made.

12. Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises subsequent to March 16, 2004 as to Parcel 1 and subsequent to August 1, 2002 for Parcels 2 and 3.


Note: Parcel 1 has been used for the sale and storage of petro-chemicals and may have suffered the environmental degradation common to sites used for such purposes.

**Schedule B , Part 2**
**Policy No.: 5412-2602406**

**In addition to the matters set forth in Part 1 of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company Insures that such matters are subordinate to the lien or charge of the Insured mortgage upon said estate or Interest:**

NONE

Exhibit "A"

**Parcel 1:**

BEGINNING FOR THE SAME at the intersection of the South side of Orleans Street, 66 feet wide, and the West side of North Washington Street, 70 feet wide, thence leaving the said point of beginning and running and binding on the West side of North Washington Street, 70 feet wide, as now surveyed, courses referred to True Meridian as established by Baltimore City Topographical Commission South 2 degrees 45 minutes 00 seconds East, 75.00 feet to the intersection of the North side of a 10 foot alley and the west side of North Washington Street, 70 feet wide, thence leaving the West side of North Washington Street, 70 feet wide and running and binding on the North side of said 10 foot alley, South 87 degrees 04 minutes 30 seconds West, 140.00 to the intersection of the North side of said 10 foot alley and the East side of North Chapel Street, 20 feet wide; thence running and binding on the East side of North Chapel Street, 20 feet wide, North 2 degrees 45 minutes 00 seconds West 75.00 feet to the intersection of the South side of Orleans Street, 66 feet wide, and the East side of North Chapel Street, 20 feet wide; thence running and binding on the South side of Orleans Street, 66 feet wide, North 87 degrees 04 minutes 30 seconds East, 140.00 feet to the place of beginning.

**Parcel 2:** (+/- 2.334 acres)

All that land situate in the City of Baltimore, State of Maryland, , known and designated as Lot No. 4, Chapel (MD A-1) and described as follows:

All courses and distances in this description are referred to the true meridian as adopted by the Baltimore Survey Control System.

Reserving to the City all of its right, title and interest in and to the beds of all streets abutting the property herein described; subject, however, to the use of said streets in Common as public highways. All references to streets and alleys are for the purpose of description only and are not to effect a dedication.

BEGINNING for the same at the point formed by the intersection of the ease side of Wolfe Street, as not laid out 70 feet wide, and the south side of Orleans Street, as now laid out 66 feet wide, and running;

THENCE binding on the south side of said Orleans Street, North 87 degrees 04' 30" East 159 54 feet to intersect the east side of the former bed of Chapel Street, 20 feet wide, as condemned and closed;

THENCE binding on the east side of the former bed of Chapel Street, South 02 degrees 45' 00" East 75.00 feet to intersect the north side of the former bed of a 10 foot alley, as condemned and closed;

THENCE binding on the north side of the former bed of said 10 foot alley, North 87 degrees 04' 30" East 140.00 feet to intersect the west side of Washington Street as now laid out 70 feet wide;

THENCE binding on the west side of said Washington Street, South 02 degrees 45' 00" East 299.76 feet to intersect the north side of Fayette Street as now laid out 70 feet wide;

THENCE binding on the north side of Fayette Street, South 87 degrees 03' 40" West 299.0 feet to intersect the aforesaid east side of Wolfe Street and;

THENCE binding on the east side of said Wolfe Street, North 02 degrees 50' 00" West 374.83 feet to the Place of Beginning.

**Baltimore City Tax Ward 06 Section 11 Block 1684 Lot 001.**


**Parcel 3:** (+/- 5.573 acres)

All that land situate in the City of Baltimore, State of Maryland, known and designated as Lot No. 5, Chapel (MD A-1) and described as follows:

All courses and distances in this description are referred to the true meridian as adopted by the Baltimore Survey Control System.

Reserving to the City all of its right, title and interest in and to the beds of all streets abutting the property herein described; subject, however, to the use of said streets in Common as public highways. All references to streets and alleys are for the purpose of description only and are not to effect a dedication.

BEGINNING for the same at the point formed by the intersection of the south side of Fayette Street, as now laid out 70 feet wide, and the east side of Wolfe Street, as now laid out 70 feet wide; and running;

THENCE binding on the south side of said Fayette Street, North 87 degrees 03' 40" East 298.90 feet to intersect the west side of Washington Street, as now laid out 70 feet wide;

THENCE binding on the west side of said Washington Street, South 02 degrees 45' 00" East 807.27 feet to intersect the north side of Baltimore Street, as now laid out 70 feet wide;

THENCE binding on the north side of said Baltimore Street, South 87 degrees 06' 00" West 302.85 feet to intersect the east side of Wolfe Street, as now laid out 60 feet wide;

THENCE binding on the east side of last said Wolfe Street, North 02 degrees 54' 50" West 331.81 feet;

THENCE binding on the east side of Wolfe Street, varying in width, North 01 degrees 43' 53" East 70.23 feet; and;

THENCE binding on the East side of Wolfe Street, as now laid out 70 feet wide North 02 degrees 50' 00" West 405.25 feet to the Place of Beginning.

