IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

)
JLB REALTY, LLC                           )
)
         Plaintiff,               )           Case No. 1:09-cv-00632-BEL
v.                                 )
)
CAPITAL DEVELOPMENT, LLC     )
)
         Defendant.        )
_____)

MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

November 9, 2009

John T. Prisbe
Gregory T. Wasylak
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland  21202
(410) 244-7400 (telephone)
(410) 244-7742 (facsimile)

Attorneys for Plaintiff JLB Realty, LLC

## Table of Contents

I.   OVERVIEW ........................................................................................................... 1

II.  FACTS ................................................................................................................... 3

     A.   Background on the real property, parties, and various persons. ........................ 3

     B.   The Contract and terms therein. .......................................................................... 6

     C.   In August 2008, JLB and its counsel raise title objections ................................ 7

     D.   Negotiation and execution of the First Amendment ........................................... 8

     E.   During the September 2008 to December 2008 time period,
          Capital Development fails to secure the execution and recordation
          of a release of the LDA ...................................................................................... 9

     F.   In late December 2008 and in light of the financial meltdown,
          JLB informs Capital Development that it will either be
          terminating or restructuring.  Attempts to salvage a restructured
          deal do not get successfully negotiated, and JLB terminates the
          Contract ............................................................................................................ 11

     G.   Notes connected with Capital Development's decision to buy out its
          prior affordable housing promise and the eventual June 17, 2009
          amendment to the LDA ...................................................................................... 17

III. ARGUMENT ....................................................................................................... 19

     A.   Summary judgment principles. .......................................................................... 19

     B.   Section 2 of the First Amendment controls and that contract
          language is clear and unambiguous.  Under the parties'
          express arrangements, JLB had the right to terminate and is
          entitled to the return of its earnest money deposit .......................................... 20

     C.   Capital Development's conclusory arguments are meritless .............................. 22

IV.  CONCLUSION .................................................................................................... 26

Plaintiff JLB Realty, LLC ("Plaintiff" or "JLB"), through counsel, submits this memorandum in support of its motion for summary judgment.

## I. OVERVIEW

This is a straightforward case involving the return of earnest money deposit funds to JLB in accordance with the express terms of a commercial real estate sales contract. JLB was the contract purchaser and posted one million dollars in earnest money deposit funds. Defendant Capital Development, LLC ("Defendant" or "Capital Development") was the contract seller.

In an August 21, 2008 agreement titled "First Amendment to the Contract for Sale" (the "First Amendment"), these commercial parties specifically addressed JLB being entitled to terminate the sales contract and obtain the return of its earnest money deposit under the circumstances relevant here. In that August 21, 2008 First Amendment, these commercial parties expressly agreed that:

> "Release of Earnest Money. Notwithstanding anything to the contrary contained in Section 3.d, the Title Company [*i.e.*, the entity holding the deposit funds in an escrow account] shall not release any portion of the Earnest Money to Seller until such time as that certain Agreement dated August 12, 1972, recorded in Liber 2947, folio 747 between Chapel Housing Partnership and the Mayor and City Council of Baltimore shall have terminated and been released of record[1] such that it no longer encumbers the Property (the "Release"). **If the Release has not been executed and recorded within 45 days following the date of this Amendment, Purchaser shall be entitled to terminate this Contract by written notice to Seller at any time before the release has been executed and recorded, in which event, the Earnest Money shall be returned to Purchaser**." (Bold emphasis added).

---

[1] The referenced August 12, 1972 agreement is a Land Disposition Agreement (the "LDA") between Baltimore City and a predecessor-in-interest owner of the land. The LDA contained provisions that, *inter alia*, restricted the development density for the land to not more that 30 dwellings units per acre. Such a restriction was problematic for developments contemplated. *See also* Discussion *infra* at footnote 3.

*See* First Amendment at § 2.  A true and accurate copy of the contract of sale between the parties ("Contract of Sale" or "Contract") is included at Exhibit 1 to this memorandum, and a true and accurate copy of the First Amendment is included at Exhibit 2.

In late December 2008, and in large part as a result of the economic circumstances that had developed, JLB determined and advised Capital Development that either: (1) JLB would be terminating the sales contract and obtaining the return of its deposit funds; or (2) there needed to be a second amendment that restructured the possible sale and the terms in a manner that was acceptable to JLB.  **There is no dispute** that a release of the LDA had not been executed and recorded by that date.

In early 2009, the parties were not successful in attempts to negotiate a second amendment to the Contract.  As a result, on February 16, 2009, JLB exercised its right to terminate and receive the return of its deposit funds.  **There is no dispute** that a release of the LDA had not been executed and recorded by that date.[2]

Accordingly, **there is no dispute** that, pursuant to the terms expressly agreed upon by these commercial parties, JLB was and is entitled to the return of its earnest money deposit.  Summary judgment should be entered in favor of JLB.

---

[2]     From a belated document production that was not made by Capital Development until *after* the discovery period closed, it appears that, eventually on June 17, 2009, Capital Development obtained an executed amendment of the LDA that was ready for recordation (an actual release for the LDA was not obtained).  It also appears that Capital Development still has not recorded that document in Baltimore City land records.  JLB reserves all rights and arguments as a result of the failures by Capital Development to produce materials or disclose information prior to the close of discovery.

