# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


JLB REALTY, LLC,

       Plaintiff

vs.                           CASE NO. 1:09-CV-00632 BEL

CAPITAL DEVELOPMENT, LLC,

       Defendant

_____/


       The deposition of DAVID HOLMES was held on Thursday, September 10, 2009, commencing at 9:35 a.m., at the Law Offices of Venable, LLP, 750 East Pratt Street, Suite 900, Baltimore, Maryland 21202, before Steven Poulakos, Notary Public in and for the State of Maryland.


REPORTED BY:   Steven Poulakos

## Page 6

1  case. Other than that, have you been to a deposition
2  previously?
3     A   No.
4     Q   So I take it, one, not only have you not
5  been to one, you've not been deposed?
6     A   That's correct.
7     Q   Have you ever given testimony anywhere?
8     A   Not to -- I mean, I'm trying to recall.
9     Q   Why don't we do it this way. Have you ever
10  given testimony in court?
11     A   Yes.
12     Q   Have you ever given testimony in
13  administrative proceedings?
14     A   Yes.
15     Q   Even though we're not in a court or an
16  administrative proceeding, it's still the same thing.
17  People will be asking you questions to get your
18  knowledge. You're under oath. To the extent you can
19  answer fully and accurately, we're looking for that.
20     A   Okay.
21     Q   If you do not understand the question, let

## Page 7

1  me know. I'm happy to try and rephrase it so that
2  we're both on the same page, okay?
3     A   Okay.
4     Q   When we speak and I question, you answer,
5  we're going to have to not interrupt each other,
6  because the gentleman taking this down cannot take two
7  people speaking at the same time.
8     A   Okay.
9     Q   You will have to answer with a yes, no,
10  whatever, because he will not take down shakes of heads
11  or nods or anything like that, okay?
12     A   Yes.
13     Q   You indicated you were into -- currently
14  self-employed with real estate development. Can you
15  identify for me what entities you conduct those real
16  estate development activities through?
17     A   I have a holding company called Blueprint
18  Concepts. Through that holding company, I'm currently
19  involved in three development projects, that each of
20  them have different entities and have -- each have
21  different development teams associated with them, along

## Page 8

1  with different partners.
2     Q   Can you identify for me the projects and
3  the entities for those projects?
4     A   Sure.
5     Q   Please do so.
6     A   First one is Capital Development, LLC.
7  That project is the Washington Hill -- I'm sorry, the
8  Gateway at Washington Hill. The second is South
9  Broadway Properties, LLC. That is the redevelopment of
10  the 600 block of South Broadway in Fells Point. And
11  the third is an entity called 2200 Gravois, LLC and
12  that is a abductive reuse of a warehouse in St. Louis,
13  Missouri.
14     Q   So that I can understand a little bit of
15  your background, can you tell me your educational
16  background? Did you get a degree, what it was in, and
17  when did you obtain it?
18     A   I graduated with a master's degree in 1995
19  from Johns Hopkins University. That master's degree
20  was a master's of science in real estate development.
21     Q   What about undergrad?

## Page 9

1     A   Shippensberg University, 1987, with a
2  bachelor's of art in business.
3     Q   In terms of employment experience and
4  background, can you give me an overview? And I'll
5  start with the first full-time employment. If you were
6  full-time employed before 1987, that's fine, but if
7  not, if it was just college jobs, I'm not really
8  worried about that. I'm looking for full time.
9     A   Worked for Drexel Burnham Lambert in
10  investment banking.
11     Q   When was that?
12     A   From '88 to '92. From there,
13  Prudential-Bache. I think it's called Prudential
14  Securities today, but Prudential-Bache to '93. Took a
15  year off to do some development down in North Carolina.
16  My mom was living and residing down in North Carolina
17  so I restored an old farmhouse for her down there.
18        Decided to go back to graduate school,
19  relocated myself to Baltimore for Johns Hopkins
20  University. It was during those years attending the
21  university that I started restoring, renovating houses

Page 10

1  on the side, and once I finished graduating, continued
2  developing a portfolio, residential properties.
3      By 1996, created a management company
4  called Real Estate Dimensions and through that entity
5  purchased six apartment buildings, most of which were
6  in north Baltimore, as well as the Washington Hill
7  site.
8      Sold off the apartment portfolio in 2005
9  and then in 2005 started the South Broadway project.
10  Q   I'm going to backtrack to try and make sure
11  I understand, sort of fill in a little bit.
12  A   Okay.
13  Q   '88 to '92, I think you indicated Drexel
14  Burnham?
15  A   That's correct.
16  Q   What is it that you did for them?
17  A   On the retail side. We worked mostly on
18  high-yield bonds. Drexel underwrote the bonds and we
19  sold them on the retail front desk. So we worked
20  directly with high-end clients.
21  Q   When you say we --

