# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JLB REALTY, | * | |
| Plaintiff | * | |
| vs. | * | |
| CAPITAL DEVELOPMENT, LLC, | * | CASE NUMBER: |
| Defendant | * | 1:09-CV-00632-BEL |
| | * | |

- - - - - - - - -

Deposition of GARY PLICHTA, taken on Tuesday, October 6, 2009, beginning at 10:00 a.m., at Sellman & Hoff, LLC, 201 North Charles Street, Baltimore, Maryland, before Linda Ann Crockett, a Notary Public.

- - - - - - - - -

Reported by:
  Linda A. Crockett

Page 46

1    A. I never asked him to do anything
2    specifically with the LDA. He was driving that
3    train with the city. I was a support person from
4    the standpoint of putting together some numbers.
5    But I can't recall specifically saying you need
6    to do this. I did register our concerns and the
7    financial impact. But it was all incumbent upon
8    him to resolve the issue.
9        Q. I'm just going to use your metaphor of
10   driving that train, if you don't mind. In
11   connection with his driving that train, to the
12   best of your knowledge, did he keep you abreast
13   of all of his efforts in connection with driving
14   that train?
15       MR. PRISBE: Same objections.
16       A. Yes, to a point.
17       Q. And when you say to a point, what do you
18   mean?
19       A. There was a meeting that I was invited
20   to with the director of housing, and I can't
21   remember the date. I want to say it was in

Page 47

1    December. And magically I was disinvited at some
2    juncture, and I called Dave and he said I think
3    it was Stanley's directive, but I'm not really
4    sure. At that juncture things -- I was no longer
5    involved in that process. So I had been involved
6    and then kind of out of the blue I was dropped
7    from the process.
8        Q. Do you know why you were no longer
9    involved at that point in time?
10       A. I think Dave told me that Stanley told
11   him that the city didn't want me there.
12       Q. Did he say why?
13       A. No. It was surprising to me because I
14   had been participating with them, kind of
15   monitoring what was going on, and then I was kind
16   of disinvited. I don't know today what the
17   reason was.
18       Q. Even though you were disinvited to that
19   meeting, and you said you didn't directly
20   participate after that with the city; is that
21   correct?

Page 48

1        A. I did not participate directly with the
2    city after that, I don't believe.
3        Q. David did keep you abreast of what
4    occurred in those discussions and meetings with
5    the city?
6        MR. PRISBE: Objection to form and
7    foundation.
8        A. I recall at least one phone call
9    subsequent to that, that Dave called me up and
10   said that he had made some inroads with the city.
11       Q. In fact, he did invite you to the
12   hearing at the land use committee on January 28,
13   correct?
14       A. Yes. But that was nothing to do with
15   the LDA.
16       Q. Wasn't that meeting the meeting at which
17   they approved the letter of intent that David had
18   proposed?
19       MR. PRISBE: Objection to form and
20   foundation.
21       A. If it was, I wasn't at that meeting.

Page 49

1        Q. Do you recall being at a meeting at
2    which the letter of intent that had been agreed
3    in principle to between the city and Mr. Holmes
4    was introduced?
5        A. I was at one meeting. It was in a city
6    hall forum. There were a couple council members
7    there. My recollection was that that meeting was
8    for the approval or the -- maybe it was the first
9    read of the put amendment. But I don't recall
10   there being a bill introduced, or perhaps if
11   there was a meeting, I wasn't at the meeting
12   where a bill was introduced and approved.
13       Q. Do you recall Dave reaching a resolution
14   with the city whereby he was going to pay a
15   certain set sum per unit for the -- to buy out
16   the affordable housing?
17       MR. PRISBE: Objection to form and
18   foundation.
19       A. I recall him calling me and telling me
20   that. I don't recall ever participating in a
21   meeting or in a public forum where I heard that,

Page 58

1    Q. And then try to figure out what the
2  payment is that would satisfy the city?
3    A. There was at least one meeting where
4  Dave mentioned a payment, and the response I
5  heard back was from Dave, I think in a subsequent
6  phone call they came back with something almost
7  quadruple what he had offered. Maybe it was in a
8  meeting. He mentioned something like 200,000.
9  They said we want a million or 2 million. It was
10 a preposterous number.
11   Q. This deal that Dave conveyed to you he
12 had reached with the city, was it your
13 understanding that this would satisfy your
14 concerns about the LDA?
15     MR. PRISBE: Objection to form and
16 foundation.
17   A. Can you repeat the question.
18     (The record was read, as requested.)
19     MR. PRISBE: Same objection.
20   A. You're asking me about my opinion and my
21 concerns. Certainly until the LDA went away

