**DEFENDANT'S EXHIBIT 2**

# ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

JLB REALTY,                       *

       Plaintiff          *

vs.                               *

CAPITAL DEVELOPMENT, LLC,   *   CASE NUMBER:

       Defendant          *   1:09-CV-00632-BEL

                                 *

- - - - - - - -

Deposition of **GARY PLICHTA**, taken on Tuesday, October 6, 2009, beginning at 10:00 a.m., at Sellman & Hoff, LLC, 201 North Charles Street, Baltimore, Maryland, before Linda Ann Crockett, a Notary Public.

- - - - - - -

Reported by:
   Linda A. Crockett

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888     Fax (410) 821-4889

### Page 17

1  Q. Would it be fair to say that during that
2  time you did have discussions with them as to the
3  reasons why the project should be terminated?
4      MR. PRISBE: Objection. Form and
5  foundation.
6  A. There was a myriad of conversations
7  regarding the projects. It was very fluid.
8  Ultimately I worked for JLB, which is controlled
9  by Glen Jones and Bay Miltenberger and they make
10 those decisions. It's best to pose that question
11 to them.
12 Q. Did you understand as it was relayed to
13 you that the reason for termination was because
14 of the financial markets were in turmoil?
15     MR. PRISBE: Objection. Form and
16 foundation.
17 A. We had discussions that the markets were
18 in turmoil, and again, I don't want to give you
19 an opinion because I am not Glen Jones.
20 Q. Please don't give me an opinion.
21     MR. PRISBE: Allow him to finish, if you

### Page 18

1  may.
2  Q. I'm sorry. Please finish.
3  A. Again, I don't want to provide you with
4  insight that I don't have. One thing that you
5  will find through your depositions perhaps is
6  that one thing I did do was prosecute to the
7  letter the directions that were given to me and
8  by the people I worked for. They paid me a lot
9  of money and asked me to do a task and I never
10 didn't complete what tasks they assigned. So I
11 can't tell you anything more than that.
12 Q. Correct me if I'm wrong, what you're
13 telling me is you can't speak for the hierarchy
14 as to specifically what reasons they felt
15 warranted the termination?
16     MR. PRISBE: Objection to form and
17 foundation.
18 A. It would be remiss of me to speculate.
19 I was not part of the Dallas operation. I was
20 part of the D.C. operation. We were the ones who
21 were executing in the field from the directive

### Page 19

1  level. They controlled ultimately the moves.
2  When I was given a directive, as I was by Paul
3  Johnston, I delivered the message immediately to
4  Dave. When I was given a directive by Bay to
5  terminate a contract, the contract was
6  terminated.
7  Q. During that time frame December,
8  January, December '08, January '09, February '09,
9  did you have any discussions with Paul Johnston,
10 Bay Miltenberger, or any of the hierarchy at JLB
11 as to why they wanted to terminate the contract?
12     MR. PRISBE: Objection.
13 A. There were a lot of conversations. I
14 was an advocate of the contract. And so I had to
15 give them my opinions and they would digest them
16 and give me back their position. But I can't
17 tell you what went into their decisions because I
18 didn't make their decisions.
19 Q. I'm not asking you to read their minds.
20 I'm only asking you to convey to me what they
21 told you and the impressions that you developed

### Page 20

1  from what they told you. So that having been
2  said, based upon your discussions with them, was
3  the motivating force behind the termination the
4  existing state of the financial market at the
5  time?
6      MR. PRISBE: Same objections. Form and
7  foundation. You can answer.
8  A. Perhaps. Again, I don't want to give
9  you the -- I don't want to give you the
10 impression I know because I don't. I was an
11 advocate. I fought hard, diligently to keep all
12 the deals alive, not just this one. I didn't get
13 paid unless I performed and I believed in these
14 transactions. In terms of the ultimate decision,
15 it wasn't mine, nor did I have a vote. So I
16 can't render you something I wasn't part of.
17 There's probably a lot of documents here of
18 testimony of my advocating the position for this
19 deal.
20 Q. Let me back you up for a second. You
21 just said I didn't get paid unless I performed.

