# DEFENDANT'S EXHIBIT 3

1

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3

4    JLB REALTY, LLC,

5              Plaintiff

6    vs.                      CASE NO. 1:09-CV-00632 BEL

7    CAPITAL DEVELOPMENT, LLC,

8              Defendant

9    _____/

10

11

12           The deposition of DAVID HOLMES was held on

13    Thursday, September 10, 2009, commencing at 9:35 a.m.,

14    at the Law Offices of Venable, LLP, 750 East Pratt

15    Street, Suite 900, Baltimore, Maryland 21202, before

16    Steven Poulakos, Notary Public in and for the State of

17    Maryland.

18

19

20

21    REPORTED BY:  Steven Poulakos

**Page 142**

1 where you were informed by JLB that they desired the
2 return of the earnest money?
3 A  There was a conversation that Gary Plichta
4 and I had, which Gary Plichta made reference to the
5 credit market collapsing, challenges in finding debt
6 financing, and that JLB would like to perhaps
7 reconsider looking at the deal, and that there is the
8 possibility that if we can't find perhaps some
9 resolution, then JLB may end up withdrawing and would
10 like its deposit refunded.
11 Q  Where did this conversation take place?
12 A  My office.
13 Q  Do you remember when this conversation took
14 place?
15 A  I believe it was December the 30th, but I
16 may be off by a day.  I know it wasn't the 31st, but I
17 think it was the 30th.
18 Q  Maybe we can help refresh your
19 recollection, but I believe it's a good recollection.
20 A  Okay.
21    MR. PRISBE: Number 6.

**Page 143**

1    (Whereupon, a document was marked as
2 Deposition Exhibit Number 6.)
3    THE WITNESS: (Witness reviewing document.)
4    BY MR. PRISBE:
5 Q  The court reporter has marked as Number 6
6 an e-mail trail bearing the Bates label designation as
7 JLB196, which shows, in fact, on December 29th, 2008,
8 communication about a meeting, albeit you couldn't make
9 lunch, the next day in the morning between you and
10 Mr. Plichta.
11 A  Yes.
12 Q  Which I believe is the reference you just
13 made to December 30th.
14 A  That's correct.
15 Q  This was in your office, you say?
16 A  Yes.
17 Q  This was in Fells Point?
18 A  Yes, it is.
19 Q  Was anybody else there?
20 A  No.
21 Q  Do you remember how long the meeting

**Page 144**

1 lasted?
2 A  Maybe an hour.  It wasn't a long meeting at
3 all.  I would say maybe about an hour, if not shorter.
4 Q  Did he bring any materials or did you bring
5 any materials?
6 A  No.
7 Q  Did you have an understanding as to what
8 the purpose of the meeting was prior to the meeting?
9 A  Not at all.
10 Q  Did you make any notes, either during the
11 meeting or after the meeting, about the meeting?
12 A  No.
13 Q  Tell me as best you recollect -- we'll
14 first go substance of the meeting before we get down to
15 details.  What was discussed, what topics and what was
16 the gist of the discussion?
17 A  That he, over the past week or so, been
18 corresponding with JLB corporate and that there was a
19 real concern whether this project, given the size and
20 scope of it, would get financing in this market and
21 that, you know, JLB is still very much committed to the

**Page 145**

1 project and that, you know, we certainly want to try to
2 see if there's a way that we might be able to
3 renegotiate the contract so that we could find it more
4 financiable -- financiable?  Is that not a good word?
5    MR. HOFF: I'm going to keep a list of
6 them.
7    THE WITNESS: You want to sound educated
8 but yet --
9    MR. HOFF: That Hopkins master goes a long
10 way.
11    THE WITNESS: That it was just a real
12 concern and that we would, you know, over the course --
13 you know, in the next couple of weeks or so, that for
14 me to think about maybe some ideas or some ways that we
15 could find some opportunity to help them achieve what
16 they need to get the project financed.  And expressed
17 concern that JLB, you know, is looking at other
18 projects that they have in their structure, their
19 offices they have, and they're reevaluating different
20 deals and that they're -- some projects are on the
21 chopping block, that aren't going to be financed, but

