EXHIBIT A

Page 1

```
          IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MARYLAND


JLB REALTY, LLC,                   :

       Plaintiff,                  :

   vs.                             : CASE NO.

CAPITAL DEVELOPMENT, LLC,          : 1:09-cv-00632-BEL

       Defendant.                  :

                  -------------------
```

Deposition of PAUL JOHNSTON, as Corporate Designee pursuant to Rule 30(b)(6) for JLB Realty, LLC, taken on Friday, August 14, 2009, at 9:40 a.m., at the law offices of Sellman & Hoff, 201 North Charles Street, Baltimore, Maryland, before Paul A. Gasparotti, Notary Public.

```
                  -------------------
```

Reported by:
Paul A. Gasparotti

Page 2

APPEARANCES:

    JOHN T. PRISBE, ESQUIRE
    Venable, LLP
    750 East Pratt Street
    Suite 900
    Baltimore, Maryland 21202
    (410) 244-7798
    (410) 244-7742 (Fax)
    jtprisbe@venable.com
      On behalf of the Plaintiff
    ALAN J. HOFF, ESQUIRE
    Sellman Hoff, LLC
    201 North Charles Street, Suite 1331
    Baltimore, Maryland 21201
    (410) 332-4151
    (410) 332-1746 (Fax)
    ahoff@sellmanhoff.com
      On behalf of the Defendant

ALSO PRESENT: David Holmes

Page 3

    PROCEEDINGS
    -----------
    PAUL JOHNSTON,
being first duly sworn to tell the truth, the
whole truth, and nothing but the truth, testified
as follows:
    EXAMINATION BY COUNSEL FOR DEFENDANT
    BY MR. HOFF:
  Q. Mr. Johnston, state your name and spell it for the record please.
  A. Paul Johnston, P-A-U-L, J-O-H-N-S-T-O-N.
  Q. And your home address please?
  A. 7013 Westlake Avenue, Westlake is one word, Dallas, Texas 75214.
  Q. And your work address?
  A. 909 Lake Carolyn, C-A-R-O-L-Y-N, Parkway, Suite 960, Irving, Texas, Irving spelled I-R-V-I-N-G, ZIP code 75039.
    (Discussion off the record.)
  Q. You are an employee of JLB?
  A. Correct.

Page 4

  Q. How long?
  A. Two years, two moths.
  Q. What's your current title?
  A. Operating partner.
  Q. Where does that put you in the pecking order?
  A. There's an executive committee really of six people, and I'm one of those.
  Q. And the executive committee essentially runs the company?
  A. Right, we make all the key decisions.
  Q. Is there a CEO?
  A. Glen Jones.
  Q. CFO?
  A. Chuck Carey.
  Q. Chairman of the board?
  A. Not really.
  Q. Are there any executive VPs or anything like that?
  A. The structure of the company, to better answer that, there's JLB Partners LP, it's a

Page 5

partnership that is managed by the executive committee I just described. There is no executive vice president of that entity.
  Q. So, are you really effectively an employee of JLB Partners?
  A. Yes.
  Q. And is JLB Realty an affiliate of the JLB Partners?
  A. Yes.
  Q. Is JLB Realty a single purpose LLC?
  A. Yes, it's the entity that we use to contract and purchase real estate.
  Q. Do you set up a separate entity for each particular deal you're going to go in?
  A. No.
  Q. So JLB Realty may have had a contract on this particular piece of property and may be involved in other transactions?
  A. Correct.
  Q. Is JLB Realty the entity that you exclusively use for real estate transactions?

Page 18

1  foundation.  I'm not sure I understood what your
2  question is.
3      MR. HOFF:  I'm not certain what there is
4  to understand.
5      Q.  Was the project at Washington Hill
6  terminated?
7      A.  Yes.
8      Q.  Did JLB terminate it?
9      A.  Yes.
10     Q.  And my question is, were the reasons the
11  same as with the Washington Hill project, and you
12  said in part.
13     MR. PRISBE:  Objection to form.  I think
14  you first jumbled Washington Hill, but that's --
15  why don't you ask him what the reasons were.
16  That's the easiest way.
17     MR. HOFF:  I'm going to actually ask the
18  questions in the way that I thought it was
19  appropriate, because he said they terminated the
20  Federal Hill project because there wasn't, I
21  think you described it as an appetite in the

Page 19

1  equity market for the project, correct?
2      MR. PRISBE:  Just for the record, I
3  think he said South Charles, but be that as it
4  may --
5      MR. HOFF:  Okay.
6      Q.  Would you prefer I call it the South
7  Charles project?
8      A.  Yes.
9      Q.  And then I believe you said that the
10  Washington Hill project was terminated in part
11  for the same reasons, correct?
12     A.  The lack of debt and equity in the
13  commercial real estate development market was one
14  of the reasons in a list of reasons why
15  Washington Hill did not go forward.
16     Q.  And what would that list of reasons have
17  been?
18     A.  To go to, for background I guess you
19  might say, I mean, obviously the commercial real
20  estate development market is in a state that it
21  has not been in since the '20s or '30s.  And

