EXHIBIT B

```
        IN THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MARYLAND

JLB REALTY,               *

          Plaintiff       *

    vs.                   *

CAPITAL DEVELOPMENT, LLC, *   CASE NUMBER:

        Defendant         *   1:09-CV-00632-BEL

                          *
```

- - - - - - - - -

Deposition of GARY PLICHTA, taken on Tuesday, October 6, 2009, beginning at 10:00 a.m., at Sellman & Hoff, LLC, 201 North Charles Street, Baltimore, Maryland, before Linda Ann Crockett, a Notary Public.

- - - - - - - - -

Reported by:
  Linda A. Crockett

Page 2

1  APPEARANCES:
2
3    JOHN T. PRISBE, ESQUIRE
4    Venable, LLP
5    750 East Pratt Street
6    Suite 900
7    Baltimore, Maryland 21202
8    (410) 244-7798
9       On behalf of the Plaintiff
10
11   ALAN J. HOFF, ESQUIRE
12   Sellman & Hoff, LLC
13   201 North Charles Street
14   Suite 1331
15   Baltimore, Maryland 21201
16   (410) 659-0070
17      On behalf of the Defendant
18
19 Also Present:  Dave Holmes
20                Paul R. Johnston
21

Page 3

1        THE PROCEEDINGS
2        - - - - - - - - - - - - -
3          STIPULATIONS
4  It is stipulated and agreed by and between
5  counsel for the respective parties that the
6  reading and signing of this deposition by the
7  witness is hereby waived.
8        - - - - - - - - - - - - -
9          GARY PLICHTA,
10 first duly sworn to tell the truth, the whole
11 truth, and nothing but the truth, testified as
12 follows:
13     EXAMINATION BY MR. HOFF:
14     Q. Mr. Plichta, welcome.  Glad you made it.
15     A. Glad to be here.
16     Q. Ever been in a deposition before?
17     A. I have.
18     Q. Let me back up.  Spell your last name.
19     A. P-L-I-C-H-T-A.
20     Q. And Gary is your first name?
21     A. Correct.

Page 4

1     Q. Middle name?
2     A. Michael.
3     Q. Home address?
4     A. 12428 Mountain Road, Lovettsville,
5  Virginia 20180.
6     Q. Current business address?
7     A. The same.
8     Q. Working for yourself currently?
9     A. That's correct.
10    Q. Name of business?
11    A. Just independent consulting.
12    Q. Do you have it incorporated or set up in
13 LLC?
14    A. I have some LLCs.  One is Phoenix
15 Contractors LLC.
16    Q. Ever been in a deposition before?
17    A. Yes.
18    Q. Are you familiar with the protocol?
19    A. Yes.
20    Q. You understand when I ask questions,
21 answer them, don't nod your head, don't shake

Page 5

1  your head.  Give verbal cues, if possible.  Wait
2  until I'm done with my question.  Answer my
3  question as best you can.  If you don't
4  understand it tell me you don't understand it,
5  and I'll try to rephrase it.
6     A. I will.
7     Q. Educational background?
8     A. Yes.
9     Q. High school, I assume?
10    A. Yes.
11    Q. Graduated what year?
12    A. 1977.
13    Q. From where?
14    A. Taylor Center High School.
15    Q. In?
16    A. Taylor, Michigan.
17    Q. After that?
18    A. University of Michigan, Ann Arbor.
19    Q. BA?
20    A. Ultimately from Michigan State
21 University in 1981.

Page 62

1  housing?
2      A. I want to answer that in two parts.
3      Q. Please do.
4      A. Yes, I believe that he would have done
5  that. But when we got into what the actual
6  impact was going to be, I think even he was
7  surprised about how substantial it could be. So
8  from that perspective I think it was more than --
9  it was more than he thought. So could we have
10 swallowed it? Up until that point in time I
11 absolutely believed him. Subsequent to that
12 point in time I think there was a shadow of doubt
13 in my mind that it was so large, had it gone down
14 that track where the city wanted it to be, that
15 would be a tough thing for him to swallow.
16     Q. The problem with the LDA, as I
17 understand it, and you correct me if I'm wrong,
18 was the fact that it had a density level
19 associated with the project that was not
20 acceptable to JLB?
21     A. It had an adverse financial impact on

Page 63

1  the pro forma that would have diluted the
2  potential net operating income to the point where
3  we could no longer substantiate developing the
4  project. It's not that we were adverse to
5  inclusionary housing as a concept, but it would
6  have an adverse financial impact on this project.
7      Q. I'm only talking about the density
8  provisions of the LDA?
9      A. Oh, initially, yes, going back to the
10 original. In the initial density restrictions on
11 the LDA would prohibit the deal from moving
12 forward.
13     Q. And it's those density issues that, from
14 a financial standpoint, JLB absolutely needed to
15 get out, get rid of?
16     A. We were very clear that that would be an
17 impediment to this development.
18     Q. And you knew also from the beginning
19 that the LDA was going to expire in late June of
20 2009, correct?
21     A. Yes.

