UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JLB REALTY, LLC | * | |
| Plaintiff | * | |
| | * | |
| v. | * | CIVIL NO. L-09-632 |
| | * | |
| CAPITAL DEVELOPMENT, LLC | * | |
| Defendant | * | |

*******

MEMORANDUM

This case arises from a real estate deal gone sour.  In June 2008, Plaintiff JLB Realty, LLC ("JLB") contracted to purchase two parcels of land in Baltimore City from Defendant Capital Development, LLC ("Capital").  JLB planned to develop the parcels with rental apartment units and retail space.

During the contract's due diligence and title review period, JLB noted an encumberance on the property.  The encumberance, a Land Disposition Agreement ("LDA") between Baltimore City and a predecessor-in-interest owner of the property, was a material issue for JLB because it limited development to thirty dwelling units per acre.  Accordingly, the parties negotiated and, in August 2008, executed a First Amendment to the contract.  The First Amendment specified that if the City did not release the LDA within forty-five days, JLB had the right to terminate the contract and receive the return of its earnest money.

Capital negotiated with the City but was unable to secure release of the LDA by October 6, 2008, the contractual deadline.  Due to changing economic conditions, in December 2008, JLB advised Capital that the project could not go forward unless it was significantly restructured or reduced in scope.  The parties then entered into negotiations to salvage the deal.

In January 2009, JLB tendered a second amendment to the contract, which Capital rejected.  Capital then tendered a counter-offer, which JLB rejected.  On February 16, 2009, JLB formally terminated the contract and requested the return of its earnest money.  Capital acknowledged that the deal was dead but refused to release the earnest money JLB had deposited.

Seeking return of its earnest money, JLB filed the instant suit on March 13, 2009.  Now pending is JLB's motion for summary judgment.  Docket No. 18.  The Court held a hearing on the motion on February 18, 2010.  For the reasons stated herein, the Court will, by separate Order of even date, GRANT JLB's motion.  The Clerk is DIRECTED to CLOSE the case.

I.      **Background**

The facts are fully set forth in the parties briefs.  The undisputed material facts are as follows.

A.      **The Parties and the Property**

Capital Development, LLC is a real estate investment and development company based in Baltimore, Maryland.  The principals of Capital, David Holmes and Cristina King, are experienced real estate investors who have been involved in many projects in Baltimore City.  P.'s Ex. 6, 16-18, 17-24, 39.

Among Capital's holdings are three contiguous parcels of land in the Washington Hill area of East Baltimore.  This property, which is bounded by Orleans, Baltimore, Washington, and Wolfe streets, is located just south of Johns Hopkins Hospital and just north of the Fells Point neighborhood.  P.'s Ex. 3.  Development of this property is crucial to the revitalization of the corridor between Johns Hopkins and Fells Point.

In 2007, Capital sought to sell the Washington Hill property.  Capital hired a commercial brokerage, CB Richard Ellis, to entertain proposals from national and local developers. Ultimately, Capital accepted a proposal from JLB, a sophisticated real estate development company headquartered in Dallas, Texas.[1]  Gary Plichta, an Executive Vice President, managed JLB's Mid-Atlantic regional office and submitted the proposal, which called for JLB to purchase two parcels of the Washington Hill property.  Capital planned to retain and develop the third parcel.

**B.     The Contract**

On June 13, 2008, JLB and Capital authorized and executed a sales contract for the Washington Hill property.  P.'s Ex. 1.  Both parties were represented by experienced counsel throughout the negotiation and drafting of the contract.[2]  The contract established a base purchase price of $20,400,000.  Id. § 2.  The contract was not contingent on JLB obtaining financing for the property.  It was, however, contingent on the completion of a title review to ensure that Capital had good and marketable title to the property.  Id. § 4.  If JLB discovered a blemish on title during the review period, the contract gave JLB the right to terminate and secure the return of its earnest money.  Id. §§ 4(d), 4(e), 11(b).

---

[1] JLB is one of several partnerships owned and operated by JLB Partners, LP ("JLB Partners"), a sophisticated real estate company.  See JLB Partners, About Us, http://www.jlbpartners.com/AboutUs.aspx.  JLB Partners, which is headquartered in Dallas, Texas, is comprised of two units: a network of "Regional Partners," or offices, which operate in several markets throughout the United States, and a group of "Corporate Partners," which oversee the regional offices' operations.  Together, the Corporate Partners have over fifty years of real estate development experience.
[2] David Tatum, Esq., an experienced real estate attorney with the Texas law firm Geary, Porter & Donovan, P.C., represented JLB.   Barry Greenberg, Esq., an experienced real estate attorney with the Maryland law firm Rosenberg, Martin, Greenberg, LLP, represented Capital.