**Baltimore City Tax Ward 06 Section 11 Block 1702 Lot 001**

 **Fidelity National Title**
Insurance Company

### ENDORSEMENT

Re: Dell House-Capital Development

Attached to and forming part of Policy Number 5412-2602406 of Fidelity National Title Insurance Company.

Item 7 of the Exclusions from Coverage is Eliminated.

This endorsement, when countersigned by an authorized signatory, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.

Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding until countersigned by an authorized signatory as designated below.

Signed and sealed this   14th   day of February 2006.

Countersigned:                                     *Fidelity National Title Insurance Company*
Watermark Settlement & Escrow LLC

                                                     SEAL    By: _____ President
By: _____                 ATTEST _____ Secretary
       Authorized Signatory
       Deborah Marl

Cr Arb Endorsement


**Fidelity National Title**
Insurance Company

**ENDORSEMENT**

Re: Dell House-Capital Development

Attached to and forming part of Policy Number 5412-2602406 of Fidelity National Title Insurance Company.

The Company assures the Insured that the land is the same as that delineated on the plat of survey made by S. J. Martenet and Co. Inc., dated March 16, 2004 and entitled ALTA/ACSM Land Title Survey Property knows as No. 1921 Orleans Street Ward: 6, Section: 11 Blocks: 1684 and 1702, Baltimore City Maryland." as to Parcel 1.

The Company assures the Insured that the land is the same as that delineated on the plat of survey made by S. J. Martenet and Co. Inc., dated   August 2, 2002, revised December 2, 2002, and entitled ALTA/ACSM Land title Survey Property of Chapel Housing Partnership, Ward: 6, Section: 11 Blocks: 1684 and 1702, Baltimore City Maryland." as to Parcels 2 and 3

The Company hereby insures the Insured against loss which the Insured shall sustain in the event the assurance herein shall prove to be incorrect.

This endorsement, when countersigned by an authorized signatory, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.

Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding until countersigned by an authorized signatory as designated below.

Signed and sealed this   14th day of February, 2006
Countersigned:
Watermark Settlement & Escrow LLC

By:
Authorized Signatory
Deborah Marl

*Fidelity National Title Insurance Company*

SEAL

BY:                        President
ATTEST                     Secretary

"Same As" Endorsement

 **Fidelity National Title**
Insurance Company

## ENDORSEMENT

Re:   Dell House-Capital Development

Attached to and forming part of Policy Number 5412-2602406 of Fidelity National Title Insurance Company.

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1.  The existence at Date of Policy of any of the following:
    (a)  Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired.
    (b)  Unless expressly excepted in Schedule B:
        (1)  Present violations on the land of any enforceable covenants, conditions or restrictions, and any existing improvements on the land which violate any building setback lines shown on a plat of subdivision recorded or filed in the public records.
        (2)  Any instrument referred to in Schedule B as containing covenants, conditions or restrictions on the land does not, in addition, (i) establish an easement on the land; (ii) provide a lien for liquidated damages; (iii) provide for a private charge or assessment; (iv) provide for an option to purchase, a right of first refusal or the prior approval of a future purchaser or occupant.
        (3)  Any encroachment of existing improvements located on the land onto adjoining land, or any encroachment onto the land of existing improvements located on adjoining land.
        (4)  Any encroachment of existing improvements located on the land onto that portion of the land subject to any easement excepted in Schedule B.
        (5)  Any notices of violation of covenants, conditions or restrictions relating to environmental protection recorded or filed in the public records.
2.  Any future violation on the land of any existing covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest in the land by the insured, provided the violation results in:
    (a)  Invalidity, loss or priority, or unenforceability of the lien of the insured mortgage; or
    (b)  loss of title to the estate or interest in the land if the insured shall acquire title in satisfaction of the indebtedness secured by the insured mortgage.
3.  Damage to existing improvements, including lawns, shrubbery or trees:
    (a)  which are located on or encroach upon that portion of the land subject to any easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved;
    (b)  resulting from the future exercise of any right to use the surface of the land for the extraction or development of minerals excepted from the description of the land or excepted in Schedule B.
4.  Any final court order or judgment requiring the removal from any land adjoining the land of any encroachment excepted in Schedule B.
5.  Any final court order or judgment denying the right to maintain any existing improvements on the land because of any violation of covenants, conditions, or restrictions or building setback lines shown on a plat of subdivision recorded or filed in the public records.

Wherever in this instrument the words, "covenants, conditions, or restrictions," appear, they shall not be deemed to refer to or include the terms, covenants, conditions or limitations contained in an instrument creating a lease.

As used in paragraphs 1(b)(1) and (5), the words "covenants, conditions or restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection.

This endorsement is made a part of the policy and is subject to all the terms and provisions thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF FIDELITY NATIONAL TITLE INSURANCE COMPANY has caused its corporate name and seal to be hereunto affixed by its duly authorized officers on this      14th      day of      February      2006.