II. <u>FACTS</u>

A.   <u>Background on the real property, parties, and various persons.</u>

<u>The real property</u>.  Capital Development owns real property located in Baltimore City in an area referenced as "Washington Hill" or "Gateway at Washington Hill."  The site is in proximity to The John Hopkins Hospital and the Fells Point area of Baltimore City.  The real property is commonly referred to as being comprised of three parcels: Parcel A, Parcel B, and Parcel C.  The area and parcels are depicted in the photographs included as Exhibit 3.

The possible transaction between JLB and Capital Development involved the possible purchase by JLB of Parcel A and Parcel B which contain approximately 7.38 acres.  *See* Exhibit 1 at § 1.  JLB contemplated primarily developing those two parcels with roughly 444 residential rental apartment units, with some additional retail space.  *Id.* at § 2.  Capital Development was not selling Parcel C, and Capital Development contemplated developing that parcel itself with retail, commercial, and office space.[3]

<u>JLB and various personnel</u>.  JLB is a real estate investment and development company headquartered in Texas.[4]  In 2008, Plaintiff JLB had a regional

---

[3]      This real property was called the Chapel Housing Site in the 1970s and, at that time, a then-existing developer entity (an entity named Chapel Housing Partnership) acquired the property from Baltimore City and entered into a Land Disposition Agreement dated as of August 2, 1972 with the City (*i.e.,* the previously referenced "LDA").  As noted, among other things, the terms of the LDA limited the development density to not more than 30 dwellings units per acre which was significantly problematic where JLB planned for roughly 444 dwelling units for the 7.38 acres.  A true and accurate copy of the 1972 LDA is included at Exhibit 4.  (The 30 dwelling units per acre density restriction of the LDA is found in Exhibit B to that document, at § 1(c) thereof).  As reflected by public land records, in December 2002, Capital Development obtained the land for a purchase price of $4,500,000.  *See* True and accurate copies of the December 2002 Deed and Deed of Trust relating to Capital Development's acquisition of the property, true and accurate copies of which are included collectively as Exhibit 5.

[4]      Plaintiff JLB is owned by JLB Partners, LP.  For general background on JLB Partners, LP and its affiliates, *see generally* www.jlbpartners.com.

office located in Herndon, Virginia and possible projects in what was referred to as the "Mid-Atlantic" region.   In light of the downturns in the economy and the real estate market, the Mid-Atlantic office closed in April 2009 and no longer exists.

Mr. Paul Johnston is an operating partner for JLB Partners, LP, works out of the corporate headquarters in Dallas, and has management authority and responsibilities for JLB.   Mr. Gary Plichta was a local manager for JLB in the former Mid-Atlantic regional office.   Mr. Ben Kerschberg is a former employee of JLB who also worked in the Mid-Atlantic regional office when it existed.[5]

Capital Development and its personnel.   Capital Development is a Maryland real estate investment company and has two principals/employees: Mr. David Holmes and Ms. Cristina King (a/k/a Tina King).   *See* September 10, 2009 Deposition of Capital Development's David Holmes, copy of those excerpts cited in this memorandum included at Exhibit 6 (the "Holmes Deposition"), at 16-18, 39 (Mr. Holmes and Ms. King are the only personnel of the company and the two principals).   Mr. Holmes and Ms. King have been principals together in various businesses or ventures for approaching two decades since they met during graduate school.   *Id.* at 15-18.   Mr. Holmes is the active managing member for Capital Development.

Mr. Holmes is an educated, experienced, and sophisticated real property developer and investor.   Mr. Holmes testified that he has a B.A. degree in Business from Shippensburg University and a M.S. degree in Real Estate Development from The Johns Hopkins University.   Holmes Deposition at 8-9.   He worked in investment banking for Drexel Burnham Lambert and Prudential-Bache Securities from roughly 1988 to 1993.

---

[5]        When JLB's Mid-Atlantic office closed, Mr. Plichta and Mr. Kerschberg (and most employees in that office) were let go in a reduction in force.

*Id*. at 9-10.  Mr. Holmes has been involved in close to 50 real estate purchases (Holmes Deposition at 17-24); used an estimated 20-30 entities to transact his business endeavors (Holmes Deposition 27-28); used roughly a dozen different law firms for his various business dealings and entities (Holmes Deposition at 35); has been involved in at least three prior lawsuits (Holmes Deposition at 28-29); and understands contractual agreements and their importance.[6]

  <u>Attorneys involved</u>.  David Tatum, Esquire is an experienced real estate and business transaction attorney with the Texas law firm of Geary, Porter & Donovan, P.C.  Mr. Tatum is a long time real estate and business attorney for Plaintiff JLB, for its parent JLB Partners LP, and/or their management.  Attorney Tatum represented JLB throughout the negotiation and drafting of the sales contract, the first amendment to the contract, a possible second amendment to the contract, and the termination.

  Barry Greenberg, Esquire is an experienced business and real estate transaction attorney with the Maryland law firm of Rosenberg Martin Greenberg, LLP.  Mr. Greenberg represented Capital Development throughout the negotiation and drafting of the sales contract, the first amendment to the contract, a possible second amendment to the contract, and the termination.

  Stanley Fine, Esquire is an experienced land use attorney with the Maryland law firm of Rosenberg Martin Greenberg, LLP.  Attorney Fine represented Capital Development in the company's dealings with Baltimore City.

---

[6] Ms. Tina King is the other member of Capital Development.  Deposition testimony confirms that Ms. King similarly is a sophisticated and educated person and developer, and has been a principal with Mr. Holmes in various business ventures for approaching two decades.  Among other things, Ms. King is now the owner (with her husband) of the company known as Real Estate Dimensions which owns and manages six apartment buildings (consisting of roughly 440 units) in the Johns Hopkins University area, having bought out the interests of Mr. Holmes in that entity.  Holmes Deposition at 17-18, 21.