Page 11

1  A   Our division.
2  Q   What was your specific position and what is
3  it that you specifically did?
4  A   I'm trying to think of what that was
5  called. I want to say financial advisor I think is the
6  correct term, position.
7  Q   What does a financial advisor in the 1988
8  to 1992 time period do for Drexel Burnham?
9  A   We -- I, through our research desk, would
10  identify certain bonds, investments, most of which were
11  bonds, that's what we were good at, and identified
12  which bonds would be appropriate for which clients.
13  Q   And what types of bonds are we talking,
14  corporate bonds?
15  A   Yes.
16  Q   What types of clients did you deal with and
17  did you personally deal with them?
18  A   Yes. Individuals mostly. A few small
19  businesses.
20  Q   Is '92 when Drexel Burnham went out of
21  business?

Page 12

1  A   Somewhere in '91, '92. Part of the
2  settlement with the, I think Prudential took over our
3  office and -- yes.
4  Q   The transition to Prudential for '92 to
5  '93, is that because of that takeover or did you
6  actually change positions all together?
7  A   No, same thing. You just kind of rolled
8  right into a new company. It was different. It didn't
9  have the type of bonds that we were used to. Just a
10  different corporate structure. It wasn't soon
11  thereafter I wasn't interested in continuing with
12  Prudential.
13  Q   In terms of selling to individual investors
14  or small businesses and reviewing the types of bonds
15  that were out there, can you articulate for me, what is
16  it you did? Did you read the documents? Did you
17  create the documents? Did you do financial analyses?
18  What were some of the specific tasks that you did at
19  those positions?
20  A   I relied heavily on the research desk.
21  Drexel had quite an extensive group of researchers

Page 13

1  that -- or analysts that put together research reports.
2  I did my own research. I did -- I relied heavily on
3  their opinions, but when it came to identifying what
4  type of equities or bonds for a particular client, I
5  made those calls.
6  Q   Did you have an assigned list or was it
7  sort of go out and find clients? How did that work?
8  A   Combination. I think there were some
9  brokers that had clients that felt that they maybe
10  would be better served by, you know, another broker to
11  come in, but I would say the majority of them were
12  clients that I, over the few years, found myself.
13  Q   Just so I'm understanding the breadth of
14  it, the number of clients, I'm just looking for a
15  general figure. Are we talking five? Are we talking
16  500? Are we talking somewhere in between?
17  A   Fifty to seventy-five.
18  Q   I believe you said that you, after the
19  Prudential-Bache employment experience, went to North
20  Carolina to develop a property with -- or develop a
21  property in North Carolina, correct?

4 (Pages 10 to 13)

Page 14

1    A    Correct.
2    Q    Can you explain to me how that came to be
3    and what it is that you did to develop that?
4    A    My mother -- my parents divorced. My mom
5    ended up relocating down to North Carolina and
6    purchased an old farmhouse. Growing up as kids we were
7    always pretty crafty with tools and we always fixed
8    everything. My dad was pretty good about teaching us
9    those types of skills.
10        So when I was deciding whether I wanted to
11   continue going down the security industry, working for
12   different investment banking firms or not, I thought
13   this would be a good opportunity to take some time off.
14   Something that I've been kind of antsy to do was to
15   restore this farmhouse, and that's what brought me down
16   to do that, take some time off and think about what was
17   my next chapter in my life.
18   Q    Was it for your mother to live in or were
19   you trying to redevelop it to sell it? What was the
20   purpose of that?
21   A    She purchased it and was living in it. So

Page 15

1    it was for her to --
2    Q    It wasn't a commercial development?
3    A    No.
4    Q    It was a development for family?
5    A    A 250-year-old great house.
6        MR. HOFF: Where?
7        THE WITNESS: Right outside Raleigh is a
8    little town called Creedmoor. I think 4,000 people
9    might reside there.
10       BY MR. PRISBE:
11   Q    The master's of science at Johns Hopkins
12   University, how long was that? Was it a year, two
13   years?
14   A    Today they have a full-time program, but
15   this was new for Johns Hopkins and it was a part-time
16   program. It took me two-and-a-half years to finish it.
17   Q    I believe you had explained to me that in
18   approximately May of 1996 while at the university, you
19   had created something called Real Estate Dimensions; is
20   that correct?
21   A    Right as I was finishing the degree, I