Page 59

1  there were concerns. So did it alleviate the
2  concerns, no. Was it a positive movement, yes.
3  But I knew that it had to go through an approval
4  process, and anything can happen in an approval
5  process.
6    Q. It was your understanding as Dave
7  conveyed it to you that this deal he had reached
8  with the city would make the LDA go away,
9  correct?
10     MR. PRISBE: Same objections.
11   A. Yes, it was my understanding from what
12 he conveyed to me verbally, not having seen
13 anything written, that this was a positive step
14 in making the LDA go away. But there was always
15 concern that the LDA, primarily from our counsel,
16 that the LDA needed to go away, not probably go
17 away.
18   Q. So when you say probably, it was only
19 probably because it had not yet been signed off
20 on by the city -- by the mayor's office?
21     MR. PRISBE: Objection. You can answer

Page 60

1  if you can.
2    A. Yes, essentially.
3    Q. Previously you had said, and I'm quoting
4  you here, you said until the LDA went away there
5  were concerns, right?
6       MR. PRISBE: Is there a question there
7  or you --
8    Q. Do you recall saying that?
9    A. Whatever I said is on the record. Until
10 the LDA went away completely there were concerns
11 on our part. Nothing had been administrated by
12 the city government and we knew that there were
13 other departments that had to sign off, so you're
14 always cautious that something could break bad.
15 So I was cautiously optimistic.
16   Q. Assuming that David Holmes would be able
17 to take that last step to get it signed off on by
18 the mayor's office, based on that assumption,
19 would that have satisfied all of your concerns
20 about the LDA?
21     MR. PRISBE: Objection to form and

Page 61

1  foundation.
2    A. Yes.
3    Q. Now, one other thing in that light, you
4  knew about the LDA from the beginning of this
5  project, right?
6    A. Yes.
7    Q. You knew about it all the way back even
8  before the initial contract was signed, correct?
9    A. Yes.
10   Q. Do you recall there ever coming any
11 times where Dave Holmes said to you Gary, if I
12 can't make the inclusionary housing issue go
13 away, I will compensate JLB accordingly?
14   A. Yes.
15   Q. Did you have any reason to disbelieve
16 him?
17   A. No.
18   Q. Did you believe that if Dave Holmes
19 could not make the inclusionary housing go away,
20 he would in fact reimburse JLB for any potential
21 financial loss associated with the inclusionary

Page 62

1  housing?
2      A. I want to answer that in two parts.
3      Q. Please do.
4      A. Yes, I believe that he would have done
5  that. But when we got into what the actual
6  impact was going to be, I think even he was
7  surprised about how substantial it could be. So
8  from that perspective I think it was more than --
9  it was more than he thought. So could we have
10 swallowed it? Up until that point in time I
11 absolutely believed him. Subsequent to that
12 point in time I think there was a shadow of doubt
13 in my mind that it was so large, had it gone down
14 that track where the city wanted it to be, that
15 would be a tough thing for him to swallow.
16     Q. The problem with the LDA, as I
17 understand it, and you correct me if I'm wrong,
18 was the fact that it had a density level
19 associated with the project that was not
20 acceptable to JLB?
21     A. It had an adverse financial impact on

Page 63

1  the pro forma that would have diluted the
2  potential net operating income to the point where
3  we could no longer substantiate developing the
4  project. It's not that we were adverse to
5  inclusionary housing as a concept, but it would
6  have an adverse financial impact on this project.
7      Q. I'm only talking about the density
8  provisions of the LDA?
9      A. Oh, initially, yes, going back to the
10 original. In the initial density restrictions on
11 the LDA would prohibit the deal from moving
12 forward.
13     Q. And it's those density issues that, from
14 a financial standpoint, JLB absolutely needed to
15 get out, get rid of?
16     A. We were very clear that that would be an
17 impediment to this development.
18     Q. And you knew also from the beginning
19 that the LDA was going to expire in late June of
20 2009, correct?
21     A. Yes.