**Page 41**

I know that occurred, whenever that first amendment occurred. Whether there was something in between, I just don't recall a specific conversation.

Q. You were given a directive by Paul Johnston late December to terminate this project; did that come as a bolt out of the blue to you?

A. Yes.

Q. You had no inkling prior to that discussion that JLB intended to terminate this project?

A. Let me qualify my answer. I'm a promoter. I promote real estate development. I promoted this site. I'm always a believer that I can get things done. At that juncture I believed that I could get this deal through, get it built. So it was somewhat a surprise for me to get the call from Paul Johnston at that time and said terminate the contract.

Q. Is it fair to say that even after that juncture, after that directive from Paul

**Page 42**

Johnston, that you still believed that you could get this project done?

A. Absolutely. Developers are optimists. You have to be. Whatever challenge is in front of you, conquer the challenge.

Q. Now, you worked with Dave Holmes on this project all the way from probably the spring of '08 all the way through February of '09, correct?

MR. PRISBE: Objection. Form and foundation. You can answer.

A. Yes.

Q. Did you enjoy working with him?

A. Absolutely.

Q. Did you find that Dave was a man of his word?

MR. PRISBE: Objection. Form and foundation. You can answer.

A. Yes.

Q. If you asked Dave to perform a task or a function in connection with the project, in your experience, did he follow through and get it

**Page 43**

done?

MR. PRISBE: Objection to form and foundation. You can answer.

A. Yes.

Q. And would you characterize your relationship with Dave as being in essence, and I don't mean in the legal sense, but you were partners on the project?

MR. PRISBE: Same objections.

A. Let me make sure there's no misunderstanding what partners means. There was an idea that we both would take a piece of this transaction, JLB having the residential component and Dave having the retail component. From that perspective there was a partnership. But he wasn't a partner of mine on the JLB side. So there wasn't a partnership arrangement there. We ate from what we killed and he ate from what he killed, so to speak. Does that answer your question?

Q. That's why I said from a legal

**Page 44**

perspective I'm not asking the question, but from a practical perspective and how the two of you worked together in coordinating things, did you see it as a joint venture, a partnership?

MR. PRISBE: Objection to form and foundation. You can answer if you understand. A joint venture I believe is a legal term. And you've changed your terminology.

Q. I'm talking from common parlance?

A. We worked in a cooperative effort for a common goal.

Q. And you found Dave to be very cooperative?

A. Yes.

Q. I take it you recall what the LDA is?

A. Yes.

Q. And how it relates to this project?

A. Yes.

Q. I take it you also recall what the PUD is and how it relates to the project?

A. Yes.

Page 57

1  A.  Yes.
2  Q.  And in fact what Mr. Holmes conveyed to
3  you that he had agreed to with the city, a
4  payment, that is something that you and
5  Mr. Holmes had discussed for the prior two or
6  three months, correct?
7      MR. PRISBE:  Objection to form.
8  A.  My recollection is that we were running
9  down a path with the city that included a number
10 of different options, including a payment
11 provision.  But that the city pushed back because
12 they really wanted inclusionary housing
13 component.  Post my involvement is when he was
14 able to work a deal with the city.  But I was not
15 part of that.  But I know that at least in one
16 meeting with the city he tendered an offer and it
17 was rebutted by the city because they were
18 advocates of inclusionary housing.  So we had to
19 show what adverse impact inclusionary housing
20 would have and how it would jeopardize the
21 project.