Page 146

1   right now, yours is still one that we'd like to do, but
2   it's challenging. We just need to find a way to work
3   together on how we can get this thing financed.
4       That was -- that's the gist. I think I
5   just sat and listened more than anything. And we
6   talked about, you know, what happens if you just can't
7   get financing, you know. I didn't want to keep
8   spending a lot of time and effort and money on teaming
9   with JLB if they just aren't able to find the financing
10  out there. And Gary reiterated that he didn't think
11  that was the case. He thinks there is a way that we
12  could probably find this. But they wouldn't drag it
13  on. They would probably stop it and call it a day.
14      BY MR. PRISBE:
15  Q   I understand you say you listened -- in
16  your mind, you listened a lot. What did you say, if
17  anything?
18  A   I was shocked. I just didn't see it
19  coming. Part of it is right up to that, Gary's been
20  pretty clear about this is a great project for him and
21  his team, as well as JLB. We were really moving the

Page 147

1   design process along. There was a lot of pressure for
2   everybody to make sure that we got the construction
3   drawings in by the July 1st date, which triggered a
4   lead certified building requirement. That there just
5   seemed to be no indications at all that at the end of
6   the day, with -- even with, you know, the credit
7   markets the way they were, I always just got the
8   impression that this was one project that JLB would
9   certainly want to continue working on, even if they let
10  other projects go.
11  Q   And you said the way the credit markets
12  were. What do you mean by that?
13  A   It just became more challenging for --
14  banks weren't really lending. If they were, you know,
15  they were coming up with 40 percent equity in some
16  cases. The challenges were starting to become clearer
17  and louder as you witnessed other projects out there
18  unable to get financing.
19  Q   In fact, by December of 2008, was the
20  financial meltdown, the stimulus package, correct?
21  A   Yes.

Page 148

1   Q   What did you discuss about renegotiation?
2   A   I was shocked, numb. I told Gary, let me
3   think about, you know, some ideas. I remember asking
4   him, you know, what are some of the things you're
5   thinking, and Gary mentioned to me that on his drive up
6   to Baltimore that morning, that he was thinking of --
7   an easy solution would be just to split it in half and
8   do it in two phases, as opposed to one project. And he
9   asked me how did I feel about that.
10      I told him, you know, let me just digest
11  all of this. I feel like I got hit with a frying pan.
12  It was just shocking. And that we were going to get
13  through the holidays, the next day was New Year's Eve,
14  and that we would circle back and take the next four
15  days or so to try to figure out what makes sense for
16  us -- what makes sense for us, being Tina and myself,
17  what makes sense for us as being a team with JLB, and
18  then what makes sense for JLB. So I just wanted to
19  kind of clear -- bring all of my thoughts together on
20  it, so --
21  Q   What, if any, discussion did you have about

Page 149

1   them pulling out in the future if financing didn't work
2   out?
3   A   Well, with Gary, you know, he always talked
4   about how this was -- and I hate to keep saying it, but
5   if it was the last project that JLB wanted to do, that
6   this was going to be it. I don't know the depth of all
7   of the other projects. I can't really express whether
8   I think my project was any better than some of the
9   other ones out there, but it was always that common
10  element that Gary always portrayed, that was the top of
11  their list.
12      And Gary's thought when we had this
13  conversation is that we're going to find some closure
14  on this. The credit market is down, but I remember him
15  mentioning that Jim Bosner is comfortable with the
16  40 percent. That's where the markets are. I remember
17  we had this conversation about -- you know, in the
18  fall, you were hearing people putting up 30 percent
19  equity. By the end of the year, they were 40 percent
20  equity.
21      Gary mentioned that Jim Bosner was

Page 150

1  comfortable and was committed to that and promised that
2  to Gary, so that what we needed to do was work on
3  finding a bank that would lend, you know, the
4  construction financing, the debt required, and that
5  was, you know, what we needed to do was figure out how
6  can we get a bank to lend 30 million plus dollars, that
7  banks -- at that point, banks were just closing the
8  doors.
9     So I never really felt like it was
10 collapsing. I always just felt like the deal's going
11 to happen. We're just going to have to restructure.
12 Q  My question -- and I appreciate that, but
13 my question was a little bit different. You
14 articulated that in this December 30 conversation, that
15 you estimated to be an hour, maybe somewhat less. I
16 wrote down that you said there was an explanation that
17 if the financing wasn't coming, JLB probably would pull
18 out.
19 A  Yes.
20 Q  And I'm trying find out what specific
21 discussion occurred about that, JLB pulling out.