Page 20

1  obviously we have had to reassess our entire
2  business model and go back and look at a lot of
3  different things, including everything from cash
4  flow to employment, to which projects we were
5  willing to move forward on, and the stage each of
6  those projects were and factors involved with
7  those projects.  We had an instance here where we
8  felt we still had, and were under advice that we
9  still had contractual rights which we chose to
10  execute.  And we look at the projects that we had
11  and decided which ones could we reasonably move
12  forward on, which ones do we know that we can
13  deliver.  And in the development industry, as far
14  as delivering a project, that does include debt,
15  that does include equity, that does include
16  entitlements, that does include title issues,
17  that does include the cost of money to pursue the
18  project that we loosely refer to as pursuit
19  costs, which can be design services, earnest
20  money, those types of things.
21     We had a seller that already told us he

Page 21

1  was going to fight us over the earnest money if
2  we chose to execute the contractual right that we
3  had, and so we decided at that point that it was
4  time to terminate the project.
5      Q.  You told me there was a list of reasons,
6  and you proceeded to say that you were advised
7  that you had the contractual right to terminate,
8  and I assume that was advice from counsel?
9      A.  As well as my opinion.
10     Q.  As well as your opinion, fine.  My
11  question to you is, what were the reasons why you
12  exercised that contractual right?
13     MR. PRISBE:  Objection.  I think he just
14  answered.
15     A.  I just answered that.
16     Q.  Well, you proceeded to give me sort of a
17  laundry list of every reason under the sun.  I'm
18  asking what in your mind drove the decision that
19  we are going to terminate this contract?
20     MR. PRISBE:  Objection to form and
21  foundation, and I believe it's been asked and

Page 22

1  answered.
2      A. I mean, in my mind I described, and in
3  my opinion the issues involved were basically, in
4  any business you make a decision based off risk
5  and reward, and you look at what do you feel like
6  you could deliver, and this project was not a
7  certain deliver, so to speak. We had a million
8  dollars up at risk that the seller had already
9  told us he was going to fight us over. I'm of
10 the opinion then, as of now, and received counsel
11 then and now that we still maintain the
12 contractual right to terminate this project and
13 receive the earnest money refund. So we made the
14 business decision to terminate the project,
15 recoup the million dollars with the intent of
16 still negotiating with the seller if he was still
17 willing to, to see if there was a project to be
18 had, to be developed.
19     Q. When was the decision made to terminate
20 the contract and recoup the earnest money?
21     A. There was no exact date in my mind that

Page 23

1  I recall. There had been discussion about
2  terminating probably since the beginning of the
3  latter part of the fourth quarter of last year.
4      Q. So in the November-December time frame?
5      A. Right. And then I called Gary in
6  December, I don't know the exact date, and
7  instructed him to terminate the contract.
8      Q. Do you know when in December?
9      A. No.
10     Q. Now, was this a decision by you or a
11 decision by the board?
12     A. It was a decision that was discussed
13 within the executive group. I was of the opinion
14 that we needed to do it. I received concurrence
15 from others and so I called Gary.
16     Q. And you gave him instructions to
17 terminate in December?
18     A. Correct.
19     Q. Do you know when he did in fact
20 terminate?
21     A. He went and met with, can I call him

Page 24

1  Dave?
2      Q. Sure, if you're willing to.
3      A. He met with Dave in late December and
4  relayed that news that there was an intent to
5  terminate. He did not terminate the contract as
6  he had been told to. He started having some
7  discussions I think with, or I know with Bay,
8  about trying, instead of terminating,
9  renegotiating the entire basic purchase
10 structure, and so the termination didn't happen.
11     Q. Do you know why Gary did not follow your
12 instructions?
13     A. No.
14     Q. Were you aware of it at that time, in
15 late December, early January, were you aware that
16 Gary had not followed your instructions to
17 terminate the contract?
18         MR. PRISBE: Objection to form to the
19 extent it's vague. You can answer.
20     A. Yes.
21     Q. Did you talk with him about that?

Page 25

1      A. Yes.
2      Q. And what was said in that discussion?
3      A. I don't recall the exact words
4  obviously, but I think the general nature of it
5  was that he was doing what any good development
6  guy would, he was fighting to save his project,
7  and so he was wanting to say let's not terminate,
8  let's go back and try to restructure something
9  that would be agreeable to both parties, and
10 that's what was proceeded with.
11     Q. Did he relay to you what his discussion
12 with Dave Holmes was in late December?
13     A. No.
14     Q. Do you have any personal knowledge
15 sitting here today as to exactly what he told
16 Dave Holmes in that discussion?
17     A. I was not present at the meeting
18 obviously.
19     Q. Did you ever get a report from anybody
20 as to what Dave Holmes was told in that December
21 time frame?