Page 64

1      Q. When Paul Johnston gave you the order to
2  terminate the project in late December, do you
3  recall what date that was exactly?
4      A. It was the last week in December. It
5  was after Christmas and prior to New Year's. It
6  was a Monday or Tuesday.
7      Q. So we'll just call it late December.
8  Can you tell me exactly what he said? Can you
9  tell me as best you can recall what he said?
10     A. He called up and said we need you to
11 terminate the contract; we need to get our
12 earnest money back before the end of the year.
13     Q. Do you recall what you said back to him?
14     A. I'm sure it wasn't polite. I don't
15 recall exactly. I probably -- I'm sure I asked
16 him why. I probably registered my disdain and he
17 was an advocate that he told me to do that and so
18 I immediately called Dave and went and saw and
19 sat down with Dave.
20     Q. You say I asked him why. What reasons
21 did he give?

Page 65

1      A. He said they wanted to terminate the
2  contract and they wanted their money in the
3  account before the end of the year.
4      Q. That was all he would say in terms of
5  the reasons why?
6      A. Pretty much. Pretty shocking.
7      Q. Did you say you then called up Dave to
8  arrange a meeting?
9      A. I did.
10     Q. I assume you didn't say anything on the
11 phone to him?
12     A. No.
13     Q. When was that meeting scheduled for?
14     A. I think it was the next day.
15     Q. So still the end of December, December
16 29, 30, somewhere in that range?
17     A. Yes.
18     Q. Did you terminate the contract in that
19 meeting?
20     A. I told him what was told to me. I told
21 him I was here to terminate the contract and get

Page 66

1  the money back.  I recall him saying at least
2  three times I'll fight you over the money.  And
3  we had a long conversation on a variety of
4  different topics, the state of the economy.  But
5  I went and reported back to JLB.
6     Q.  Did you tell him we are terminating or
7  did you tell him we are considering terminating?
8     A.  My recollection is that I prefaced it by
9  saying we need to modify the contract or I'm
10 going to have to terminate the contract today.  I
11 think I also said that Dallas would stay in the
12 deal if we could get $950,000 back and leave
13 50,000 up.
14    Q.  Is that something that Paul Johnston
15 told you?
16    A.  It was either Paul or Bay.  And I'm not
17 sure if it was on the call with Paul, but it was
18 with authority from either Paul or Bay that I got
19 that directive.  I think what -- my recollection
20 is Paul called me and gave me the directive.  I
21 called Bay to register my disdain, offered some

Page 67

1  options, one of which was that they would stay in
2  the deal if I could orchestrate an amendment to
3  the contract with Dave and they would leave in
4  50,000.
5     Q.  Did you tell Dave Holmes in that
6  discussion the reasons for the termination?
7        MR. PRISBE:  Subject to his earlier
8  testimony.  You can answer.
9     A.  I recall having a passionate plea with
10 Dave saying we should stay in the deal; keep this
11 thing together.  I'd be able to bring it home and
12 complete the job, that I was given a directive
13 and I'm here to deliver the message.  I recall
14 telling him that message succinctly.  I was -- he
15 was stunned in receiving the message.  I was
16 stunned in delivering the message.  We talked
17 about the challenges of the economy and the thing
18 that stuck out to me, what I took away from it is
19 he's not going to accept this proposal and he
20 would fight us for this money.  I distinctly
21 remembering him saying those words three times

Page 68

1  because I went back and reported that to JLB.
2     Q.  And that's in connection with the
3  million dollar earnest money?
4     A.  Correct.
5     Q.  Did you tell him why it is that JLB
6  thought they were entitled to the earnest money,
7  or did that topic not come up?
8     A.  I don't know that I offered an
9  entitlement reason because -- I'm trying to
10 recall.  It was -- I think I was an advocate of
11 the position that in order to keep this deal
12 alive we needed to find common ground.  They want
13 their money back; what can we work out.
14    Q.  How long was that discussion?
15    A.  It was an hour, at least.
16    Q.  In his office?
17    A.  In his office.
18    Q.  So you came to Baltimore for that?
19    A.  Absolutely.
20    Q.  Nobody else was present during that
21 meeting?

Page 69

1     A.  No.
2     Q.  And is it fair to say that the bulk of
3  that hour was then devoted to let's figure out a
4  way to make this work?
5     A.  A good portion of that hour was me
6  trying to regain credibility with Dave.
7     Q.  Why?
8     A.  Because once I delivered the message I
9  think that he looked on me and the company in
10 disdain.  And a good portion of the hour was me
11 trying to work out a deal with him that we could
12 keep this thing alive.
13    Q.  You said a good chunk of time was
14 devoted to you regaining credibility?
15    A.  I didn't gain credibility.
16    Q.  I'm not saying did you.  How did you
17 attempt to regain credibility in that discussion?
18    A.  You know, I don't have all the
19 specifics.  And it's hard to, when you deliver a
20 message like this, it's hard.  His trust factor
21 in me diminished to zero.  His trust factor to