### C.      The LDA

During the negotiation and drafting of the contract, Capital advised JLB that there was an encumberance on the property.  During the due diligence and title review period, JLB discovered that the encumberance, a Land Disposition Agreement with the City, limited development to not more than thirty dwelling units per acre.  See P.'s Ex. 4.  The LDA was a significant impairment to the project because JLB's plans called for approximately sixty dwelling units per acre.  Accordingly, at the close of the due diligence and title review period, JLB objected to the LDA as an encumberance on title to the property.  See P.'s Ex. 8.

Capital concedes that the LDA was a material issue and that JLB was entitled to terminate the contract at this point.  Nevertheless, the parties sought to keep the deal alive.  Accordingly, on August 21, 2008, they executed a First Amendment to the contract.  The First Amendment gave Capital forty-five days to secure the release of the LDA.  In the event that Capital was unsuccessful, the amendment expressly provided that JLB "shall be entitled to terminate the Contract by written notice to Seller at any time before the Release has been executed and recorded, in which event, the Earnest Money shall be returned to the Purchaser."  P.'s Ex. 2, 2 (emphasis added).

Capital retained Stanley Fine, Esq., an experienced land use attorney, to represent Capital in its dealings with the City.  Fine informed Capital that the City would not release the LDA unless JLB agreed to allocate 6% of the development's rental units for affordable housing.  JLB rejected this condition, and Capital continued to negotiate with the City.  It is undisputed that on October 6, 2008, the date on which the forty-five day period set forth in the First Amendment expired, the LDA had not been released.  It is

also undisputed that, per the First Amendment, JLB obtained the right to terminate the contract.

Nevertheless, Capital continued to negotiate with the City.  By mid-December, Capital and the City had agreed to a "buy-out" of the affirmative housing requirement. The agreement was read aloud and approved at a City Council Land Use Committee hearing on January 28, 2009.  It is undisputed, however, that the Board of Estimates did not finalize or approve the agreement until June 17, 2009.

### D.     Termination

Meanwhile, in December 2008, JLB had determined that it would either exercise the forty-five day termination right or, if the parties could agree, proceed under a revised project plan.  D.'s Ex. 7, 23.  In late December, Plichta explained to Holmes that JLB would continue the project only if Capital agreed to a substantial modification of the original plans.  D.'s Ex. 2, 41.  From that point on, the parties acknowledged that the June 2008 contract was defunct.  They attempted to salvage the deal by negotiating a second amendment that would have split the project into two phases.

JLB tendered a draft second amendment on January 20, 2009.  D.'s Ex. 17.  The draft altered the original contract in several material ways.  It provided that JLB would purchase two 2.7865 acre lots of the Washington Hill property in two separate phases. Id. § 2.  The offer specified that each phase had a separate closing date and financing condition.  Id. §§ 7, 8.[3]

During the period when Capital was evaluating JLB's offer, Plichta explained to Holmes that JLB considered the original contract to be dead.  In an e-mail of January 29,

---

[3] As discussed above, the June 2008 contract had not separated the deal into phases or included a financing requirement.

2009, Plichta explained to Holmes that JLB was offering the revisions "in the hope of keeping the deal alive."  P.'s Ex. 15.  In combination, the e-mail and the proposed Second Amendment advised Holmes that the original business deal embodied in the 2008 contract was no longer viable.

On February 4, 2009, Capital rejected JLB's offer and tendered a counter-offer. JLB rejected the counter-offer and, on February 16, 2009, issued a termination notice.  In response, Capital Development directed the settlement company not to return the earnest money to JLB.  Two days later,  Holmes informed his partner, King, that the original contract was dead and that the deal would not proceed unless JLB accepted Capital's counter-offer:

> JLB is trying to save the deal . . . but I've been stuck on our last offer and nothing more.  JLB has contacted John at CBRE that they really want to save the deal. John has asked me What would it take?  I've told John that I don't trust JLB and that we will stand on our last offer. . . .  I told [Plichta] that we are DONE and that the last offer is still on the table.

P.'s Ex. 19.  To date, the settlement company has held the earnest money in escrow. Seeking return of the earnest money, JLB filed the instant suit on March 13, 2009.

## II.     Discussion

### A.     Standard

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses

from proceeding to trial).  Nevertheless, in determining whether there is a genuine issue of

material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in

the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810

F.2d 1282, 1286 (4th Cir. 1987).

> **B.** **Analysis**

Capital concedes that the language of the First Amendment is clear and

unambiguous.  Capital also concedes that JLB obtained the right to terminate the contract

on October 6, 2008, the date upon which the forty-five day period set forth in the First

Amendment expired.  Nevertheless, Capital contends that JLB is equitably estopped from

enforcing the forty-five day termination clause.  In the alternative, Capital argues that

JLB breached the implied contractual covenants of good faith and fair dealing.