Countersigned:
Watermark Settlement & Escrow LLC

*Fidelity National Title Insurance Company*

By:                                                           SEAL   By:                          President

Authorized Signatory                                      ATTEST                       Secretary
Deborah Mart

ALTA Endorsement – Form 9

 **Fidelity National Title**
Insurance Company

## ENDORSEMENT

Re:  Dell House-Capital Development

Attached to and forming part of Policy Number 5412-2602406 of Fidelity National Title Insurance Company.

The Company insures against loss or damage sustained by the insured if, at Date of Policy:  (i) the land does not abut and have both actual vehicular and pedestrian access to and from Wolfe Street, Baltimore Street, Washington Street and Orleans Street (the "Street"); (ii) the Street is not physically open and publicly maintained, or (iii) the insured has no right to use existing curb cuts or entries along that portion of the Street abutting the land.

This endorsement, when countersigned by an authorized signatory, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.

Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding until countersigned by an authorized signatory as designated below.

Signed and sealed this 14th day of        February                2006.

Countersigned:                                                    *Fidelity National Title Insurance Company*
Watermark Settlement & Escrow LLC

By: _____                    SEAL       By: _____  President
        Authorized Signatory                                    ATTEST  _____
        Deborah Marl                                                                          Secretary

Access Endorsement

 **Fidelity National Title**
Insurance Company

## ENDORSEMENT

Re: Dell House-Capital Development

Attached to and forming part of Policy Number 5412-2602406 of Fidelity National Title Insurance Company.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

> Any environmental protection lien, which at Date of Policy is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B.

This endorsement, when countersigned by an authorized signatory, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.

Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

This endorsement shall not be valid or binding until countersigned by an authorized signatory as designated below.

Signed and sealed this 14th day of        February            2006.

Countersigned:                              *Fidelity National Title Insurance Company*

Watermark Settlement & Escrow LLC

By: _____             SEAL    By: _____  President

Authorized Signatory                               ATTEST _____  Secretary
Deborah Marl

Commercial 8.1 Endorsement

## Fidelity National Title Insurance Company

Re: Dell House-Capital Development

Attached to and made a part of Fidelity National Title Insurance Company Policy No.: 5412-2602406

The Company hereby insures the Insured against loss or damage which the Insured shall sustain by reason of any inaccuracies in the following:

> The land described in Schedule A as Parcels 1 and 2, taken as a tract, comprises one contiguous parcel of land with no gaps or gores.

The total liability of the Company under said Policy and any endorsements attached thereto shall not exceed, in the aggregate, the face amount of said Policy and costs which the Company is obligated under the provisions of said Policy to pay.

This endorsement, when countersigned by a duly authorized Officer or Agent, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.

Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Date: February 14, 2006

Issued at/by:   **Fidelity National Title Insurance Company**

Watermark Settlement & Escrow LLC

By: _____
      Authorized Signature
      Deborah Marl

**Contiguity**

EXHIBIT E

DESCRIPTION OF RETAIL IMPROVEMENTS

*Gateway at Washington Hill*

<u>**Property Description of Retail and Grocery**</u>

The property described is considered to be in the schematic phase. Specific design criterion as dictated by the end user may alter this description to a magnitude unspecified at this time.

Description:

The grocery/retail is intended to be Type 3 construction. Foundations are to be concrete construction. Geotechnical information and structural engineering will determine the depth and bearing loads of these foundations as the design progresses.

Grade differentials on the site will controlled by use of concrete retaining walls at the exterior perimeter of the grocery that are partially below street elevation. All remaining above grade walls are intended to be reinforced Concrete Masonry Units (CMU) to segregate the grocery/retail from the parking and residential areas of the project.

The mezzanine and roof levels of the structure are to be cast-in-place concrete. This will allow structural integrity for the residential property constructed over this area. Some areas of the mezzanine may be determined to be structural steel to accommodate architectural elements of the design. The ground floor slab-on-grade is suggested to be left out to allow the construction of underground utilities necessary for internal grocery store plumbing, mechanical, and electrical requirements.

Exterior façade will be inclusive of vision surfaces such as storefront glass elements, ingress and egress doorways, and finish surfaces as approved through the Architect of Record (brick, stone, stucco, etc.).

Infrastructure will be provided as necessary to incorporate adequate load for storm, sanitary, water, and electrical demand as agreed upon by the end user and the project Engineer of Record. This infrastructure is only to incorporate the needed demand of the grocery/retail external of the grocery/retail portion of the project. Actual design and construction of the grocery/retail facility mechanical, electrical, plumbing, and fire protection is to be performed by the end user.

Exterior street, landscaping, and signage required by the end user, and any elements specific to individual demands of a specific grocer or retailer will need to be identified during the initial design phase or be priced separate from the basic core and shell agreement.

The intent is to provide a structural core and shell adequate to support the grocery/retail facility as integrated into a residential property, a watertight envelope for interior design, MEP infrastructure adequate for grocery/retail design, and exterior facade as agreed upon through the architectural design and approval phase.

EXHIBIT F

LIST OF APPROVALS TO BE OBTAINED BY PURCHASER

- Urban Design and Architecture Review Panel (UDARP) Approval.
- Site Plan Review Commission (SPRC) Approval.
- Planning Commission Final Design Approval.