- 5 -

B.      <u>The Contract and terms therein</u>.

After negotiations by these commercial parties and their counsel for a number of months, the parties entered into a written contract for the possible sale of Parcels A & B (the previously referenced "Contract" or "Contract of Sale").  *See* Exhibit 1.  The Contract contains a merger/integration clause confirming that the final terms are in that writing and replace all prior understandings, representations and statements (oral or written).  *See* Section 13(c):

> "This Contract embodies and constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements (oral or written) are merged into this Contract".

In §13(c) of the Contract, these commercial parties also expressly agreed that no contractual provision may be waived, modified, amended, discharged, or terminated except in writing and then only to the extent that the writing so provides:

> "Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument."

The Contract had a base purchase price for Parcels A & B of Twenty Million Four Hundred Thousand Dollars ($20,400,000.00), which was subject to some possible adjustments depending upon: (a) whether the total number of residential units that JLB could construct ended up being more than or less than 444, and (b) whether the total allowed retail floor area that JLB could develop on those two parcels ended up being more than or less than 10,000 square feet.  *See* Contract at §2.

- 6 -

The Contract provided for earnest money deposits totaling One Million Dollars ($1,000,000.00) (*see* Contract at §3); for a due diligence and title review period for JLB to review property title issues and other matters (*see* Contract at §4); for the right of JLB to raise title objections, terminate the Contract, and secure the return of the earnest money deposited (*see, e.g.,* Contract at §4(d), §4(e), §8, §11(b)); that time was of the essence (*see* Contract at §13(g)); and for notice to be sent to the parties and their counsel (*see* Contract at §13(a)).

C.      In August 2008, JLB and its counsel raise title objections.

During a due diligence and title review period commencing after execution of the Contract, Stewart Title Guaranty Company ("Stewart Title") issued a proposed title insurance commitment dealing with the title ownership of, and any encumbrances upon, the real property.  JLB reviewed that title insurance commitment and related paperwork which, among other things, disclosed the continued existence of the LDA as an encumbrance on title to the property and that the LDA placed material restrictions on development of the property.

In communications among JLB personnel and representatives of Capital Development (including Capital Development's attorneys) during the due diligence and title investigation in July 2008 and August 2008, the LDA was raised as a material issue. By way of example in this regard, on or around July 15, 2008, Mr. Ben Kerschberg of JLB's Mid-Atlantic office observed that the LDA still encumbered the property and that circumstance was a very big deal:

> "Ron [Plichta] and I have some concerns about the Land Disposition Agreements of 1972 and 2007 ….

> <u>LDA of 1972</u>
> - Section 1(a) provides that compliance with non-discrimination laws runs in perpetuity.  Fine.
> - There are some other sections that caught my eye.  These run until June 27, 2009:
>   - 1(c) -- Maximum Density = 30 dwelling units per residential acre.  <u>**Naturally, this is a very big deal**</u>..…"

(underlining in the original and bold emphasis added).

A true and accurate copy of the July 15, 2008 e-mail communications is included at Exhibit 7.

In August 15, 2008 correspondence, JLB timely and formally raised objections to the status of title to the property and to the title commitment issued by Stewart Title, including objection to the LDA as an encumbrance on the property.  *See* August 15, 2008 letter of John Inabnett, Esquire raising objections by JLB, a true and accurate copy of which is included at Exhibit 8.

D.    <u>Negotiation and execution of the First Amendment</u>.

In August 2008, the parties and their counsel discussed how to handle JLB's objection to the LDA encumbrance, possible termination, return of the earnest money, and related items.  The parties and their counsel communicated on a possible first amendment to the Contract and, when doing so, addressed:  (a) JLB having the right to terminate the possible transaction until such time that a release of the LDA was actually recorded in land records; and (b) if such a termination occurred, that the earnest money shall be immediately returned to JLB.  In this connection, versions of a proposed first amendment were exchanged.

On August 21, 2008, Capital Development's attorney (Barry Greenberg, Esquire) recognized the important termination right that JLB requested in the proposed

- 8 -

first amendment and commented:

> "Is there a time that we can all get on the phone this afternoon to discuss the 1972 restriction and how it is to be resolved pursuant to the contract.  Obviously, this is not an unknown condition of title.  However, as I just told David Tatum, I am not sure that resolution within 45 days or a termination by the Purchaser is the appropriate way to address it in the Contract.  I will be out of town tomorrow, but can be available for a call in the afternoon if it needs to be done tomorrow."

A true and accurate copy of the e-mail correspondence by Attorney Greenberg is included at Exhibit 9.

The parties agreed to a final form of the First Amendment that gave Capital Development 45 days to obtain and record a release of the LDA.  If such a release had not been executed and recorded by that time, then JLB obtained a right to terminate the Contract and have the deposit funds immediately returned and that right continued until such time that a release for the LDA was actually executed and recorded in land records.  *See* § 2 of the First Amendment.

E.    During the September 2008 to December 2008 time period, Capital Development fails to secure the execution and recordation of a release of the LDA.

As contemplated under the Contract, Capital Development undertook certain efforts in the August 2008 to December 2008 time period to obtain from Baltimore City a release for the LDA.  Capital Development naturally attempted to do so in as favorable a fashion as possible for Capital Development.