Page 16

1    became close friends with another student who shared
2    some similar interests on going into business.
3    Q    Was that Ms. King?
4    A    Yes. Ms. Tina King, I believe.
5    Q    And did you form Real Estate Dimensions
6    with her?
7    A    Yes.
8    Q    And does Real Estate Dimensions still exist
9    today?
10   A    Yes.
11   Q    Do you have any interest in Real Estate
12   Dimensions today?
13   A    No.
14   Q    Does Ms. King essentially own Real Estate
15   Dimensions?
16   A    Yes.
17   Q    When you created Real Estate Dimensions, I
18   assume there were probably two people really in the
19   entity, specifically Ms. King and yourself?
20   A    Yes.
21   Q    Was there ever more employees than Ms. King

Page 17

1    and yourself?
2    A    Yes.
3    Q    Can you sort of just give me a general
4    summary of Real Estate Dimensions? I think at one
5    point you indicated that it bought six apartment
6    buildings.
7        Can you just describe for me how it grew,
8    when it grew, whether there were employees that were
9    financial to pick out the thing or whether you, in
10   fact, had employees to manage the particular buildings?
11   A    The time that Tina and I created Real
12   Estate Dimensions, I had a number of rental properties
13   that I was restoring while I was attending Johns
14   Hopkins University. Tina at the time was managing on
15   behalf of another owner on a couple of apartment
16   buildings and had an interest in wanting to go off on
17   her own to do management.
18       We thought this would be a great
19   combination, where I could bring my portfolio in and we
20   would create the management company. At first we were
21   thinking that we would want to do third-party

Page 18

1  management while building up a portfolio for ourselves,
2  also including my own portfolio, but decided that --
3  what triggered the change in that is that we had an
4  opportunity to purchase the first apartment building
5  and it was from that point on that we decided to build
6  our own portfolio and to manage our own assets.
7      So I think it was in 1997, I believe, we
8  purchased a 130-unit building just near Johns Hopkins
9  University.
10     Q   This is the Wyman Park?
11     A   Wyman Park Apartments.
12     Q   And for that purchase, did you negotiate
13 the purchase with Tina with whoever was selling it?
14     A   This was one of the assets that Tina was
15 currently managing at the time. So her employer was
16 moving to California and decided to put the property up
17 for sale. That's what started us going down that path,
18 is that this was the first asset that kind of triggered
19 all of that.
20     Q   With respect to that purchase, did you
21 execute a written contract for the sale?

Page 19

1      A   Yes. I provided the front equity to
2  purchase it and the rest of it was financed through a
3  bank. I was trying to think if there was any paper
4  that was held back. If there was, it wasn't much, but
5  it was a pretty simple transaction.
6      Q   And there was, I assume, a closing
7  associated with it?
8      A   That's correct.
9      Q   Do you remember who conducted the closing?
10     A   The title company?
11     Q   The settlement company. I call them
12 settlement company. You call them title companies.
13     A   Man, it seems like a lot of transactions
14 ago. I don't recall.
15     Q   Did you employ counsel to help you with it?
16     A   Yes.
17     Q   Do you remember who that attorney was?
18     A   Carol Weld King, a friend of the family's.
19     Q   And that was the first -- sort of left you
20 on -- I think you said it seems like a lot of
21 transactions ago. Can you give me an estimate of how

Page 20

1  many transactions have occurred since that point in
2  time, whether it be for Real Estate Dimensions or some
3  other of the entities you've identified?
4      A   I mean, dozens.
5      Q   Just so I'm trying to understand that
6  dozens means, are we talking 48? Are we talking 96?
7  Would it be over a hundred different properties that
8  have been bought and sold by you in your life?
9      A   Probably closer to 50.
10     Q   As I understand it, at least six of them
11 have been apartment buildings?
12     A   That's correct.
13     Q   Are there any other -- I'm not going to
14 include a house in it with the rental property, but
15 what I would consider many multiple family dwellings?
16     A   Like a turnkey operation, an existing
17 structure?
18     Q   I'm looking for volume, bigger dollar
19 amount. I assume the Wyman Park Apartment was a
20 multi-million dollar purchase.
21     A   Yes.