Page 64

1      Q. When Paul Johnston gave you the order to
2  terminate the project in late December, do you
3  recall what date that was exactly?
4      A. It was the last week in December. It
5  was after Christmas and prior to New Year's. It
6  was a Monday or Tuesday.
7      Q. So we'll just call it late December.
8  Can you tell me exactly what he said? Can you
9  tell me as best you can recall what he said?
10     A. He called up and said we need you to
11 terminate the contract; we need to get our
12 earnest money back before the end of the year.
13     Q. Do you recall what you said back to him?
14     A. I'm sure it wasn't polite. I don't
15 recall exactly. I probably -- I'm sure I asked
16 him why. I probably registered my disdain and he
17 was an advocate that he told me to do that and so
18 I immediately called Dave and went and saw and
19 sat down with Dave.
20     Q. You say I asked him why. What reasons
21 did he give?

Page 65

1      A. He said they wanted to terminate the
2  contract and they wanted their money in the
3  account before the end of the year.
4      Q. That was all he would say in terms of
5  the reasons why?
6      A. Pretty much. Pretty shocking.
7      Q. Did you say you then called up Dave to
8  arrange a meeting?
9      A. I did.
10     Q. I assume you didn't say anything on the
11 phone to him?
12     A. No.
13     Q. When was that meeting scheduled for?
14     A. I think it was the next day.
15     Q. So still the end of December, December
16 29, 30, somewhere in that range?
17     A. Yes.
18     Q. Did you terminate the contract in that
19 meeting?
20     A. I told him what was told to me. I told
21 him I was here to terminate the contract and get

Page 66

1  the money back. I recall him saying at least
2  three times I'll fight you over the money. And
3  we had a long conversation on a variety of
4  different topics, the state of the economy. But
5  I went and reported back to JLB.
6      Q. Did you tell him we are terminating or
7  did you tell him we are considering terminating?
8      A. My recollection is that I prefaced it by
9  saying we need to modify the contract or I'm
10 going to have to terminate the contract today. I
11 think I also said that Dallas would stay in the
12 deal if we could get $950,000 back and leave
13 50,000 up.
14     Q. Is that something that Paul Johnston
15 told you?
16     A. It was either Paul or Bay. And I'm not
17 sure if it was on the call with Paul, but it was
18 with authority from either Paul or Bay that I got
19 that directive. I think what -- my recollection
20 is Paul called me and gave me the directive. I
21 called Bay to register my disdain, offered some

Page 67

1  options, one of which was that they would stay in
2  the deal if I could orchestrate an amendment to
3  the contract with Dave and they would leave in
4  50,000.
5      Q. Did you tell Dave Holmes in that
6  discussion the reasons for the termination?
7      MR. PRISBE: Subject to his earlier
8  testimony. You can answer.
9      A. I recall having a passionate plea with
10 Dave saying we should stay in the deal; keep this
11 thing together. I'd be able to bring it home and
12 complete the job, that I was given a directive
13 and I'm here to deliver the message. I recall
14 telling him that message succinctly. I was -- he
15 was stunned in receiving the message. I was
16 stunned in delivering the message. We talked
17 about the challenges of the economy and the thing
18 that stuck out to me, what I took away from it is
19 he's not going to accept this proposal and he
20 would fight us for this money. I distinctly
21 remembering him saying those words three times

Page 68

1  because I went back and reported that to JLB.
2      Q. And that's in connection with the
3  million dollar earnest money?
4      A. Correct.
5      Q. Did you tell him why it is that JLB
6  thought they were entitled to the earnest money,
7  or did that topic not come up?
8      A. I don't know that I offered an
9  entitlement reason because -- I'm trying to
10 recall. It was -- I think I was an advocate of
11 the position that in order to keep this deal
12 alive we needed to find common ground. They want
13 their money back; what can we work out.
14     Q. How long was that discussion?
15     A. It was an hour, at least.
16     Q. In his office?
17     A. In his office.
18     Q. So you came to Baltimore for that?
19     A. Absolutely.
20     Q. Nobody else was present during that
21 meeting?

Page 69

1      A. No.
2      Q. And is it fair to say that the bulk of
3  that hour was then devoted to let's figure out a
4  way to make this work?
5      A. A good portion of that hour was me
6  trying to regain credibility with Dave.
7      Q. Why?
8      A. Because once I delivered the message I
9  think that he looked on me and the company in
10 disdain. And a good portion of the hour was me
11 trying to work out a deal with him that we could
12 keep this thing alive.
13     Q. You said a good chunk of time was
14 devoted to you regaining credibility?
15     A. I didn't gain credibility.
16     Q. I'm not saying did you. How did you
17 attempt to regain credibility in that discussion?
18     A. You know, I don't have all the
19 specifics. And it's hard to, when you deliver a
20 message like this, it's hard. His trust factor
21 in me diminished to zero. His trust factor to