Page 58

1  Q.  And then try to figure out what the
2  payment is that would satisfy the city?
3  A.  There was at least one meeting where
4  Dave mentioned a payment, and the response I
5  heard back was from Dave, I think in a subsequent
6  phone call they came back with something almost
7  quadruple what he had offered.  Maybe it was in a
8  meeting.  He mentioned something like 200,000.
9  They said we want a million or 2 million.  It was
10 a preposterous number.
11 Q.  This deal that Dave conveyed to you he
12 had reached with the city, was it your
13 understanding that this would satisfy your
14 concerns about the LDA?
15     MR. PRISBE:  Objection to form and
16 foundation.
17 A.  Can you repeat the question.
18     (The record was read, as requested.)
19     MR. PRISBE:  Same objection.
20 A.  You're asking me about my opinion and my
21 concerns.  Certainly until the LDA went away

Page 59

1  there were concerns.  So did it alleviate the
2  concerns, no.  Was it a positive movement, yes.
3  But I knew that it had to go through an approval
4  process, and anything can happen in an approval
5  process.
6  Q.  It was your understanding as Dave
7  conveyed it to you that this deal he had reached
8  with the city would make the LDA go away,
9  correct?
10     MR. PRISBE:  Same objections.
11 A.  Yes, it was my understanding from what
12 he conveyed to me verbally, not having seen
13 anything written, that this was a positive step
14 in making the LDA go away.  But there was always
15 concern that the LDA, primarily from our counsel,
16 that the LDA needed to go away, not probably go
17 away.
18 Q.  So when you say probably, it was only
19 probably because it had not yet been signed off
20 on by the city -- by the mayor's office?
21     MR. PRISBE:  Objection.  You can answer

Page 60

1  if you can.
2  A.  Yes, essentially.
3  Q.  Previously you had said, and I'm quoting
4  you here, you said until the LDA went away there
5  were concerns, right?
6      MR. PRISBE:  Is there a question there
7  or you --
8  Q.  Do you recall saying that?
9  A.  Whatever I said is on the record.  Until
10 the LDA went away completely there were concerns
11 on our part.  Nothing had been administered by
12 the city government and we knew that there were
13 other departments that had to sign off, so you're
14 always cautious that something could break bad.
15 So I was cautiously optimistic.
16 Q.  Assuming that David Holmes would be able
17 to take that last step to get it signed off on by
18 the mayor's office, based on that assumption,
19 would that have satisfied all of your concerns
20 about the LDA?
21     MR. PRISBE:  Objection to form and

Page 61

1 foundation.
2    A. Yes.
3    Q. Now, one other thing in that light, you
4 knew about the LDA from the beginning of this
5 project, right?
6    A. Yes.
7    Q. You knew about it all the way back even
8 before the initial contract was signed, correct?
9    A. Yes.
10    Q. Do you recall there ever coming any
11 times where Dave Holmes said to you Gary, if I
12 can't make the inclusionary housing issue go
13 away, I will compensate JLB accordingly?
14    A. Yes.
15    Q. Did you have any reason to disbelieve
16 him?
17    A. No.
18    Q. Did you believe that if Dave Holmes
19 could not make the inclusionary housing go away,
20 he would in fact reimburse JLB for any potential
21 financial loss associated with the inclusionary

Page 62

1 housing?
2    A. I want to answer that in two parts.
3    Q. Please do.
4    A. Yes, I believe that he would have done
5 that. But when we got into what the actual
6 impact was going to be, I think even he was
7 surprised about how substantial it could be. So
8 from that perspective I think it was more than --
9 it was more than he thought. So could we have
10 swallowed it? Up until that point in time I
11 absolutely believed him. Subsequent to that
12 point in time I think there was a shadow of doubt
13 in my mind that it was so large, had it gone down
14 that track where the city wanted it to be, that
15 would be a tough thing for him to swallow.
16    Q. The problem with the LDA, as I
17 understand it, and you correct me if I'm wrong,
18 was the fact that it had a density level
19 associated with the project that was not
20 acceptable to JLB?
21    A. It had an adverse financial impact on

Page 63

1 the pro forma that would have diluted the
2 potential net operating income to the point where
3 we could no longer substantiate developing the
4 project. It's not that we were adverse to
5 inclusionary housing as a concept, but it would
6 have an adverse financial impact on this project.
7    Q. I'm only talking about the density
8 provisions of the LDA?
9    A. Oh, initially, yes, going back to the
10 original. In the initial density restrictions on
11 the LDA would prohibit the deal from moving
12 forward.
13    Q. And it's those density issues that, from
14 a financial standpoint, JLB absolutely needed to
15 get out, get rid of?
16    A. We were very clear that that would be an
17 impediment to this development.
18    Q. And you knew also from the beginning
19 that the LDA was going to expire in late June of
20 2009, correct?
21    A. Yes.