Page 151

1  A  I think Gary was responding like a knee
2  jerk reaction when he told me that they just weren't
3  going to be finance this in its entirety, the market is
4  not there. And I think my response was, you know,
5  well, that's what we agreed to.
6     And he's like, look, if that's what you
7  need, if that's what's going to happen, that you're --
8  this deal is all or none in terms of phasing, then JLB
9  may end up, you know, wanting to terminate this, but
10 they're just not going to be able to finance it in its
11 entirety.
12 Q  Anything else that you remember about that
13 topic on that conversation of December 30th?
14 A  Again, it would -- Gary was very -- kind of
15 somewhat somber relaying the information, but at the
16 same time, I think he also was very encouraged by the
17 fact that we have taken this project so far. We've
18 made such great strides and he and I have such a good
19 working relationship, that he was just confident that
20 we were going to be able to figure out a way to have
21 this project work and move forward.

Page 152

1  Q  What, if any, discussion was there about
2  the earnest money and returning the earnest money to
3  JLB?
4  A  He just mentioned to me that, again, when
5  he responded to my knee jerk reaction, he just
6  responded that if they terminated, that obviously they
7  would want their deposit back.
8  Q  Anything else about earnest money?
9  A  I have -- I can't recall if I responded to
10 that comment or not. If I did, I probably would have
11 told him that I didn't think that JLB was entitled to
12 it back. But again, the direction of this meeting was
13 all about let's keep a positive outlook, let's move
14 forward, we're going to figure out a way. That's the
15 gist of that meeting.
16 Q  Did you tell him that you would fight JLB
17 about the earnest money?
18 A  Again, I can't recall specifically in that
19 meeting. I know that at some time, from that point
20 moving forward, that a conversation came up, and it may
21 have been on the December 30th meeting, where the

Page 153

1  earnest money, that JLB would be requesting it back if
2  they terminate the agreement. I probably would have
3  said that I don't think they'd be entitled to it and
4  that's something that we would have to fight over.
5  Q  Could you have said that Mr. Plichta will
6  say you said probably at least three times during that
7  conversation that you would fight JLB over on the
8  earnest money?
9  A  On that December 30th?
10    MR. HOFF: Objection.
11    BY MR. PRISBE:
12 Q  Yes, sir.
13    MR. HOFF: Foundation.
14    BY MR. PRISBE:
15 Q  Would that be accurate?
16 A  It could be. Again, that wasn't the gist
17 of the meeting.
18    MR. HOFF: Same objection.
19    BY MR. PRISBE:
20 Q  Did you have any discussion that you viewed
21 the deposit as being hard?

1   up the issue?

2        A     After JLB -- more specifically Gary signed

3   the sales contract.  And again prior to signing the

4   sales contract JLB was made well aware of the LDA and

5   the housing issue.  Gary and I verbally and in kind of

6   a work session continued to work on it and we had a

7   pretty good understanding as to how we were moving

8   forward with their participation in how the LDA was

9   going to get resolved.

10           Contractually, though, it was kind of left

11  floating.  And I know that their attorney really wanted

12  to nail this issue more specifically contractually and

13  not have it floating out there.

14       Q     When you say this issue can you be more --

15       A     The LDA.

16       Q     And how do you know that their attorney

17  wanted to nail the issue and not have it floating out

18  there?

19       A     I think Gary probably had mentioned it to

20  me that we needed to deal with this issue and amend the

21  contract.

1          Q      Can you tell me what you mean when you say

2    contractually it was left floating?  It's not a term

3    that lawyers typically use but business people do.  So

4    can you tell me what you mean by contractually it was

5    left floating?

6          A      There wasn't any -- there wasn't a -- it

7    wasn't dealt with in the original sales contract.  So

8    it was an open issue that was going to be dealt with at

9    another time.  So we all knew that we were going to be

10   amending the sales contract to reflect how we were

11   going to handle the LDA.  So contractually it's just

12   physically being dealt with on a contract.