> **1.** **Equitable Estoppel**

Capital's equitable estoppel argument rests on several assertions.  First, that JLB

did not terminate the contract at the expiration of the forty-five day period.  Second, that

Capital, in reliance on JLB's assurances, incurred expenses that it would not have

incurred otherwise, including an obligation to pay the City to waive the affordable

housing requirement.  Third, that JLB did not exercise the forty-five day termination right

until February 2009, after market conditions had made JLB's participation in the project

all but impossible.

It is unlikely that Capital could satisfy the elements of equitable estoppel in a

commercial setting such as this one.  The parties are sophisticated real estate investors

and developers.  They were represented by experienced counsel throughout the

transaction at issue.  At the critical stages, the parties took care to set out their rights and

obligations in writing.  Nevertheless, the Court will analyze Capital's equitable estoppel argument.

The three elements of equitable estoppel under Maryland law are: (1) voluntary conduct or a representation by the party to be stopped, (2) reliance by the estopping party, and (3) detriment to the estopping party.  See, e.g., Bessette v. Weitz, 148 Md. App. 215, 241 (2002).  Whether an estoppel exists is a question of fact to be determined in each case.  Gould v. Transmerican Associates, 224 Md. 285, 297 (1961).  Although wrongful or unconscionable conduct is generally an element of estoppel, an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other.  Bean v. Steuart Petroleum, 244 Md. 459 (1966).  The party who relies on an estoppel has the burden of proving the facts that create it.  Doub v. Mason, 2 Md. 380, 406 (1852).

As early as December 2008, JLB advised Capital that the original contract was dead.  Further, JLB advised Capital that the continuation of the project was expressly contingent on the creation of a new and substantially revised deal.  JLB tendered a draft second amendment that split the project into two phases, changed the property to be purchased and the price, and added a financing condition.  Capital understood this draft to be a new offer, rejected it, and tendered a counter-offer.  When JLB rejected Capital's counter-offer, Capital refused to continue negotiating with JLB.  Given these facts, no reasonable jury could conclude either that Capital, in January and early February 2009,

considered the original deal to be in full force and effect, or that JLB intended to pursue

the deal as laid out in the initial contract.[4]

Further, Capital has grossly overestimated the extent of its detriment.  Capital argues that

it incurred a detriment because it agreed to pay the City over $400,000 to release the LDA

without the affordable housing requirement.  The timing of this transaction, however,

undermines Capital's argument.

JLB terminated the contract on February 16, 2009.  Upon receiving the termination

notice, Capital could have stopped negotiating with the City.  Nevertheless, Capital continued to

negotiate with the City, believing that removing the affordable housing requirement was in its

best interest.  Cf. P.'s Reply Ex. F, Jan. 19, 2009 e-mail from King to Holmes ("The bottom line.

That we get more money for the units without the 6% encumbrance.  So it is a win win situation

for us if we pay to make it go away.").  Capital did not obligate itself to the buy-out until June

17, 2009, some four months after JLB terminated the deal.

## 2.     Implied Covenants of Good Faith and Fair Dealing

Capital also argues that JLB breached the implied contractual covenant of good faith and

fair dealing.  Maryland courts have stated that "in every contract there exists an implied covenant

that each of the parties thereto will act in good faith and deal fairly with the others."  Food Fair

Stores, Inc. v. Blumberg, 234 Md. 521, 534 (1964).  Capital argues that JLB breached this

obligation by using the LDA as a pretense to terminate at "the last possible minute."  D.'s Opp.

20.

There are several rebuttals to this argument.  First, no breach of the implied duty of good

---

[4] See Dahl v. Brunswick, 277 Md. 471, 487 (1976) ("[T]he party claiming the benefit of the
estoppels must have been misled to his injury . . . having believed and relied upon the
representations of the party sought to be estopped.").

faith or fair dealing can occur where the matter is covered by an express contract clause.  The Seventh Circuit has explained that "[a]lthough courts refer to the obligation of good faith that exists in every contractual relation, that is not an invitation to the court to decide whether a party ought to have exercised privileges expressly conferred in the document."  <u>Kham and Nate's Shores No. 22 v. First Bank of Whitney</u>, 908 F.2d 1351 (7th Cir. 1990).  Here, it is undisputed that the First Amendment to the contract gave JLB the right to terminate the contract if the LDA had not been released within forty-five days.

Second, as stated above, JLB advised Capital that the original deal was defunct.  At no time after the expiration of the forty-five day period did JLB ever represent to Capital that it intended to waive the termination right and proceed with the original deal.  Given these facts, JLB did not breach any implied contractual covenants.

**III.    Conclusion**

For the reasons stated herein, the Court will, by separate Order of even date, GRANT JLB's Motion (Docket No. 18).  The Clerk is DIRECTED to CLOSE the case.


_____/s/_____
Benson Everett Legg
United States District Judge