Of note in this regard, in meetings and communications between Baltimore City and Capital Development during this time period, Baltimore City reminded Capital Development of a prior commitment made by Mr. Holmes and/or

Capital Development to provide affordable housing units in the area.[7]   In the discussions between Baltimore City agencies and Capital Development, Baltimore City's housing department resisted release or adjustment of the LDA until after satisfactory arrangements between Capital Development and Baltimore City were reached on the affordable housing subject.[8]

During this time period, Capital Development, David Holmes, and one of the attorneys assisting Capital Development (Stanley Fine, Esquire) asked for calculations and information from JLB on what effects an affordable housing component could have on the proposed JLB development.  For instance, Capital Development and its counsel (Attorney Stanley Fine) asked JLB to generate projections on the possible financial impacts that inclusion of an affordable housing requirement might have upon

---

[7]     In approximately the 2004-to-2006 time frame, Capital Development undertook certain efforts to develop the site itself and obtained a Planned Unit Development Approval (the "PUD" or "PUD Approval") from Baltimore City to allow certain development in the area.  Baltimore City passed an ordinance to provide approval for various zoning authorizations for that planned development; and a copy of Baltimore City Ordinance 04-859 is included at Exhibit 10.  Capital Development then contemplated townhouses would be built upon Parcels A & B.  In connection with that 2004 PUD Approval, the evidence indicates that Baltimore City also requested and either Capital Development or Mr. Holmes agreed that no less than 6% of the townhouses proposed to be constructed on Parcels A and B shall be priced and sold as "affordable housing units" in accordance with FHA/VA (*i.e.*, the Federal Housing Administration and Veterans Administration) underwriting guidelines.  Those arrangements were not included in the Baltimore City Ordinance.  Rather, eventually, there was a draft of a possible amendment to the LDA which, if it had been fully executed by Baltimore City and Capital Development, would have documented such arrangements and then been recorded in the land records.  However, that year's earlier draft was never fully executed and was never recorded.  *See* Earlier 2006 draft of a possible first amendment to the LDA, copy included at Exhibit 11.

Capital Development's efforts to develop Parcels A& B did not prove successful.  As a result, in or around January 2008, Capital Development listed the property for sale with a real estate broker (CB Richard Ellis, Inc.) and requested proposals.  JLB was one of the entities responding to the listing and the request for proposals through CB Richard Ellis, Inc.

[8]     For example in this regard, by October 15, 2008, Capital Development's counsel (Stanley Fine, Esquire) had discussed the affordable housing issue with Baltimore City Housing Commissioner Paul Graziano.  Commissioner Graziano voiced objection to a suggestion that affordable housing units would not be included or could be provided solely to employees of the nearby Johns Hopkins Hospital, supported continued demand for an affordable housing component, and requested more information on the alleged impacts that a 6% affordable housing commitment would have upon the contemplated development.  *See* October 15, 2008 e-mail communication, a true and accurate copy of which is included at Exhibit 12.

- 10 -

JLB's contemplated development so that Capital Development could then use such information in Capital Development's negotiations with Baltimore City.[9]

Discussions between Capital Development and Baltimore City included several possible scenarios including: (a) Capital Development asking Baltimore City to waive or release the prior inclusionary housing promise by Capital Development/Mr. Holmes; (b) Capital Development suggesting that an affordable housing component could be satisfied by the offering of certain units to employees of The John Hopkins Hospital; and/or (c) Capital Development proposing to make a payment in lieu of any requirement that there be inclusionary housing. There is no dispute that, in late December 2008 and continuing throughout the first quarter of 2009, no release of the LDA was executed and recorded.

F.      In late December 2008 and in light of the financial meltdown, JLB informs Capital Development that it will either be terminating or restructuring. Attempts to salvage a restructured deal do not get successfully negotiated, and JLB terminates the Contract.

Under the circumstances that existed in late December 2008, including the financial meltdown, JLB's corporate office determined that JLB would either: (a)

---

[9]      At times, and while employing conclusory statements and crafted characterizations that are not supported, Capital Development seems to suggest that by providing some information or some assistance to aid Capital Development in Capital Development's discussions with Baltimore City, there was a supposed partnership or there is some other legal effect. That is wrong. As noted by Mr. Plichta during his deposition, Capital Development and Mr. Holmes "drove the train" in its discussions with Baltimore City:

> "I never asked him [*i.e.*, Capital Development's David Holmes] to do anything specifically with the LDA. He was driving that train with the city. I was a support person from the standpoint of putting together numbers. But I can't recall specifically saying you need to do this. I did register our concerns and the financial impact. But it was all incumbent him to resolve the issue."

Deposition of Mr. Gary Plichta, copy of excerpts cited in this memorandum included at Exhibit 13 (the "Plichta Deposition"), at 46.

exercise its termination right and get the return of its $1,000,000 earnest money deposit, or (b) if the parties could timely agree, then proceed with a revised project plan under a negotiated second amendment.  On December 30, 2008, JLB's local office manager, Gary Plichta, met with Capital Development's David Holmes at Capital Development's offices and advised to that effect.  As related by Mr. Plichta in his deposition when questioned by Capital Development's counsel:

> Q.   So still the end of December, December 29, 30, somewhere in that range?
>
> A.   Yes.
>
> Q.   Did you terminate the contract in that meeting?
>
> A.   I told him [*i.e.,* David Holmes] what was told to me. I told him I was here to terminate and get the [deposit] money back.  I recall him saying at least three times I'll fight you over the money.  And we had a long conversation on a variety of different topics, the state of the economy.  But I went and reported back to JLB.
>
> Q.   Did you tell him you were terminating or did you tell him you were considering terminating?
>
> A.   My recollection is that I prefaced it by saying we need to modify the contract or I'm going to have to terminate the contract today.  I think that I also said that Dallas would stay in the deal if we could get $950,000 back and leave 50,000 up.