Page 21

1      Q   How many purchases in these 50 transactions
2  were over a million dollars?
3      A   Including the six?
4      Q   Yes, sir.
5      A   Twenty. I'm also including closings on --
6  I'm including closing on financing as well too. So I
7  may have an acquisition and then also a different
8  settlement for closing on financing, whether it's
9  construction financing or --
10     Q   I appreciate it and that's fine. That's
11 what I was looking for, how many closings there were
12 when you all got together and executed documents and
13 negotiated documents, and some of that could be for
14 construction financing and just subsequent refinancing?
15     A   Sure.
16     Q   You indicated, I think, at some point in
17 time, I want to say it was around 2005, you became
18 involved with Capital Development and the Gateway at
19 Washington Hill property?
20     A   We -- Tina and I purchased that in -- I
21 believe it was 2002 we purchased that. That was always

Page 22

1  a project that I was working on but became a little bit
2  more involved in it directly when I sold off my
3  interests in the Real Estate Dimensions portfolio.
4     Q   When that site was acquired in 2002, did
5  you have any immediate -- or did Real Estate Dimensions
6  have any immediate plans for the property or was it
7  just an acquisition to have that in its inventory?
8     A   It was a distressed piece of property that
9  I think we had some thoughts as to what that asset
10 could be, but we did not have direct ideas or concepts
11 when we purchased it. We knew it would be a good
12 opportunity to redevelop it in some capacity to include
13 some student housing, or a portion of it, we felt it
14 was ideal.
15    Q   Do you remember the purchase price
16 approximately?
17    A   I think it was four-and-a-half.
18    Q   By that time, had you started using
19 Martin -- or Barry Greenberg at Rosenberg Martin?
20    A   Actually, it was Stanley Fine that I
21 approached first. I saw him representing Johns Hopkins

Page 23

1  University for a matter up by the university that I was
2  directly involved in a PUD up there, and I was
3  impressed with how he handled the procedures and tapped
4  him one day to help us with this.
5     Q   You gave me an estimate of how many of
6  those settlement transactions have been over a million
7  dollars. Can you identify for me what the largest one
8  had been prior to the JLB contract?
9     A   $30 million.
10    Q   Was that South Broadway?
11    A   No.
12    Q   What was that?
13    A   That was -- although South Broadway
14 combined is a little bit larger. The 30 million is a
15 tract of land down in Ocean City, Maryland.
16    Q   Did you develop that and sell it or did you
17 just sell it as land at some point in time?
18    A   We purchased it. The property went through
19 the retitlement process to increase the density and
20 height. Was approached by an outside development group
21 to team up with. Halfway through the design process,

Page 24

1  we had a difference of opinion, and before I could exit
2  them out, they proposed a buyout of buying me out and
3  they purchased the land from me and then they developed
4  it themselves.
5     Q   Do you remember the name of the
6  development?
7     A   I'm sorry. The 30 million was the land
8  acquisition. So the largest amount would have been
9  then the sale of that to the Carlyle Group.
10    Q   Was that through Real Estate Dimensions?
11    A   No. That was a separate entity. It was
12 called Bayview 45.
13    Q   Is that an entity you had formed?
14    A   Yes.
15    Q   Did you have any other partners in that or
16 was it --
17    A   Yes.
18    Q   Was it Ms. King?
19    A   Yes, she was one.
20    Q   Just in case my questioning was imprecise,
21 you had identified for me Capital Development, South

Page 25

1  Broadway Properties, LLC, and I think the second one
2  was 2200?
3     A   Gravois, G-R-A-V-O-I-S, Gravois.
4     Q   Now I have heard about Bayview 45.
5     A   Yes.
6     Q   Are there any other entities, development
7  entities or companies, you had formed over the years?
8     A   Sure.
9     Q   Can you give me first an estimate of how
10 many there were?
11    A   Some of them were single member entities.
12 Some of them were discarded entities. Some of them
13 were estate planning entities. There's quite a lot.
14 But do you want ones that are more like Bayview 45
15 where it was -- served as a purpose to purchase --
16    Q   Fair question.
17    A   Okay.
18    Q   What I'm going to try to do is first get an
19 estimate of the total number of entities that you may
20 have created or been involved with, whether
21 specifically directed to a development project or not,

7 (Pages 22 to 25)