Page 64

1    Q. When Paul Johnston gave you the order to
2 terminate the project in late December, do you
3 recall what date that was exactly?
4    A. It was the last week in December. It
5 was after Christmas and prior to New Year's. It
6 was a Monday or Tuesday.
7    Q. So we'll just call it late December.
8 Can you tell me exactly what he said? Can you
9 tell me as best you can recall what he said?
10    A. He called up and said we need you to
11 terminate the contract; we need to get our
12 earnest money back before the end of the year.
13    Q. Do you recall what you said back to him?
14    A. I'm sure it wasn't polite. I don't
15 recall exactly. I probably -- I'm sure I asked
16 him why. I probably registered my disdain and he
17 was an advocate that he told me to do that and so
18 I immediately called Dave and went and saw and
19 sat down with Dave.
20    Q. You say I asked him why. What reasons
21 did he give?

Page 73

1 in that period of time. There was work and
2 dialogue going on.
3 Q. So that dialogue went on for roughly 45
4 or 50 days. What precipitating event led to the
5 letter of February 16th?
6 MR. PRISBE: Objection to form and
7 foundation.
8 A. Can I see the letter?
9 Q. Sure.
10 I'm showing you what's marked as Exhibit
11 3. So my suspicion is that it was simply
12 attached to the complaint as Exhibit 3.
13 A. This letter is from David Tatum and was
14 likely initiated through the Dallas office as a
15 directive to send the letter out.
16 Q. I understand. But you said you got a
17 directive in late December to terminate. We know
18 the actual termination didn't happen until
19 February 16. My question is what occurred on or
20 about the February 16th time frame that suddenly
21 led to this letter of termination?

Page 74

1 MR. PRISBE: Objection to form and
2 foundation.
3 A. I don't have an answer for you. I mean,
4 I was working to try to keep the deal alive to
5 the best of my ability. I thought I had laid out
6 a position of reason. I think that Dave had
7 subscribed at least partially to that process.
8 Q. Meaning Dave was working with you
9 toward --
10 MR. PRISBE: You've got to let the guy
11 finish his question.
12 Q. I just wanted to understand that one
13 phrase.
14 MR. PRISBE: You can follow up. It's
15 just not fair to the witness and the record.
16 A. And then a decision was made by Dallas
17 to terminate the contract and they were given the
18 directive to Tatum. Tatum sent the letter and
19 that was it.
20 Q. Were you involved in that decision that
21 came from Dallas?

Page 75

1 A. If I was involved, my vote didn't count
2 because I was an advocate of the deal. To this
3 day I'm still an advocate of the deal. I did not
4 want to see this deal terminated.
5 Q. I understand your answer. I just don't
6 think it answers the question. Were you involved
7 in that decision?
8 A. I did not because I would not have made
9 that decision.
10 Q. Did they ask you to participate in that
11 decision?
12 MR. PRISBE: Objection to form and
13 foundation.
14 A. They don't ask for participation in
15 decisions like these. They dictate an edict and
16 you follow the edict. I had given my passionate
17 pleas to them as I did to David to stay the
18 course and they opted not to.
19 Q. Let me show you what has previously been
20 marked as Kerschberg Exhibit 1. You can see that
21 it's an e-mail from you?