13         Q      You understood that Mr. Tatum's e-mail

14   was -- a developer who has done many projects -- was as

15   a result of due diligence efforts by JLB and that they

16   were raising exceptions to title which would under the

17   contract potentially terminate the contract, correct?

18              MR. HOFF:  Objection to form.

19              THE WITNESS:  Not JLB.  I don't think JLB

20   really cared about the LDA.  I think their attorney was

21   driving that issue.  Just felt like this was something

271

1    that it deems necessary in its view up to a point in

2    time?

3                    MR. HOFF:  Objection to form.

4                    BY MR. PRISBE:

5        Q      Do you understand that?

6        A      I understand what you are saying, but I

7    don't agree.

8        Q      I'm not asking you to agree.  Do you

9    understand that?

10                   MR. HOFF:  Objection to form.

11                   He understands that it was sent to him.

12                   THE WITNESS:  Let me just say the LDA never

13   ever was brought up as something over my head.  The

14   LDA, in my opinion, was satisfied and dealt with and

15   that to me it was not a reason to terminate the

16   agreement.

17                   BY MR. PRISBE:

18       Q      My question -- and we'll go in baby steps

19   because I'm just trying to get where your articulation

20   of why the termination is wrong or unfair or whatever

21   ultimately comes out.  So I can help frame it for the

1   Court, for ourselves and everybody.

2            Do you understand that JLB believes and has

3   articulated that the termination right it was

4   granted -- let's do this in baby steps.  Do you

5   understand first that it believes it was granted a

6   termination right in the first amendment?

7            MR. HOFF:  Objection to form.

8            THE WITNESS:  It's too vague I'm sorry to

9   say.  The question is a little too vague because the

10  intent of that language in the first amendment applied

11  to a period of time.  And again I'm trying to help you

12  understand.  Again you weren't there, you know.  But at

13  that meeting there were four people.  The intent of

14  that language was nothing more than a benchmark to

15  check to see if JLB would be comfortable with the

16  direction that the LDA was being amended.  That was it.

17  That was it.

18            BY MR. PRISBE:

19       Q    Let's do this in baby steps.

20       A    Okay.

21       Q    I'm not asking you to articulate what you

304

1           THE WITNESS:  The amount of money that was

2    spent to purchase or to buy out these -- this

3    obligation was calculated and driven based on

4    negotiating with the city when JLB was still part of

5    the deal.

6           It's an amount that is reflective of where

7    we thought we were.  And we being JLB, where we felt

8    like there was a value of what that would mean and what

9    the city wanted and the day we ended up coming to

10   terms.  That's how that value is.

11          Do I think that there's a direct -- how do

12   I apply that to where it is today?  I really don't.  To

13   me it was a fee I paid and it was an obligation that we

14   agreed to.  That's it.

15          Is it damaging to the project?  I don't

16   know.  It depends on what gets built in the future.

17          Is it what I wanted to do?  No.  I would

18   have just kept the 6 percent, but it was in an effort

19   to satisfy the deliverables for JLB.

20          BY MR. PRISBE:

21      Q    I'm not sure whether you are saying you had

308

1    amended the 45 days came and went.  I think everybody

2    just assumed that that amended requirement in the first

3    amendment was waived.  We never really spent much more

4    time on that other than that one day on August the

5    21st.  That was it.  I don't think the LDA ever came up

6    ever again as in pertaining to the first amendment.  No

7    one ever talked about it.  Nobody until the lawsuit.

8             John, I'm telling you the truth.

9             BY MR. PRISBE:

10        Q    If we continue down to Interrogatory

11   number 5 --

12        A    Yes.

13        Q    -- there's a statement made that Gary

14   Plichta often referred to this as JLB's, quote, trophy

15   project, end quote.  And even as the economy got bad

16   made statements to the effect that JLB would let every

17   other project die before it let this one get away.

18             Do you see that?

19        A    Yes.

20        Q    The quotes around trophy project, does that

21   mean that that's the term he used?

309

1      A      Yes.

2      Q      You're saying that Mr. Plichta told you and

3   used the specific term trophy project?