Plichta Deposition (Exhibit 13) at 65-66.  JLB also notified the settlement company holding deposit funds that JLB likely would be providing either a termination letter or a modification of the sales contract.  *See, e.g.,* December 30, 2008 e-mail correspondence between JLB personnel and settlement company, a true and accurate copy of which is included at Exhibit 14 (JLB indicating that it likely will be providing "either (a) a

- 12 -

modification of our contract with the Seller, or (b) a termination letter").

   With a possible profit in the area of $16,000,000.00 on the potential land sale slipping away, Capital Development's David Holmes acknowledges that he was shocked as a result of the December 30, 2008 discussion and notification.  *See* Holmes Deposition at 146 ("I was shocked.  I just didn't see it coming"); at 148 ("I told him, you know, let me just digest all of this.  I feel like I got hit with a frying pan.  It was just shocking").

   Among the circumstances that existed were the historic economic conditions, which JLB's Gary Plichta subsequently reconfirmed to Mr. Holmes when coordinating on a possible second amendment and writing to Capital Development in January 29, 2009 correspondence:

> "There has been nothing short of a meltdown of the financial markets in the last few months, which has caused panic and a real sense of doubt in the few of us viable parties that remain standing. Numerous competitors such as Trammel Crow, JPI, Alliance, Gables, Fairfield and even REITS such as Colonial Property Trust and Camden have shut down whole offices—and often entire divisions—as a result of this debacle.  Only yesterday, Archstone terminated all but one of its employees.
>
> *   *   *
>
> Financial Crisis
> Unfortunately, we cannot predict the future of the financial market and with giants like Bank of America teetering, the uncertainty in the financial market requires us to pause.  No matter how we both feel about the merits of this project, we have to face the reality that there may not be a willing lender.  Recent Senate hearings exposed the fact that other industries are also struggling because lenders are still unwilling to extend credit.  In fact, numerous references have been made to the fact that had Congress known that the stimulus package would not be used for its intended purpose, federal funds would only have been granted with more restrictions and requirements or perhaps not made at all.  There is real frustration in every industry dependent upon financing.  Ours is no different. The preponderance of all proposed developments in every sector of

- 13 -

real estate throughout the country has been dropped or placed on hold.  I literally have polled my contemporaries at industry giants and cannot point to a single job that is moving forward at this time.

*   *   *

As I certainly regret the way I conveyed our intentions back in December, I had to address this issue with you.  JLB has been faced with the realities described above over the last several months as the market continued to get worse.  Nevertheless, given our relationship from the start, we felt it imperative to share with you our assessment of the situation with the hope of keeping the deal alive. ”

A true and accurate copy of that January 29, 2009 correspondence is included at Exhibit 15.

As the parties discussed a possible second amendment during late January 2009 and early February 2009, there is no dispute that a release of the LDA still had not been executed and recorded.  Indeed, as summarized by Mr. Holmes on January 21, 2009 when e-mailing Baltimore City personnel in connection with his continuing negotiations with the City, Capital Development believed that it had reached an impasse with Baltimore City and the LDA had become a major problem for JLB moving forward with any possible deal with Capital Development.  *See* January 21, 2009 e-mail from David Holmes to Mr. Andy Frank, a true and accurate copy of which is included at Exhibit 16.

In late January 2009 and early February 2009, the parties and their counsel tried to salvage a deal through restructured arrangements that would split the possible project into two phases.  Various in-person, telephone, and e-mail communications occurred.  On January 20, 2009, Mr. Plichta met in-person with Mr. Holmes and presented a first draft of a proposed second amendment.  True and accurate copies of draft second amendment paperwork that was exchanged between the parties and their counsel is included at Exhibit. 17.

On January 26, 2009, in a standard weekly report communication among

JLB personnel, JLB's Gary Plichta summarized the situation:

> "Earnest Money Deposit.  . . .   It is clear that we have a definitive right
> to withdraw from the contract.  The following language is what is in the
> first amendment of the contract to which we are referring.  *Release of*
> *Earnest Money.  Notwithstanding anything to the contrary contained in*
> *Section 3.d, the Title Company shall not release any portion of the*
> *Earnest Money to Seller until such time as that certain Agreement dated*
> *August 12, 1972, recorded in Liber 2947, folio747 between Chapel*
> *Housing Partnership and the Mayor and City Council of Baltimore shall*
> *have terminated and been released of record such that it no longer*
> *encumbers the Property (the "Release").  Purchaser shall be entitled to*
> *terminate this Contract by written notice to Seller at any time before the*
> *release has been executed and recorded, in which event, the Earnest*
> *Money shall be returned to Purchaser.*  The seller has not fulfilled this
> obligation; therefore we inten[d] to either renegotiate the contract (as
> proposed in the second amendment) or terminate before he is able to cure
> this issue.
>
> Renegotiation.  --  We have presented a proposed second amendment to
> the contract for the seller's review.  Amongst other things, this proposal
> would release a substantial amount of the earnest money back to us but
> more importantly, make the contract contingent on financing.   If
> accepted by the seller, we would approach this job in two phases, the
> first being the southern section incorporating roughly 195 units and
> providing for an eight month deferral of the purchase of the second
> phase, which would contain 246 units.  The seller was receptive to the
> idea of phasing and indicated in an e-mail that we should expect to
> receive comments from him tomorrow or Wednesday.  In a follow-up
> phone conversation, he seemed to be focused on what easements would
> be required if he were relegated to developed phase II.  Specifically he
> seemed to be concerned about easements for parking and SWM systems
> on the phase I portion….