Page 26

1  and then transition, after I find the total number, to,
2  okay, well, how many are along the lines of a real
3  estate development project such as Bayview 45?
4       MR. HOFF: And I have to ask: Where are we
5  going with this? What's the relevance of this?
6       MR. PRISBE: He can answer the questions.
7  I'm happy to chat with you on a break, if you want.
8       MR. HOFF: Let's take a break. Where are
9  we going with this? Are we going into the entire
10 background of his professional career? And how does
11 that tie into this lawsuit?
12      MR. PRISBE: There's a question pending.
13 If you're going to direct him not to answer it, you
14 can.
15      MR. HOFF: No, I'm not directing him at
16 this point. I'm laying the foundation for you've
17 already gone beyond the scope of anything that's
18 conceivably relevant, and now you're peering even
19 deeper into it, and I just don't see any reason for it
20 and I don't see any relevance to this lawsuit.
21      BY MR. PRISBE:

Page 27

1  Q    You can answer the question.
2  A    What was the question?
3       MR. HOFF: And I'm going to say this: I
4  will let it go for a while, but eventually it's going
5  to become so attenuated, if it's not already there,
6  that I will instruct him not to answer.
7       You can go ahead and answer the question.
8       THE WITNESS: I'm sorry, what was the
9  question again?
10      BY MR. PRISBE:
11 Q    What I was looking to do was to get a sense
12 from you, a reasoned estimate as to the number of
13 entities that have been created generally in which you
14 participated with the owner and then after that sort of
15 universe a estimate, reasoned estimate, of those that
16 dealt with real estate development that were similar to
17 sort of a Bayview 45 or Real Estate Dimensions.
18 A    Okay.
19      MR. HOFF: Objection, relevance, compound
20 question.
21      BY MR. PRISBE:

Page 28

1  Q    You can answer.
2  A    A rough guess, 24-ish entities. Let me
3  back up. Probably closer to 30 and I'm going to say
4  half of that were things like Bayview 45, roughly 15.
5  Q    For those sort of 15 development projects,
6  what I'll call them, did you have counsel for them?
7  Did you have attorneys helping you, assist you in the
8  process of either acquiring it or financing it?
9  A    Every one.
10 Q    With respect to those, was financing
11 involved in the majority of them?
12 A    Again, there's dozens and dozens of
13 transactions, so you're really interested in financing
14 on the larger?
15 Q    Anything over a million dollars. Did you
16 ever conduct a development project, real estate
17 acquisition that was in excess of a million dollars
18 where financing was not involved?
19      MR. HOFF: Objection, relevance.
20      THE WITNESS: I think there were two where
21 financing was not involved, maybe three.

Page 29

1       BY MR. PRISBE:
2  Q    So would it be fair to say that as to the
3  substantial majority of them financing was involved?
4  A    That's correct. And when you mean
5  financing, you're referring to equity, third party --
6  Q    Somebody other than David Holmes.
7  A    So whether it's equity to purchase or
8  equity to do construction financing, okay.
9  Q    It could be a bank lending money. It could
10 be an investor lending money. It's going out and
11 trying to obtain funds from a third party to be able to
12 either acquire the property or develop the property.
13 A    Okay.
14 Q    So it would be fair to say that in the
15 substantial majority of them, some type of financing
16 was involved?
17 A    Correct.
18 Q    Did any of those projects ever result in
19 any type of lawsuit?
20 A    Yes.
21 Q    How many of them?

Page 34

1  Q   Was there a written contract that dealt
2  with potential forfeiture and potential return of the
3  $4 million deposit?
4  A   Boy. I'm sure there was. I just can't
5  recall.
6  Q   Okay. Do you remember what attorneys you
7  used for the acquisition and, obviously, a $4 million
8  deposit?
9  A   Yes.
10 Q   Who were they?
11 A   On the purchase of the land -- it actually
12 started with one attorney and ended up finishing it
13 with another. To purchase the land was Brian Sheahan
14 with Gebhardt & Smith. It was then finished with David
15 Berinski, at that time with Gordon, Feinblatt. That
16 was on the acquisition of the land. Negotiations of
17 settlement were handled with Danielle Zoller with
18 Gordon, Feinblatt.
19 Q   We've talked about, in terms of law firms,
20 a number of ones, from Gebhardt & Smith, Rosenberg
21 Martin, Gordon, Feinblatt. Can you give me an