Page 76

1 A. Yes.
2 Q. Dated February 16th?
3 A. Right.
4 Q. The same date as the termination.
5 A. Right.
6 Q. Presumably prior to the termination
7 letter going out but I can't vouch for that?
8 A. I don't know.
9 MR. PRISBE: Objection. There's no
10 question pending.
11 Q. Why were you asking Ben Kerschberg on
12 that date for the status of the LDA request with
13 the board of estimates?
14 A. I'm sure I was responding to a request
15 from Dallas. There may be another e-mail or
16 phone call that said what is the status of the
17 LDA. I'm sure I walked down the hall and said
18 Ben, can you find out.
19 Q. Was there concern to your knowledge on
20 the part of Dallas that in fact the deal between
21 Mr. Holmes and the city with regard to the

## Page 77

1 termination of the LDA was going to be concluded?
2    MR. PRISBE: Objection to form.
3    A. I'm not sure I understand the question.
4 Can you restate that?
5    Q. To your knowledge was there concern on
6 the part of Dallas that Mr. Holmes was close to
7 closing his deal with the city regarding the
8 termination of the LDA?
9    A. I would say --
10    MR. PRISBE: Same objection.
11    A. I would say that would be fair, yes.
12    Q. And the concern was that once he got
13 that matter to conclusion, then JLB would no
14 longer be able to claim that as a basis for the
15 termination of the contract?
16    MR. PRISBE: Objection. Form and
17 foundation.
18    A. They were monitoring that closely.
19    Q. Thank you.
20    MR. HOFF: Off the record.
21    (Off the record.)

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889

## Page 78

1 BY MR. HOFF:
2    Q. Between that December discussion with
3 Dave Holmes and that termination letter of
4 February 16th, do you recall ever having a
5 discussion with Dave in which you said Dave, the
6 basis on which JLB believes it can terminate is
7 because you have not yet gotten the LDA modified?
8    MR. PRISBE: Objection to form. You can
9 answer.
10    A. I do recall saying that to him. Now,
11 when that was -- it might have been in that
12 December meeting and I think maybe that's what
13 offended him. But I do recall a conversation, a
14 singular conversation saying I think he might
15 have mentioned why are -- how are they going to
16 terminate and I mentioned the LDA. And again, I
17 think he was offended. But I can't tell if it
18 was the December conversation or a different
19 conversation. There was a lot of dialogue post
20 December that I was trying to build back
21 credibility.

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889

## Page 79

1    Q. So you recall it happening, you just
2 can't recall the specifics?
3    A. I can recall saying that to him in the
4 context he said how do you think that they can
5 terminate, and I said because the LDA isn't
6 signed.
7    Q. I think you said you recall him being
8 offended?
9    A. Yes.
10    Q. Did he tell you why he was offended?
11    A. Because he just got a message that we
12 were terminating or in the process of
13 terminating. It was pretty obvious.
14    Q. Did he ever say to you that he was
15 offended -- words to this effect obviously, not
16 exactly. But did he ever say to you that he was
17 offended because he had done everything you asked
18 of him with respect to getting the LDA
19 terminated?
20    MR. PRISBE: Objection to form. Subject
21 to his earlier testimony.

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889

## Page 80

1    A. I'm sure he said something of the like.
2 I don't know specifically -- I can't tell you a
3 meeting. But I'm sure he -- I can recall a
4 conversation that had that content in it that he
5 said, hey, you know, I've been doing everything
6 I've been saying I was doing.
7    Q. And do you recall him saying to you
8 something to the effect of Gary, I did everything
9 you guys asked me to do as to the LDA; how can
10 you claim that you can now terminate on that
11 basis?
12    MR. PRISBE: Objection.
13    A. I don't recall those specific words.
14 It's a long time ago. But the intent I think was
15 that he mentioned his dissatisfaction because he
16 had been working diligently on the LDA.
17    Q. And to your knowledge had he been
18 working diligently on the LDA?
19    A. He had been working diligently on the
20 LDA.
21    Q. To your knowledge had he done what he

CRC-Salomon
Baltimore, Maryland
Phone (410) 821-4888   Fax (410) 821-4889