4      A      I recall on one account.

5      Q      I'm sorry.

6      A      I recall on one account him using those

7   specific words.

8      Q      When was that one account?

9      A      Sometime in '08.

10     Q      Can you give me more of a time frame?  Are

11  we talking June of '08?  Are we talking September of

12  '08?

13     A      The term trophy property used once, maybe

14  twice.  I don't know.  Maybe even more than that.  The

15  common thread throughout our relationship was this was

16  an important project, not project.  And it was carried

17  all the way through.  Even when the contract was

18  terminated, having Gary and one of his partners in

19  Texas call John to try to resurrect a project, I always

20  got the impression this was an important project for

21  them.

310

1          It's a unique, very unique parcel of land

2     across from the world's number one hospital.  It's just

3     an odd situation.  I was told on many times that this

4     was just, you know, a very unique and special situation

5     that they were thrilled to be developing.

6          I can't recall exactly the date the trophy

7     property term was used, but there's no doubt in my mind

8     it was used at least once, if not more, but there was a

9     common thread throughout the whole duration of our

10    relationship.

11        Q     I'm just trying to understand some answers

12    here.  There's a lost of stuff going on in the case and

13    I'm trying to understand a specific answer.  And my

14    understanding is you remember it being used once.

15        A     Yes.

16        Q     And my question was, and I think it is in

17    response to your question it was sometime in 2008:

18    Could you provide to me a better sense of when he used

19    that term, whether it was in June 2008 when the

20    contract was being signed, whether it was in

21    August 2008 when the first amendment was being signed,

311

1    or was it at some other point in time?

2         A     Maybe more in the middle.  I hate to be so

3    vague.

4         Q     The middle of --

5               MR. HOFF:  I am sorry.  Let him finish.

6               THE WITNESS:  The last quarter of '08.

7               BY MR. PRISBE:

8         Q     That's fine.

9         A     It is a term that stuck in my mind when it

10   was mentioned.

11        Q     When the phrasing here says he often

12   referred to this as, quote, trophy project, as you sit

13   here today that's not your recollection that he

14   actually often used that specific term?

15        A     I probably should have been more clear

16   this.  I think that he often referred to the project as

17   a trophy-like project often, but used the word trophy

18   project perhaps once or twice.  Not perhaps once.

19   Once, perhaps twice.

20        Q     The text continues.  He made comments to

21   this effect several times, perhaps more than several

316

1       A       He felt bad or horrible that he wasn't more

2   honest with what was going on with JLB and the whole

3   deposit.

4       Q       He said this to you?

5       A       Yes.

6       Q       Do you know when he said it?

7       A       He said it to me right after I confronted

8   him the day I saw Howard Perlow and talked to Gary

9   about it.  He felt pretty bad about how he handled the

10  whole thing.  He or him and JLB.

11      Q       What is it that he said or what did you

12  understand was the issue with respect to the deposit?

13      A       You mean in December or this letter?  I'm

14  sorry.

15      Q       This letter -- you indicated you did have a

16  discussion with him about him feeling horrible, I think

17  your word was, about how he had conveyed intentions

18  back there.  And I think you said it had to do with a

19  deposit.

20      A       Yes.

21      Q       I'm trying to understand, did he discuss

1    with you what it was about that deposit that he felt

2    horrible about or conveying their intentions about the

3    deposit --

4         A       That he didn't tell me that they were

5    trying to get the deposit back.

6         Q       Do you remember what he said, what you said

7    about why he felt horrible, what he did, why they were

8    doing it, any of the specifics of that conversation?

9         A       Again at the time this letter was written

10   or back in December 30th?

11        Q       Why don't we do this in baby steps.

12        A       I'm sorry.

13        Q       I think you said you confronted him at some

14   point in time.

15        A       That's right.

16        Q       And you confronted him on the topic of the

17   deposit; is that correct?

18        A       I think within a day or two after I had

19   spoke with Howard Perlow I mentioned to him that I

20   learned of the fact that JLB was trying to get its

21   deposit back behind my back.

319

1   get emotionally involved and let's try to keep this

2   project moving along.