Copy of the relevant portions of the January 26, 2009 report are included at Exhibit 18

(some portions of the document deal with other, unrelated projects and are redacted from

the exhibit).

On or around February 4, 2009, Capital Development returned a revised

draft of a possible second amendment to JLB.  That version was not acceptable to JLB

and, essentially, Capital Development was not willing to agree with certain terms being

requested by JLB including the return of most of the earnest money deposit.  *Cf.* February

- 15 -

19, 2009 e-mail by David Holmes to Ms. Tina King, copy included at Exhibit 19, relating

Mr. Holmes' prior conversations with Capital Development's real estate broker and with

JLB's Gary Plichta, and indicating that:

- Capital Development/Mr. Holmes are "stuck on our last offer and nothing more"; and

- "we will stand on our last offer"; and

- "I told him [*i.e.*, JLB's Gary Plichta] that we are DONE and that the last offer is still on the table."

With no second amendment agreed upon by the parties, JLB issued a

termination notice on February 16, 2009.  *See* February 16, 2009 correspondence, a true

and accurate copy of which is included at Exhibit 20.  Again, **there is no dispute** that, as

of that February 16, 2009 date, a release of the LDA had not been executed and recorded.

Capital Development sent a one-sentence February 17, 2009 letter to the

settlement companies holding the deposit funds in escrow and requested that the earnest

money deposit funds not be returned to JLB.  *See* February 17, 2009 letter, a true and

accurate copy of which is included at Exhibit 21.  Not surprisingly, that one-sentence

letter provided no justification for the request and gave no explanation.

Due to the differing positions presented by the parties, the settlement

company has held the deposit funds in escrow pending either agreement by the parties or

other resolution.  In light of Capital Development's wrongful actions, JLB filed this

action on March 13, 2009.

G.     Notes connected with Capital Development's decision to buy out its prior affordable housing promise and the eventual June 17, 2009 amendment to the LDA.

In the January 2009 to June 2009 time frame, Capital Development's David Holmes continued his discussions and negotiations with Baltimore City and the process of possibly securing approvals and actions needed for, among other things:  (a) Capital Development making a payment in lieu of complying with its prior promise to include affordable housing units, with Mr. Holmes requesting differing payment terms from the City depending upon whether or not he could salvage a deal with JLB; and, (b) assuming that such negotiations proved successful, then taking further actions that could include the execution and recordation of a release or modification of the LDA.   By February 11, 2009, Mr. Holmes had orally advised JLB's Gary Plichta that Mr. Homes had "cut a deal" by agreeing to tentative arrangements with Baltimore City that would allow him to buy-out his prior promise on affordable housing units and be able to address the LDA.

However, notwithstanding those tentative arrangements, it is undisputed that further actions and approvals were still needed.  If all such actions and approvals actually occurred, and if the LDA was then released or amended and that document was then recorded in land records, weeks or months still would pass (and, ultimately, such actions and events took through at least until June 17, 2009 and seem to have resulted in an executed amendment to the LDA on that date).  *See, e.g.,* Document dated June 17, 2009 and titled First Amendment to Land Disposition Agreement, copy included at Exhibit 22 (reflecting that the Baltimore City Board of Estimates approval was obtained on June 17, 2009 and final signature occurred on that date).  As Mr. Plichta explained in

deposition when questioned by Capital Development's counsel in connection with this topic:

> Q.  This deal that Dave conveyed to you he had reached with the city, was it your understanding that this would satisfy your concern about the LDA?

> A.  You're asking me about my opinion and my concerns. Certainly until the LDA went away there were concerns. So did it alleviate the concerns, no.  Was it a positive movement, yes.  But I knew that it had to go through an approval process, and anything can happen in an approval process.
>
> * * *
>
> Yes, it was my understanding from what he conveyed to me verbally, not having seen anything written, that this was a positive step in making the LDA go away.  But there was always concern that the LDA, primarily from our counsel, that the LDA needed to go away, not probably go away.

Plichta Deposition at 58-59.

After the February 16, 2009 termination by JLB, Capital Development was free to continue to proceed with efforts to extract itself from any inclusionary housing obligation whether or not it was able to salvage a deal with JLB.   Capital Development chose that course and eventually did so, to its financial benefit no matter what project ultimately proceeds in the future.   And, roughly four months after the termination, it seems that there was an executed amendment to the LDA.[10]

---

[10]    As noted previously, Capital Development failed to produce materials and information during the discovery period -- prejudicing JLB and its ability to explore the underlying facts and prepare defenses.  By way of example only, the June 17, 2009 First Amendment to the LDA was not produced until *after* the discovery period passed.  JLB reserves all rights and arguments as a result of the failures by Capital Development to comply with discovery requests and Capital Development's  failures to produce materials or disclose information prior to the close of discovery.

- 18 -

III.  ARGUMENT

A.      Summary judgment principles.

"Summary judgment is appropriate where there is no genuine issue of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Germain v. Norris*, 536 F. Supp. 2d 585, 588 (D. Md. 2008).