Page 35

1  assessment of how many different law firms you have
2  used during the course of your development career?
3       MR. HOFF: Objection. John, can you,
4  please, tell me even remotely how this would be
5  relevant to the lawsuit?
6       BY MR. PRISBE:
7  Q   You can answer the question.
8       MR. HOFF: John, I have the right to ask
9  you, where are you going with this?
10      MR. PRISBE: Why doesn't he answer the
11 question, we can excuse the witness, and I'm happy to
12 articulate with you.
13      MR. HOFF: Actually, I would prefer then
14 that you articulate it with me before he answers the
15 question.
16      MR. PRISBE: I have a question pending. He
17 can answer the question.
18      BY MR. PRISBE:
19 Q   Give me an estimate, if you can.
20 A   Roughly a dozen.
21 Q   Okay.

Page 36

1       MR. PRISBE: Do you want to excuse the
2  witness?
3       MR. HOFF: Sure.
4       (Witness leaving the room.)
5       MR. PRISBE: I'm asking questions on the
6  background, experience, sophistication of a person who
7  is trying to argue that he is entitled to a million
8  dollars from my client. Part of his and part of your
9  allegations is that you've detrimentally relied upon
10 some type of feeling or conduct you got from actions
11 and events in disregard of contractual terms that were
12 negotiated by attorneys in a hundred-million-dollar
13 development deal where there was a million-dollar
14 deposit.
15      I believe the sophistication, the
16 education, and the employment experience of someone
17 like him is seriously relevant, will be compelling
18 evidence to whether it's Judge Legg or a fact-finder on
19 whether, if there was reliance, which I seriously
20 doubt, that reliance could be justified or reasonable.
21 And this is all extremely relevant to that. In fact,

Page 37

1  it is powerful evidence of that.
2       MR. HOFF: I think you're grossly
3  overstating the case. We're looking at the specific
4  facts of this case. If you want to say that Mr. Holmes
5  is a sophisticated man, a sophisticated businessman,
6  there's no question that he has experience, that he is
7  sophisticated in these dealings, but how many layers
8  he's ever used over the years, what that has to do with
9  the contractual language and what that has to do with
10 the specific facts leading up to this case is
11 absolutely inconsequential.
12      And I've let you go so far, but eventually,
13 I'm just going to instruct the witness not to answer.
14 And you can take it up with the judge and the judge can
15 tell me that I'm incorrect.
16      MR. PRISBE: Actually, unless it's a
17 privileged instruction, I believe the burden will be
18 upon you to seek a protective order.
19      MR. HOFF: And I think you're right. I
20 would agree with you there. But I think you'd also
21 agree that I've been more than fair in letting you get

Page 38

1   into the multiple developments he's done over the years
2   and how many involve more than a million dollars.
3         MR. PRISBE: Alan, we've been going less
4   than 40 minutes, of which 10 minutes has been taken up
5   by your objections on the record.
6         MR. HOFF: Ten minutes? Please, John,
7   John. Hardly. Probably closer to about two minutes at
8   this point.
9         MR. PRISBE: The transcript will reflect
10  it.
11        MR. HOFF: I've been polite and I've let
12  you go with the witness, but eventually, I'm just going
13  to instruct the witness not to answer.
14        MR. PRISBE: But the record will reflect
15  we've been going less than 40 minutes, of which
16  substantive questions on this maybe had been 10 or 15.
17        MR. HOFF: I strongly disagree with your
18  characterization of the time.
19        MR. PRISBE: We're going to take a break.
20        (A short break was taken.)
21        BY MR. PRISBE:

Page 39

1   Q    We were talking before the break about some
2   of your experiences previously. I think you had
3   identified that in 2002, you and Ms. King had acquired
4   the site that I'll -- I think you referred to as
5   Gateway at Washington Hill.
6   A    Correct.
7   Q    And that Capital Development was formed at
8   that time, correct?
9   A    That's correct.
10  Q    Has Capital Development ever had any
11  personnel, other than yourself and Ms. King, employed
12  by it or as members of the LLC?
13  A    No.
14  Q    And are both you and Ms. King members of
15  the LLC today?
16  A    Yes.
17  Q    And are you the managing member?
18  A    We both may be. If not, I am. I think we
19  also have -- just to be clear, we -- part of our
20  interest then for estate purposes were broken into
21  trusts so that the land is owned by Tina and I and