3          Q     He continues in this that nevertheless

4   given our relationship from the start we felt it

5   imperative to share with you our assessment of the

6   situation with the hope of keeping the deal alive.

7                Do you see that?

8          A     Yes.

9          Q     Is it fair to say that in the December

10  discussion he indicated the deal might not be alive?

11         A     No.  But if you read the sentence before it

12  talks about over the last several months.  I think

13  where JLB was starting to show concern about the

14  financial credit market was more profound in January.

15               And I think it was just over the course of

16  all of the meetings and phone calls throughout January

17  that we understood the depth of how they were analyzing

18  the credit market and why we were all trying to take

19  steps to help each other out.  Again letting them draw

20  down the deposit for outstanding bills, splitting the

21  asset into two, delaying settlement until the end of

321

1      A      Here we are in January. Obviously

2  December 30th they were anxious to get it back. So you

3  start with that. Obviously the deposit was important

4  for them to get it back. My sense is that I think JLB

5  really genuinely wanted to continue doing this deal,

6  but wanted to have its deposit back at the same time

7  too. So I just felt like let's try to find a happy

8  medium here.

9      Q      So what Mr. Plichta informed you about,

10  after your confrontation and all, was to the effect

11  that JLB wanted its deposit back but also wanted to

12  proceed with a restructured project.

13          Why don't you tell me what he said to you

14  about it.

15          MR. HOFF: Let him finish. He was just

16  starting to answer your question and then you

17  interrupted him.

18          THE WITNESS: I don't know. You don't have

19  to get upset. Here's how. It was through kind of a

20  process of learning as I was negotiating on the second

21  amendment.

322

1            If you look at the drafts of the second

2    amendment, it's reflective of how they were willing to

3    actually look at various ways of structuring the

4    security deposit.

5            So I think as opposed to them coming out

6    and saying we want the whole deposit back, they were

7    coming out and saying, look, maybe we'll limit our

8    exposure on the deposit if we structure it this way.

9    We would look at it and say how about we restructure it

10   this way.  But at no point ever did they say we want it

11   all back or we're not going to move forward.  It was

12   through a process of drafts after drafts trying to

13   figure out a happy medium here on the deposit.

14            BY MR. PRISBE:

15        Q    I understand that.

16            Was there any statements, discussions

17   between you and Mr. Plichta that if we don't have a

18   restructured deal by the time an LDA will be released

19   Texas will execute a termination right because it wants

20   to protect the deposit?

21        A    Never.

328

1    he discuss with you essentially what is framed out here

2    that we think or JLB thinks there's a right to

3    terminate and either one of two things are going to

4    happen, we are going to renegotiate or to protect the

5    deposit we will terminate before there can be a cure of

6    the issue?

7              MR. HOFF:  Objection to form.  And I have

8    to say, John, this is now probably the 500th different

9    way you have posed the same question to him.  You keep

10   asking this.  You did it the prior deposition of him.

11   He's been in the deposition probably ten hours minimum

12   and you keep asking this question and you ask it in

13   different ways and you keep trying to get something out

14   of the Witness.  I have to tell you this is getting to

15   the point where it's ridiculous.  And I'm going to get

16   to the point where I'm just going to instruct the

17   Witness not to answer because this has gone on for way

18   too long.

19             BY MR. PRISBE:

20        Q    You can answer the question.

21        A    I don't ever recall Gary ever having a

329

1   conversation with me about the fact that the LDA or

2   anything regarding the LDA as being an issue for

3   termination.

4        Q     Do you remember whether he articulated in

5   those discussions about termination that there will

6   either be a renegotiated deal or an exercise of the

7   termination right before the cure?

8        A     I don't know why -- I get the impression

9   that he's conveying certain thoughts to his partners in

10  Texas which are different than the conversations he and

11  I had.

12       Q     So your answer is, no, you don't have a

13  recollection of that?

14       A     That's correct.

15       Q     On Exhibit Number 20 which I think is the

16  longer letter that was separately marked --

17       A     Are we finished with this?

18       Q     Yes.  Let me take that away.  Thanks.

19       A     (Witness reviewing document.)

20       Q     There's some handwriting on certain pages

21  of this document.  Is any of that handwriting yours?