A party opposing a motion for summary judgment has the burden of establishing the existence of a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The party opposing a summary judgment must point to "specific facts," and not "mere allegations," demonstrating that "there is a genuine issue for trial."  *Jackson v. Hartford Life and Annuity Ins. Co.*, 201 F. Supp. 2d 506, 510 (D. Md. 2002) (quoting *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 249 (4th Cir. 1988)).  There must be a genuine dispute as to a material fact and "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby*,  477 U.S. at 247-48 (emphasis in original); *see also Celotex Corp. v. Catrett*, 477 U.S. at 322-23.

Moreover, as the Fourth Circuit has explained, "[c]ontract interpretation is a subject particularly suited for summary judgment disposal."  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999).

B.      Section 2 of the First Amendment controls and that contract language is clear and unambiguous.  Under the parties' express arrangements, JLB had the right to terminate and is entitled to the return of its earnest money deposit.

> Under well settled Maryland law:
>
> "Construction of a contract is in the first instance, a question of law for the court to resolve.  Where the language of a contract is clear and unambiguous, there is no room for construction and we must presume the parties meant what they expressed."

*Simon v. Union Hospital of Cecil County*, 15 F. Supp. 2d 787, 798 (D. Md. 1998) (quoting *Shapiro v. Massengill*, 105 Md. App. 743, 754, 661 A.2d 202, *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995)).  *See also Auslander v. Helfand*, 988 F. Supp. 576, 581 (D. Md. 1997) ("where a contract's language is plain and unambiguous, no room for construction exists and the court must assume the parties meant what they said"); *Auction & Estate Reps., Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444 (1999) ("Where the language of the contract is unambiguous, its plain meaning will be given effect.  There is no need for further construction.").

Here, sophisticated commercial entities agreed upon express contract terms governing termination of the Contract and the return of the earnest money deposit to JLB.  The parties did so with the assistance and advice of experienced attorneys.  Section 2 of the First Amendment plainly and clearly provides that, if the LDA was not released within 45 days from the August 21, 2008 execution of the document, then JLB obtained a right to terminate the Contract and that right continued until a release for the LDA was executed and recorded in land records.  And, if such a termination occurred, then "the Earnest Money shall be returned to Purchaser."  (underling emphasis added).  The First Amendment was drafted to make express and clear the parties' rights and

obligations relating to termination of the Contract and the return of the earnest money. As acknowledged by Capital Development's David Homes during his deposition, the plain language gave JLB the right to terminate after 45 days if Capital Development had not secured and recorded a release of the LDA:

> Q.    If you look at the difference between what is the executed first amendment and the first draft [of a possible first amendment], the additional language really does deal with obtaining a release of the LDA within a 45-day period, or if that did not occur, JLB obtained a right to terminate the contract; is that correct?
>
> A.    That's correct.

Holmes Deposition at 107-108.

There is no genuine dispute that, in December 2008, JLB advised Capital Development, David Holmes, and the settlement company holding deposit funds that JLB would either be terminating the Contract or requiring a further modification of the Contract that was acceptable to JLB. There is no genuine dispute that the parties were unable to agree upon a second amendment to the Contract. There is no genuine dispute that, as a result, JLB issued a termination notice on February 16, 2009. And, there is no genuine dispute that, as of February 16, 2009, no release of the LDA had been executed and recorded in the Baltimore City land records.

Accordingly, there is no genuine dispute as to any material fact and, as a matter of law and pursuant to the parties' express agreement, JLB is entitled to the entry of summary judgment in its favor. The court should enter summary judgment and issue an order declaring that the earnest money deposit funds should be immediately returned to JLB.

- 21 -

C.      Capital Development's conclusory arguments are meritless.

Discovery is concluded and reveals that Capital Development fails miserably in its attempt to invent some reason for its wrongful conduct.  Boiled down, Capital Development seems to float two lines of contention: (1) supposedly, the First Amendment does not mean what it expressly states and, instead, the document should somehow be "construed" to mean what David Holmes now contends was really intended; and (2) supposedly, based upon the doctrine of detrimental reliance (also known as promissory estoppel), Capital Development is entitled to obtain the earnest money deposit.  Both contentions are meritless.

For the first time during his September 2009 deposition, Capital Development's David Holmes incredibly suggested that the language in the First Amendment does not actually mean what it says.  According to the "position" adopted by Mr. Holmes and Capital Development during that deposition, the "real meaning" of the First Amendment was not to give a termination right as expressly stated, but instead according to Mr. Holmes, "the goal of that group [negotiating the First Amendment] is to have some language in there that's nothing more than a benchmark for us to have kind of a check-in and see where we are as we proceed to terminate the LDA."  Holmes Deposition at 109.  The contention is specious and meritless as a matter of law.

First, Maryland law is clear that, where the language of a contract is plain and unambiguous, there is no room for construction and the court must assume the parties meant what they said in the plain language.  *See* Discussion *supra* at pp. 21-22; *Auction & Estate Reps., Inc., v. Ashton*, 354 Md. at 340, 731 A.2d at 444 ("Where the language of the contract is unambiguous, the plain meaning will be given effect.  There is no need for

further construction").  Mr. Holmes' after-the-fact attempt to "construe" or "re-invent" the plain and clear language contained in the parties' written agreement fails as a matter of Maryland law.

Second, even assuming *arguendo* that Maryland law might not preclude Capital Development from trying to re-invent the meaning of plain contract language (and it does), there is no evidence of some secret, hidden meaning that is contrary to the express language.  Except for the recent invention by Mr. Holmes, no witness supports or suggests such a hidden or contradictory "meaning," and the parties' course of conduct also firmly dispels the feeble attempt by Mr. Holmes to avoid the plain language to which Capital Development agreed.  *Cf.* Weekly Report by JLB personnel (located at Exhibit 18 and reflecting that JLB understood the plain language and proceeded upon that basis); August 26, 2009 Correspondence by Capital Development's Attorney Barry Greenberg, copy included at Exhibit 23 (confirming and representing that, as to JLB's objection to the LDA, the express terms in the First Amendment will be controlling: "[p]ursuant to the First Amendment to the Contract of Sale dated as of August 21, 2008, Purchaser and Seller have agreed to the manner in which this title objection may be satisfied").