Page 40

1   trusts that each of our families created.
2   Q    You're going to have to explain it to me.
3   Are you saying that Capital Development does not own
4   the land?
5   A    Capital Development owns the land. Tina
6   and I are the members of Capital Development. Tina and
7   I have created trusts, family trusts, for estate
8   purposes and took portions of our interests in Capital
9   Development and placed them in those trusts.
10  Q    So it's the LLC interest that you placed
11  into trust, is that what you're saying?
12  A    Exactly.
13        MR. HOFF: Or at least a portion of it.
14        THE WITNESS: Exactly, a portion of it.
15        BY MR. PRISBE:
16  Q    Understood. Did there come a time with
17  respect to the Washington Hill location that efforts
18  were made to develop the property? And this is prior
19  to any discussions with JLB.
20  A    Yes.
21  Q    Can you tell me when that occurred and with

Page 41

1   whom that occurred?
2   A    I'm going say within three months of
3   acquiring the site, it became clear to me that existing
4   structures on those three city blocks were beyond
5   wanting to rehab. Our initial goal was to restore
6   those units, and at least one of the blocks perhaps
7   create student housing by restoring those units for
8   student housing and then restoring the units for market
9   rate housing with a mixture of affordable housing. And
10  that was the beginning of looking at various ideas and
11  concepts.
12  Q    And at some point in time, did that have
13  more substance or more definiteness than just looking
14  at a concept? Were you in discussions either with
15  general contractors to do it yourself or with some
16  development entity to partner with you? And again,
17  this is all before JLB?
18  A    The first thought was the upper block
19  that's closest to Hopkins, that we would tear that
20  down. And we studied the remaining two blocks as to
21  the vacancy and the relocation then of the folks that

Page 106

1  BY MR. PRISBE:
2  Q  From your perspective?
3  A  I think that was the general consensus from
4  everybody involved in that conversation.
5  Q  Well, as Mr. Tatum was the attorney
6  representing JLB, would you agree his charge was to
7  protect the interest and rights of JLB?
8       MR. HOFF: Objection, foundation.
9       THE WITNESS: Sure.
10      BY MR. PRISBE:
11  Q  As we saw, there was an e-mail on the 21st,
12  7:00, and an initial draft. If you go to Exhibit 2 to
13  the complaint that's in front of you, and I think it's
14  the second tab, I believe you'll find a document also
15  dated the 21st of August 2008, the same date as the
16  initial draft.
17  A  Yes.
18  Q  That is also signed on that date.
19  A  That's correct.
20  Q  And I believe it will be, if I'm correct,
21  your signature on that document, correct?

Page 107

1  A  That's correct.
2  Q  The initial draft seemed to have just three
3  paragraphs: A title company paragraph, a release of
4  earnest money paragraph, and a miscellaneous paragraph.
5  A  That's correct.
6  Q  The miscellaneous paragraph deals with
7  telecopy, facsimile, all these terms which I sort of
8  view as drafting, and while certainly important and
9  substantive, not to the terms of business --
10  A  That's correct.
11  Q  -- correct?
12  A  Yes.
13  Q  The title company I think was basically
14  just substituting Stewart Title for Mr. Perlow's
15  settlement company.
16  A  That's correct.
17  Q  And then the other item covered was
18  actually earnest money and releasing it, correct?
19  A  That's correct.
20  Q  If you look at the difference between what
21  is the executed first amendment and the first draft,

Page 108

1  the additional language really does deal with obtaining
2  a release of the LDA within a 45-day period, or if that
3  did not occur, JLB obtained a right to terminate the
4  contract; is that correct?
5  A  That's correct.
6  Q  Is that what you understood when you signed
7  this agreement?
8  A  What was decided among the four of us as we
9  moved forward from the draft to the final document was
10  how can we proceed, move forward, yet have a monitoring
11  way to determine if this LDA is being handled, is being
12  dealt with, is it in a manner that is fine with JLB?
13  The 90 days, again, was a goal that we were looking at
14  not only wrapping up the last items but also the
15  possibility of terminating it completely.
16     What Dave Tatum wanted was something a
17  little bit more condensed so that we would monitor a
18  little bit more closer. And we all agreed that within
19  45 days, if there are issues that are going to
20  complicate this that are starting to develop that are
21  going to end up in the end not in line with -- the