Third, there is no dispute that the vague words now being offered by Mr. Holmes, such as "benchmark" or "check-in point" do <u>not</u> appear anywhere in the First Amendment.  Capital Development so concedes (as it must).  *See* Holmes Deposition at 109 (conceding such terms are not in the First Amendment).

Fourth, in effect, Capital Development and Mr. Holmes now attempt to rewrite the parties' contract.  That simply is not allowed under Maryland law and the comments of this court in *Macke Laundry Service Ltd. v. Alleco, Inc.*, 743 F.Supp. 382

- 23 -

(D. Md. 1989) are on point:

> "A court may not redraft the terms of a contract when they are clear and unambiguous simply … because one of the parties has become dissatisfied therewith."

743 F.Supp. at 389.

Capital Development also seems to assert an argument of detrimental reliance or promissory estoppel. *See Pavel Enterprises, Inc. v. A.S. Johnson Company, Inc.*, 342 Md. 143, 164-166, 674 A.2d 521, 531-533 (1996) (equating the concepts of promissory estoppel and detrimental reliance, and explaining the elements under Maryland law); *McKenzie v. Comcast Cable Communications, Inc.*, 393 F. Supp.2d 362, 372 (D. Md. 2005) (discussing Maryland law on "the theory of detrimental reliance, otherwise known as promissory estoppel").   In Maryland, detrimental reliance or promissory estoppel is a quasi-contract claim that requires a plaintiff to plead and prove the following elements:

(1)  a clear and definite promise;

(2)  where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

(3)  which does induce actual and reasonable action or forbearance by the promisee; and

(4)  causes a detriment which can only be avoided by enforcement of the promise.

*See, e.g., McKenzie*, 393 F. Supp.2d at 372-373; *Citiroof Corp. v. Tech Contracting Co., Inc.*, 159 Md. App. 578, 589, 860 A.2d 425 (2004).  None of the elements are present or satisfied here; and Defendant's contention is without merit.

First, Maryland law does not permit a party to assert a quasi-contract claim when the basis of that claim is covered in a formal, written contract.  Detrimental

reliance or promissory estoppel simply cannot be asserted when an express contract covering the same subject matter is admitted to exist. *See, e.g., Odyssey Travel Center, Inc. v. RO Cruises, Inc.*, 262 F.Supp.2d 618, 626 (D. Md. 2003) (granting defendant's motion for summary judgment on promissory estoppel because "[p]romissory estoppel is a quasi-contractual claim, which is an equitable remedy that permits recovery <u>where, in fact, there is no contract</u> ....") (applying Maryland law and underling emphasis added); *Ver Brycke v. Ver Brycke*, 379 Md. 669, 693 n.9., 843 A.2d 758 (2004) ("promissory estoppel claims, which are quasi-contract claims, would have been untenable had [the plaintiffs] argued that a contract had existed"). There is no dispute here that terms in the First Amendment specifically address and govern termination and the return of the deposit.

Second, the threshold requirement of a clear and definite promise is plainly not satisfied. *See McKenzie*, 393 F. Supp.2d at 373. No clear and definite promise of not terminating was never made by JLB, and Capital Development has not contended that. An effort by Capital Development to cobble together vague, conclusory contentions and misguided characterizations does not suffice and does not meet its burdens of production and proof on this element.

Third, these commercial parties agreed that no contractual provision may be waived, modified, amended, discharged, or terminated except in writing. *See* Contract at §13(c). There is no dispute that no written waiver, no discharge, or the like exists. Also, especially under the circumstances here and pursuant to these commercial parties' agreed framework, there is no justifiable reliance upon anything other than the terms of the Contract absent a written amendment.

Fourth, given the nature of any non-existent "promise" suggested by Capital Development, Capital Development also cannot claim any justified reliance or claim that its actions were in any way legally detrimental or harmful to it. Capital Development's obligation to remove the LDA already existed pursuant to contractual arrangements and simply taking agreed upon efforts to remove the LDA does not establish any justifiable reliance and does not constitute any legal detrimental reliance or legal harm.

## IV.   CONCLUSION

There are no disputes of any material facts and, as a matter of law, JLB is entitled to summary judgment. This court should enter an order granting summary judgment to JLB and declaring that the earnest money deposit funds should be immediately returned to JLB.

Dated:  November 9, 2009

/ s /

_____

John T. Prisbe
Gregory T. Wasylak
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland  21202
(410) 244-7400 (telephone)
(410) 244-7742 (facsimile)

Attorneys for Plaintiff JLB Realty, LLC

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9th day of November 2009, a copy of a

"Memorandum in Support of Plaintiff's Motion for Summary Judgment" was served by

the court's electronic filing system upon:

> Alan J. Hoff, Esquire
> Selman Hoff, LLC
> 201 North Charles Street,  Suite 1331
> Baltimore, Maryland  21201
> (410) 659-0077 (telephone)
> (410) 332-1746 (facsimile)
> Attorneys for Defendant Capital Development, LLC

/ s /

_____
John T. Prisbe

BA2DOCS1\#375514