Page 109

1  agreement not being in line with what Gary is agreeing
2  to and how I understood, then it was an opportunity for
3  us to also kind of circle back and determine where do
4  we go from there.
5     It is the intent of that group -- it's not
6  just my understanding, but the goal of that group is to
7  have some language in there that's nothing more than a
8  benchmark for us to have kind of a check-in and see
9  where we are as we proceed to terminate the LDA.
10  Q  When you say that group, are we talking
11  about David Tatum?
12  A  Yes, I'm sorry. David Tatum on the phone
13  and Barry Greenberg and Gary Plichta and myself in a
14  conference room.
15  Q  Do you see the word monitor or check
16  anywhere in the first amendment?
17     MR. HOFF: We'll stipulate it's not in
18  there.
19     BY MR. PRISBE:
20  Q  Is that a no?
21  A  That's a no.

Page 146

1  right now, yours is still one that we'd like to do, but
2  it's challenging. We just need to find a way to work
3  together on how we can get this thing financed.
4          That was -- that's the gist. I think I
5  just sat and listened more than anything. And we
6  talked about, you know, what happens if you just can't
7  get financing, you know. I didn't want to keep
8  spending a lot of time and effort and money on teaming
9  with JLB if they just aren't able to find the financing
10 out there. And Gary reiterated that he didn't think
11 that was the case. He thinks there is a way that we
12 could probably find this. But they wouldn't drag it
13 on. They would probably stop it and call it a day.
14         BY MR. PRISBE:
15    Q   I understand you say you listened -- in
16 your mind, you listened a lot. What did you say, if
17 anything?
18    A   I was shocked. I just didn't see it
19 coming. Part of it is right up to that, Gary's been
20 pretty clear about this is a great project for him and
21 his team, as well as JLB. We were really moving the

Page 147

1  design process along. There was a lot of pressure for
2  everybody to make sure that we got the construction
3  drawings in by the July 1st date, which triggered a
4  lead certified building requirement. That there just
5  seemed to be no indications at all that at the end of
6  the day, with -- even with, you know, the credit
7  markets the way they were, I always just got the
8  impression that this was one project that JLB would
9  certainly want to continue working on, even if they let
10 other projects go.
11    Q   And you said the way the credit markets
12 were. What do you mean by that?
13    A   It just became more challenging for --
14 banks weren't really lending. If they were, you know,
15 they were coming up with 40 percent equity in some
16 cases. The challenges were starting to become clearer
17 and louder as you witnessed other projects out there
18 unable to get financing.
19    Q   In fact, by December of 2008, was the
20 financial meltdown, the stimulus package, correct?
21    A   Yes.

Page 148

1     Q   What did you discuss about renegotiation?
2     A   I was shocked, numb. I told Gary, let me
3  think about, you know, some ideas. I remember asking
4  him, you know, what are some of the things you're
5  thinking, and Gary mentioned to me that on his drive up
6  to Baltimore that morning, that he was thinking of --
7  an easy solution would be just to split it in half and
8  do it in two phases, as opposed to one project. And he
9  asked me how did I feel about that.
10         I told him, you know, let me just digest
11 all of this. I feel like I got hit with a frying pan.
12 It was just shocking. And that we were going to get
13 through the holidays, the next day was New Year's Eve,
14 and that we would circle back and take the next four
15 days or so to try to figure out what makes sense for
16 us -- what makes sense for us, being Tina and myself,
17 what makes sense for us as being a team with JLB, and
18 then what makes sense for JLB. So I just wanted to
19 kind of clear -- bring all of my thoughts together on
20 it, so --
21    Q   What, if any, discussion did you have about

Page 149

1  them pulling out in the future if financing didn't work
2  out?
3     A   Well, with Gary, you know, he always talked
4  about how this was -- and I hate to keep saying it, but
5  if it was the last project that JLB wanted to do, that
6  this was going to be it. I don't know the depth of all
7  of the other projects. I can't really express whether
8  I think my project was any better than some of the
9  other ones out there, but it was always that common
10 element that Gary always portrayed, that was the top of
11 their list.
12         And Gary's thought when we had this
13 conversation is that we're going to find some closure
14 on this. The credit market is down, but I remember him
15 mentioning that Jim Bosner is comfortable with the
16 40 percent. That's where the markets are. I remember
17 we had this conversation about -- you know, in the
18 fall, you were hearing people putting up 30 percent
19 equity. By the end of the year, they were 40 percent
20 equity.
21         Gary mentioned that Jim Bosner was